# Exhibit A

PUBLIC VERSION

███████████████████████████

████████████████████████████

### UNITED STATES INTERNATIONAL TRADE COMMISSION
**Washington, DC**

**Before the Honorable Cameron R. Elliot**
**Administrative Law Judge**

| | |
|---|---|
| In the Matter of<br><br>**CERTAIN LITHIUM ION BATTERIES,<br>BATTERY CELLS, BATTERY MODULES,<br>BATTERY PACKS, COMPONENTS<br>THEREOF, AND PROCESSES<br>THEREFOR** | **Investigation No. 337-TA-1159** |

### COMMISSION INVESTIGATIVE STAFF'S SUPPLEMENTAL BRIEFING IN CONNECTION WITH MOTION DKT. NO. 1159-013 AND ORDER NO. 28

On November 5, 2019, Complainants LG Chem Ltd. and LG Chem Michigan Inc.

(collectively, "Complainants" or "LGC") filed a motion seeking a default judgment against

Respondents SK Innovation Co., Ltd. and SK Battery America, Inc. (collectively, "Respondents"

or "SKI") as a sanction for SKI's widespread spoliation of evidence and failures to comply with

Order No. 13 (Oct. 3, 2019) requiring forensic discovery.   *See* EDIS Doc. ID No. 693365

("Motion").[1]   On November 15, 2019, Complainants filed a notice of supplemental evidence.

*See* EDIS Doc. 694668 ("LGC's Suppl. Evidence").   On November 15, 2019, the Commission

Investigative Staff ("Staff") also filed a response supporting LGC's Motion and the sanction of

default.   *See* EDIS Doc. ID No. 694648 ("Staff's Response").

On November 20, 2019, Respondents filed an opposition to LGC's Motion that argues

that SKI's document destruction only warrants an adverse determination "that SKI had in its

---

[1] In the alternative, Complainants requested at least a determination that LGC owns protectable
trade secrets and that SKI has misappropriated and used those trade secrets to produce their
accused products and components.   *See* Motion. at 2, 67.

possession certain information now alleged to be [LGC's] trade secrets."   EDIS Doc. ID No. 695146 at 73 ("SKI's Opposition").   On November 26, 2019, Complainants moved for leave for a reply brief in support of their Motion.   *See* EDIS Doc. ID No. 695643 ("LGC's Reply").   Leave was granted for LGC's Reply.   *See* Order No. 28 (Nov. 27, 2019).

In Order No. 28 (November 27, 2019), the Administrative Law Judge ("ALJ") ordered that the parties should each provide supplemental reply briefs in connection with the Motion. *See id.* at 2.   While it is permissible for the parties to discuss any topic in the supplemental briefing, the ALJ expressly asked the parties to respond to ten (10) questions.   *See id.* at 2-3. Order No. 28 also provides that "[t]he parties may file additional evidence as needed."   *Id.* at 2.

Pursuant to Order No. 28, the Staff respectfully submits this supplemental briefing.   To the extent certain questions are primarily directed to one of the private parties, the Staff has endeavored to identify evidence that it believes may be relevant to the ALJ's consideration of the issues identified in those questions.   However, for the reasons set forth in the Staff's Response and as explained below, the Staff continues to maintain that a default judgment finding a violation of Section 337 is the appropriate sanction for SKI's failure to fully comply with Order No. 13 (Oct. 3, 2019), in view of SKI's spoliation of evidence throughout its electric vehicle ("EV") battery business.

## I.      GENERAL

In the Staff's view, Respondents' opposition disregards the ==systemic and widespread effort to destroy evidence across its entire EV battery business.==   The extent of SKI's efforts in this regard appear to the Staff to be of a larger magnitude than compared to other Section 337 trade secret misappropriation-based investigations in which a default finding a violation of Section 337 was the result.   *Contra* SKI Opp. at X (arguing SKI's "conduct here is of a different

type and magnitude" than in *Certain Stainless Steel Products* and *Certain Opaque Polymers*). Because SKI's comprehensive and, in many regards, successful efforts to destroy or alter relevant evidence raise significant questions regarding the integrity of all of the discovery taken from SKI in this investigation, the likelihood that LG and the Staff can access the issues on their merits, or that the ALJ and Commission can render a full determination on the actual merits of the issues, is highly unlikely.

While perhaps a closer question, the Staff also believes that SKI acted in bad faith in responding to Order No. 13, particularly when those acts are viewed in light of SKI's conduct shortly before the filing of the Complaint in this investigation, and even after the issuance of a "litigation hold" related to the investigation.   *See Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1328-29 (Fed. Cir. 2011) ("The fundamental element of bad faith spoliation is advantage-seeking behavior by the party with superior access to information necessary for the proper administration of justice.").   In this regard, SKI's proposed sanction is too narrowly crafted to deter others from engaging in similar behavior in Section 337 investigations, which undercuts the integrity of evidentiary proceedings.   *See Certain Stainless Steel Prods., Certain Processes for Manufacturing or Relating to Same, and Certain Prods. Containing Same*, Inv. No. 337-TA-933, Comm'n Op. at 21 (June 9, 2016) ("a sanction of default is necessary to deter similar spoliation of evidence and discovery order violations and to protect the integrity of judicial proceedings"); *accord Certain Opaque Polymers*, Inv. No. 337-TA-883, Order No. 27 at 18 (Oct. 20, 2014) (sanctions should be appropriately crafted to deter future spoliation by others).   While an undeniably serious measure, the Staff submits that SKI's actions after the issuance of Order No. 13, particularly in view of SKI's conduct both on the eve of and since the inception of this investigation, warrants a sanction of default.

## II.    SPECIFIC QUESTIONS ASKED BY THE ALJ

### A.   What evidence supports SKI's contention that the use of LG Chem-related search terms as the basis for SK00066125, and related spreadsheets, ██████████ Relatedly, when such documents were located/identified, why was the proper response to delete the documents rather than find out more about the ██████ ██████████

To the Staff's understanding, which is based on the deposition testimony of relevant SKI employees, SKI's creation of SK00066125 and related spreadsheets was not based on concerns about a transfer of information from SKI to LG Chem in the year prior.   It is not clear to the Staff why (as described below) SKI previously alleged that its ████████████████████ ██████████ and use of LG-related search terms was due to ██████████████████████ ██████████████████████. For background, as part of its October 1, 2019 opposition to LGC's motion for forensic discovery, SKI submitted an October 1, 2019 declaration from ██████████████.[2]  *See* EDIS Doc. ID No. 689925 (Oct. 1, 2019). Paragraph 16 of ██████████ declaration stated:



Ex. 8 to SKI Opp. (10/1/19 ██████ Decl.) at ¶ 16 (emphasis added).

However, ██████████ testimony at his October 28-29, 2019 deposition arguably contradicts the statement made in the foregoing declaration.  ██████████ testified that he learned

---

[2] ██████████████████████████████████████████ *See* Ex. 8 to SKI Opp. (10/1/19 ██████ Decl.) at ¶ 1.



about the details of ▮▮▮▮▮▮▮▮ (referenced in paragraph 16) secondhand from ▮▮

▮▮▮▮▮▮▮▮▮▮▮▮ *See* Staff Ex. 1 (10/29/19 ▮▮ Dep. Tr.) at 296:14-17 (Q:

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮

▮▮▮▮▮▮, 302:4-8 ▮▮▮▮▮▮▮▮

▮▮ ▮▮▮▮ ▮▮▮▮▮▮▮▮

▮▮▮▮▮ ▮▮▮ further testified:

    Q:  ▮▮▮▮▮▮▮▮▮▮▮▮
        ▮▮▮▮▮▮

    A:  ▮▮▮▮▮▮▮▮▮▮▮▮▮
        ▮▮▮▮▮▮▮▮▮▮▮
        ▮▮▮▮▮▮▮▮▮▮▮
        ▮▮▮▮▮

*See id.* at 296:5-13, 295:7-10 ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ ▮▮ ▮▮▮▮▮▮▮▮ 297:17-

298:2 ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮

During his deposition, ▮▮▮▮ also acknowledged that SKI's April 2019 "document

security inspection" was ▮▮▮▮▮▮▮▮

    Q:  ▮▮▮▮▮▮▮▮▮▮▮▮
        ▮▮▮▮▮▮

    A:  ▮▮▮▮▮▮▮▮▮▮▮▮
        ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮
        ▮▮[3]

---

[3] ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

*Q:* ███████████████████████████████
██████████████

*A:* █████████████████████████████
███████████████████████████████
██████████████

*Q:* ████████████████████████████
██████████████████

*A:* ███ █ ██████████████████████████
███████████████████

*See* Staff Ex. 1 (10/29/19 ██████ Dep. Tr.) at 300:5-301:2.   Aside from █████████ declaration,

the Staff is unaware of any credible evidence that SKI information was improperly transferred to,

or misappropriated by, LGC at any time.[4]

**B. If LG Chem-related documents were searched for and deleted in a routine way to prevent ████████████ what is the nature of such ████████████ and how have filename changes prevented such ████████████? Reference to prior ████████████ might be helpful.**

In the Staff's view, SKI's description of documents that could be ████████████

████████████████████████████ merely a euphemism for LGC-

related documents that could be problematic for SKI in legal disputes with its competitor.   *See,*

*e.g.*, Ex. 3 to Motion (SK00968270) (████████████████████████████

████████████████████████ ██████████████

████████████████████████████); *see*

*also* Ex. 1 to Motion (SK00969443) (████████████████████

████████████████████████████████

██████████████ █ █████████████████████

███████.   The term ████████████████████████

---

[4] If there is a report from SKI's ████████████, the Staff has never seen it.

██████████████████████████

6



███████████████████████████████████. For example, ██

██████████████████████████████████████

████████████████████ *See* Ex. 8(B) to SKI's Opp. at § L2 █████████

████████████████████████████████████████

███████████████████████████████. Accordingly, the term was used by

SKI to refer to potentially incriminating documents.

However, during the ████████████████████████████

████████████████████████████████████████

███████████████████████████. *See, e.g.*, Staff Ex. 2 (SK00969443)

(4/21/19 email from █████ to ███████████ with attachment titled █████████

███████████████████████████████

███████████, Staff Ex. 3 (SK00969418) ████████████████

████████████████████████████████

████████████████████████████████. What

occurred in April 2019 was neither the first nor the only deletion and document relocation effort

by SKI employees.  *See* Motion at 14-15.    However, the Staff believes that ==SKI's efforts in==

==April 2019 to delete all LGC-related documents across their battery business that could be==

█████████████ ==was not a routine business practice, but instead a calculated effort to destroy==

==known potentially incriminating evidence in advance of anticipated future litigation with== ██

███████████

**C.  What efforts, if any, did SKI undertake to identify documents responsive to discovery requests that were known to have undergone filename changes?**

To the Staff's knowledge, SKI has not made any concerted effort to identify and produce

responsive documents that were renamed as part of the April 2019 "document security

inspection."   In fact, in SKI's Opposition, SKI attempts to argue that file renaming was limited

to both a small number of documents and ███████████████████.   *See* SKI Opp. at 11

(claiming ████████████████████████████████████████

███████████████.   This is incorrect.   *See* Ex. 95 to LGC's Suppl. Evidence, EDIS

Doc. ID No. 694668 (SK01221033) ██████████████████████

███████████████████████████████████████   ████

████████████████████████   ███████████████

████████████████████████████████████████

███████████████   The available evidence shows that, as part of the April 2019

"document security inspection," ████████████████████████

███████████████████████████████████████

███████████████████████████████████

███████████████   *See id.; cf.* Ex. 1 to Motion (SK00969443) (email with similar instruction

sent to entire ████████████████).

**D.**   **What is SKI's response to LG Chem's assertion that SKI's ████████████**
**██████████████████████ would have acted to prevent**
**any loss of documents mentioned in SK00066125, or related spreadsheets, if SKI**
**had put in place a proper litigation hold between April 30 and May 12?**

To the Staff's understanding, if SKI had put in place a proper litigation hold, then

relevant documents placed in recycle bins likely could have been recovered and produced in this

investigation.   This did not occur.

According to ███████████ October 1, 2019 declaration, SKI's ██████████████████

████████████   *See* Ex. 8 to SKI's Opp. (██████ Decl.) at ¶ 13.   ███████████████████

██████████████████████████████████   *See* Ex. 60 to Motion (██████ Dep.)

at 281:4-282:4 (Q: ██████████████████████████████████

████████████████████████████



*See* Ex. 8 to SKI's Opp. (███ Decl.) at ¶ 13. ████████████████████ *Id.* ████████

SKI's ████████████████████. *See* Ex. 8(A) to SKI's Opp.   Based on the available evidence, the deletions by SKI employees appear to have occurred in earnest on or about ████████████████████ . *See generally* Ex. 95 to LGC's Suppl. Evidence, EDIS Doc. ID No. 694668 (SK01221033) (████████████████); Ex. 3 to Motion (SK00968270) (████████████████████).

Accordingly, because the Recycle Bins are set to retain documents for 30 days, there may still have been a sizeable number of documents that SKI's employees had recently deleted in April 2019 still present in the Recycle Bins in May 2019, after the litigation was filed.   If so, this means any such documents that were deleted by SKI's employees but passed through the Recycle Bins would not have actually been destroyed until they were all purged by the system during the month after this litigation was filed.

When asked about this during his deposition, ████████████████████ . *See* Staff Ex. 1 (███ Dep. Tr.) at 287:9-14 (████████████ ████████████████████) However, despite the "litigation hold" related to the Complaint in this investigation, SKI's obligation to preserve documents, and the large number of people at SKI who were involved and aware of

SKI's April 2019 document destruction efforts, apparently no one at SKI ever thought about the documents that might still exist in the Recycle Binds or recent ███████████████ during SKI's electronic discovery preservation work in ████████.

The failure to preserve documents in Recycle Binds is also not the only deficiency with respect to SKI's preservation efforts related to documents in the ████████████████████ ████. *See* Staff Ex. 1 (██████ Dep. Tr.) at 217:21-218:9 (██████████████████████ ████████████████████████████). Microsoft SharePoint is widely used, and Microsoft offers a number of e-discovery preservation tools. For example, with SharePoint, you can "apply an in-place hold to a site." *See* Staff Ex. 4 (Microsoft.com, "eDiscovery and in-place holds in SharePoint Server," available at: docs.microsoft.com/en-us/sharepoint/governance/ediscovery-and-in-place-holds-in-sharepoint-server (last visited Dec. 6, 2019)). On SharePoint, an in-place hold means that, when a user modifies or deletes a document, a copy of the original document will be preserved to an administrator-level preservation hold folder or library. *See id.* This feature has been available for SharePoint since 2013. *See id.* However, despite the widespread availability of these types of features, SKI did not take any meaningful technical steps to use such tools to preserve documents in the SKI ████████████████████. *See* Staff Ex. 1 (██████ Dep. Tr.) at 279:28-281:8, 332:2-333:11; *see also* Ex. 60 to Motion (██████ Dep. Tr.) at 142:10-13 (██████████████████ ████████████████████████████████████████ ████████████████████████).

SKI's various assertions that their litigation hold notices alone should be enough to ensure that documents have not, during the course of this litigation, been deleted and/or modified in the ██████████████ has also been proven substantially untrue. *See, e.g.*, Staff Ex. 1



(██████ Dep. Tr.) at 217:12-29 (Q: ████████████████████████████████

███████████████████████████████████    █████████████████████████

████████  ██████████  ███████████████████████  ████████

████████████████████████████████████████████████████

███████████████████████████); Ex. 8 to SKI Opp. (██████ Decl.) at ¶ 30

████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████).   Recently, SKI produced ████████

existing team room documents (meaning these documents were not ever deleted as part of the

April 2019 exercise) in response to Order No. 15 (Oct. 15, 2019); the Staff understands that these

documents were recovered and produced by SKI from █████████████████.   *See* Staff Ex. 5

(11/21/19 email from M. Plimack), Staff Ex. 6 (████████████████████████████████

████).   This indicates SKI employees are continuing to delete at least some documents in the

█████████████████████████ even now long after the "litigation hold" was put in place.

**E.    When did SKI realize that, due to the vast number of documents ordered to be produced under Order No. 13, compliance with the deadlines contained in Order No. 13 was impossible?**

In the Staff's view, SKI should have known immediately that it could not comply with

Order No. 13 within the seven (7) business-day time period during which the forensic work was

ordered to occur.   *See* Order No. 13 (Oct. 3, 2019) at 4-5.   ██████████ and others at SKI have

always known the true scope of the "document security inspection" and corresponding document

deletion exercise that SKI conducted last April 2019.   As part of SKI's opposition to forensic

discovery, ██████████ himself submitted a declaration that omitted reference to the ██

▮▮▮▮ that were similar to SK00066125.   *See* Ex. 8 to SKI Opp. (10/1/19 ▮▮▮ Decl.).[5]

Upon receipt of Order No. 13 or shortly thereafter, the Staff is of the view that SKI could have gone back to the ALJ on or about Monday October 7, 2019 for clarification and/or re-consideration in view of the other spreadsheets and the magnitude of document deletion that had occurred.   They failed to do so.

**F.  On what grounds did SKI and/or Mr. Garcia believe that Mr. Bolanos acted as a representative for LG Chem in terms of defining the appropriate scope of work required by Order No. 13?**

The Staff cannot address whether SKI and/or Mr. Arnold Garcia believed that Mr. Axel Bolanos acted as a representative for LG Chem in terms of defining the appropriate scope of work required by Order No. 13.   However, to the Staff's understanding, it was concerns reported by Mr. Bolanos to LGC's counsel that led counsel for both parties and the Staff to hold an approximately twenty minute conference call at 6 p.m. on October 9, 2019 (7 a.m. October 10, 2019 in Seoul, Korea) to expressly confirm that SKI understood that Order No. 13 was not limited to the SKI00066125 spreadsheet.

**G.  Why did Mr. Bolanos not mention the licensing issue with the Nuix software in his October 21, 2019 declaration?**

The Staff cannot specifically address why Mr. Bolanos did not mention the licensing issue with the Nuix software in his October 21, 2019 declaration.   However, according to Mr. Arnold Garcia's November 19, 2019 declaration, Mr. Bolanos left on his previously-scheduled flight on Saturday October 12, 2019 believing that there was nothing left to do other than the final Nuix data processing (because Mr. Garcia had run into a last-minute issue with his Nuix software license).   *See* Ex. 17 (11/19/19 Garcia Decl.) to SKI's Opp. at ¶ 20 (stating, "At this

---

[5]  SKI's outside counsel has also been aware of the SK00066125 spreadsheet since at least early September 2019.   *See* Complainants' Letter to ALJ Elliot Regarding Discovery Deficiencies, EDIS Doc. ID No. 687898 (Sept. 11, 2019).

time I was not aware that I would need to conduct additional interviews.").[6]

**H. How many of the ▆ former LG Chem employees that SKI admits hiring had previously worked specifically on electric car batteries while at LG Chem?**

To the Staff's knowledge, there are actually ▆ LG Chem employees who were hired by SKI.  *See* Staff Ex. 7 (SKI's Third Suppl. Response to Interrogatory No. 4 – listing these employees by name).



(*See* 12/6/19 ▆ Decl., attached to LGC's Suppl. Response).   Additionally, there is evidence that at least some of these former LGC employees were subject to non-competes.  *See* Staff. Ex. 8 (LGCHEM000007814); *see also* Staff Ex. 9 (LGCHEM000007476), Staff Ex. 10 (LGCHEM000007589).   There is evidence that a number of former LGC employees ▆

▆.  *See* Staff Ex. 11 (▆ Dep. Tr.) at 90:9-95:20; Staff Ex. 12 (▆ Dep. Tr. at 31:5-19); *see also* Staff Ex. 13 (LGCHEM000007533); Staff Ex. 14 (LGCHEM000007480).

**I. What is the connection, if any, between the documents recovered so far and the following legal issues:**

**1)  Injury or threat of injury to LG Chem's domestic industry?**
**2)  Importation?**
**3)  Any affirmative defenses asserted by Respondents?**
**4)  Remedy, including bond?**

Importantly, the documents recovered by the narrow forensic examination that SKI had

---

[6] In the Staff's view, the timeline for this and the additional interviews and work that was done by Mr. Garcia without Mr. Bolanos present (after SKI's information security team provided new information on October 14, 2019 concerning the additional Messenger-I/Nate on Biz and networked attached security ("NAS") data sources) is laid out more clearly in Mr. Garcia's November 19, 2019 declaration which was first attached to SKI's Opposition than it was in Mr. Garcia's final report of October 17, 2019.   *Compare* Ex. 19 to SKI's Opp. (11/19/19 Garcia Decl.) *with* Ex. 20 to SKI's Opposition (10/17/19 Garcia Decl.); *see also* EX. 13 to SKI Opp. (10/20/19 S. Sobin email, stating SKI IT staff "reported to Mr. Garcia on Monday morning 10/14 that there were two more systems that might be relevant to the forensic process").

Mr. Garcia conduct are all limited to ████████████.  SKI's ███████████ █ (which corresponds to the SK0006125 spreadsheet and team room) is only responsible for ██████████████████████████████.  *See* Staff Ex. 15 (██████ Dep. Tr.) at 102:11-15 (████████████████████████████████████████████████). Therefore, the SK0006125 documents recovered for ████████████████ are mostly irrelevant to the ██████████ issues of importation, injury, or threat of injury, remedy, and bond.   To the Staff's knowledge, SKI has not done any meaningful forensic work to recover documents from either ██████████████████, which has responsibility for ███ ████████ or the █████████████████.  In stark contrast to ██████████████████ █, at least these two groups would appear to have at least some responsibility for matters that would be relevant to the ALJ's, and the Commission's, consideration of injury and/or threat of injury.

With respect to the other productions of documents made from SKI's team rooms, SKI searched document titles for LG-related search terms.   SKI's information security department is also understood to have separately conducted its own file-by-file investigation of the documents listed in the ████████████ other than SK00066125 to attempt to locate and recover copies of documents that may have been deleted in one team room but may not have been deleted from all team rooms.[7]   However, the documents that have been produced from team rooms by SKI cannot, of course, be weight against, or in the context of, the information once contained in the now-deleted documents.

---

[7] It is still unclear to the Staff as to precisely what the purpose or added value for this additional internal SKI team room-related discovery is.   It may be an effort by SKI to try to obtain a count on the number of spreadsheet-listed documents that were not deleted.   As the Staff understands it, ██████████████████████████████████████████████████████.

Furhermore, ▇▇▇▇▇ spreadsheets were only intended to serve as guidance for SKI's employees in inspecting for and removing incriminating materials.   *See, e.g.*, Staff Ex. 1 (▇▇ Dep. Tr.) at 307:20-308:13.   While relevant documents might not have been deleted by SKI in April 2019, it also follows that many of the spreadsheet-listed documents that still exist in the team rooms are the subset of materials that SKI employees reviewed and determined were not sufficiently incriminating so as to require deletion during the April 2019 "document security inspection" process.   Ultimately, it is difficult for the Staff to conclude that SKI has not destroyed documents that may have been, and in fact given the instructions issued by SKI, were likely to have been, relevant to the issues listed in this question.

**J.   What documentary evidence, if any, does LG Chem assert Respondents should have produced, but did not because of spoliation, that is relevant to these same legal issues, that is:**

      **1)   Injury or threat of injury to LG Chem's domestic industry?**
      **2)   Importation?**
      **3)   Any affirmative defenses asserted by Respondents?**
      **4)   Remedy, including bond?**

If this investigation proceeds to an evidentiary hearing on the merits, all of the disputed issues that depend on production from Respondents would, presumptively, be decided on an incomplete record.   Complainants would be correspondingly deprived of the full measure of evidence that they otherwise would have had absent Respondents' spoliation of evidence.

In the Staff's view, one problem with many of Respondents' defenses is that they hinge on evidence that was likely to have been destroyed, or is at least not found in the discovery process.   For example, with respect to **injury**, it is reasonably clear that SKI is seeking to sell EV battery products that compete with LGC's products in the same basic channels and in direct competition with LGC in the U.S.   But many of the details of SKI's future plans and product and pricing strategies are likely missing.   SKI argues that there is no threat of injury because ▇

██████████████████████████████████████████████████ SKI Opp. at 5.
However, it is impossible to know that any documentation that would have otherwise been available to LGC to disprove this argument has not been deleted, or otherwise not produced, by SKI.

Similarly, with respect to **importation**, there is evidence that ████████████████ ██████████████████████████████████████████. *See* Staff Ex. 16 (████ ██████████). The Staff also understands SKI has recently admitted that it has ████████ ████████████████████████████████ and ████████ battery products. ██

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

*See* Ex. 17 (11/22/19 email from SKI's counsel N. Subhedar indicating SKI has ████████ ████████████████████████████████████████
████████████████████). Even then, the importation of batteries for testing or qualification purposes, even in very limited amounts, might be significant to SKI's business plans.

There are also significant evidentiary issues associated with Respondents' **affirmative defenses** and the known scope of SKI's document deletion efforts.  For example, Respondents argue that Complainants have taken inadequate measures to protect their asserted trade secrets. But it would be unfair to Complainants and the Staff to assess this issue in a vacuum, or for the ALJ and Commission to make determinations, with only a partial record of how Respondents themselves acquired Complainants' asserted trade secrets and the measures Respondents took to circumvent Complainants' protective measures.  This evidence is within the scope of the business-wide destruction of documents by SKI.

Similarly, Respondents may argue that they are not using certain asserted LGC trade secrets.   However, due to SKI's business-wide document destruction, the ALJ will not have the evidence necessary to determine to a certainty that Respondents did not use LGC information as a basis for developing their current products.   Nor, even in instances where SKI might in fact use different manufacturing steps from LGC's trade secrets, will the ALJ have a sufficient record to determine Respondents did not nonetheless derive their manufacturing steps from trade secrets misappropriated from Complainants.

Finally, Respondents may argue that certain of LGC's asserted trade secrets are in the possession of third party suppliers or otherwise public information.   But these types of claims that trade secret information is publicly known may also be difficult to evaluate, because if Respondents first misappropriated the trade secret information, but they themselves made the information public (by sharing it with a supplier etc.), such evidence may also have been deleted.

Absent adverse evidentiary inferences, there is an undeniable risk that SKI's systemic deletion of information (and the evidentiary gaps created by it relating to injury or threat of injury, importation, affirmative defenses, and even remedy and bond) will raise significant concerns about nearly any determination made on the merits.   Indeed, if Respondents are allowed to present these defenses, the deletion of documents will affect the Staff and LGC's ability to question, and impeach, SKI witnesses on the merits.

With respect to **remedy**, even if there is a sanction of default, the Commission is still likely to entertain and take evidence with respect to issues of remedy and the public interest. However, adequate evidence to assess the price differential between LGC's and SKI's products for a bond determine does not appear to be available.   In this situation, where SKI is believed to have deleted or otherwise obscured its pricing information from discovery, it may be appropriate

to set a bond at 100% of the entered value of the accused product.   *See, e.g.*, *Certain Arrowheads with Deploying Blades and Components Thereof and Packaging Therefor*, Inv. No. 337-TA-977, Comm'n Op. at 24 (April 28, 2017) ("The Commission has traditionally set a bond of 100 percent of the entered value of the products under these circumstances."); *Certain Digital Photo Frames and Image Display Devices and Components Thereof*, Inv. No. 337-TA-807, Comm'n Op. at 17-18 (March 27, 2013) (setting bond in amount of 100% of the entered value of defaulting respondents' products).[8]

## III.   CONCLUSION

Based on its present understanding of the facts, the Staff respectfully submits that the Motion and request for default judgment should be granted.

Dated: December 6, 2019

Respectfully submitted,

___/s/ Claire K. Comfort___
Margaret D. Macdonald, Director
Jeffrey T. Hsu, Supervisory Attorney
Claire K. Comfort, Investigative Attorney
**OFFICE OF UNFAIR IMPORT INVESTIGATIONS**
U.S. International Trade Commission
500 E Street SW, Suite 401
Washington, DC 20436
202-205-2160
202-205-2158 (facsimile)

---

[8] To the extent that the ALJ is inclined to address remedy, the Staff is of the view that it may even with a default judgment be appropriate to still require Complainants to engage in some further refinement of the elucidation of their asserted trade secrets.

| Staff Ex. 1 | 11/29/19 ▓▓▓▓ Deposition Transcript (Day 2) |
|---|---|
| Staff Ex. 2 | SK00969443 |
| Staff Ex. 3 | SK00969418 |
| Staff Ex. 4 | Microsoft.com, "eDiscovery and in-place holds in SharePoint Server" |
| Staff Ex. 5 | 11/21/19 email from M. Plimack |
| Staff Ex. 6 | Excel spreadsheet: ▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓ |
| Staff Ex. 7 | SKI's Third Suppl. Response to Interrogatory No. 4 |
| Staff Ex. 8 | LGCHEM000007814 |
| Staff Ex. 9 | LGCHEM000007476 |
| Staff Ex. 10 | LGCHEM000007589 |
| Staff Ex. 11 | 10/25/19 ▓▓▓▓ Deposition Transcript |
| Staff Ex. 12 | 11/1/19 ▓▓▓▓ Deposition Transcript |
| Staff Ex. 13 | LGCHEM000007533 |
| Staff Ex. 14 | LGCHEM000007480 |
| Staff Ex. 15 | 11/4/19 ▓▓▓▓ Deposition Transcript |
| Staff Ex. 16 | ▓▓▓▓▓▓▓▓ |
| Staff Ex. 17 | 11/22/19 email from N. Subhedar |

# Staff Ex. 1
# [REDACTED FROM PUBLIC VERSION]

# Staff Ex. 2
# [REDACTED FROM PUBLIC VERSION]

# Staff Ex. 3
# [REDACTED FROM PUBLIC VERSION]

# Staff Ex. 4

# eDiscovery and in-place holds in SharePoint Server

08/30/2019 • 8 minutes to read • 👤👤👤👤👤👤 +1

**In this article**

Managing an eDiscovery case

How eDiscovery works in SharePoint products

In-place holds

Integration with Exchange

**APPLIES TO:** ✅2013 ✅2016 ✅2019 ❌SharePoint Online

Electronic discovery, or eDiscovery, is the process of identifying and delivering electronic information that can be used as evidence. The eDiscovery Center, is a type of site collection that serves as a portal for managing eDiscovery cases. From this central location you can discover content in the SharePoint farm, in Exchange Servers 2013, 2016, and 2019, on file shares, and in other SharePoint farms. You can apply a hold to SharePoint and Exchange content that you discover. The hold ensures that a copy of the content is preserved, while still allowing users to work with their content. When you have identified the specific items that you will have to deliver, you can export them in an industry-standard format.

## Managing an eDiscovery case

When you receive a new request for eDiscovery, you create an eDiscovery case in the eDiscovery Center. An eDiscovery case is a collaboration site that you can use to organize information related to the eDiscovery request. From within an eDiscovery case, you can search for content, apply a hold to content, export content, and view the status of holds and exports that are associated with the case.

The two primary components of an eDiscovery case are eDiscovery sets and queries. Use an eDiscovery set to find content and apply a hold. Use a query to find content and export it.

**eDiscovery process flow**



To find and preserve content, create an eDiscovery set. Each eDiscovery set contains the following:

- Sources, which are locations to be searched. Exchange mailboxes, SharePoint sites, and file shares can all be sources.

- A filter, which defines what you are searching for. A filter can include search terms, a date range, and an author's name.

- An option to apply an in-place hold to the sources that contain content that matches the filter.

To find and export content, create a query. Each query contains the following:

- Query filters, which define what you are searching for. Query filters resemble a filter in an eDiscovery set, and can include search terms, a date range, and an author's name. However, query filters in a query can also use stemming.

- Sources to be searched. Exchange mailboxes, SharePoint sites, file shares, and eDiscovery sets can all be sources in a query.

When you run a query, you can see statistics about the items that were found, you can preview the results, and you can filter the results by message type (for Exchange results) or by file type (for SharePoint results). When you are finished, you can export the results of the query.

The content that you export by using a query is formatted according to the Electronic Data Reference Model (EDRM) specification so that it can be imported into a review tool. An export can include the following:

- Documents: Documents are exported from file shares. Documents and their versions can be exported from SharePoint Server.

- Lists: If a list item is included in the query results, the whole list is exported as a comma-separated values (.csv) file.

- Pages: SharePoint pages, such as wiki pages or blogs, are exported as MIME HTML (.mht) files.

- Exchange objects: Items in an Exchange Server mailbox, such as tasks, calendar entries, contacts, email messages and attachments are exported as a .pst file. If Skype for Business conversations are archived in Exchange, those can be discovered and exported, too.

- Crawl log errors.

- An XML manifest that provides an overview of the exported information.

# How eDiscovery works in SharePoint products

The Search service application is a key component of the search system in SharePoint Server. You can associate an eDiscovery Center with a Search service application. Any content that's indexed by the Search service application can be discovered from the eDiscovery Center. If you configure the Search service application to crawl file shares, you can use the eDiscovery Center to discover content on the file shares. If you configure the Search service application to crawl other websites - for example, a team site that was created by using SharePoint Server 2010 - you can use the eDiscovery Center to discover content on the websites. For SharePoint Server farms, you can also put the content on hold. If you add Exchange Server to the Search service application as a result source, you can discover content within Exchange mailboxes from the eDiscovery Center and put the mailboxes on hold. If you archive content from Skype for Business in Exchange, you can also discover Skype for Business content.

If your environment includes two isolated Search service applications - for example, SharePoint Online and SharePoint Server on-premises - you need to have two eDiscovery Centers to discover content across the farms.

**A separate eDiscovery Center for each isolated Search service application.**



As the Search system crawls content, it creates a search index. The search index stores data that's used to provide the results for search queries. The search index also stores information about the permissions that are required to access each piece of content. When a user performs a search, the search system uses the search index to identify the appropriate search results. Before displaying the results, the Search service application performs security trimming, by which the system compares the user's permissions to the permissions that are required to access content that search results link to, and then "trims" the results to show only those results that the user has permissions to view.

# In-place holds

SharePoint Server 2013 introduced the concept of an in-place hold. When you apply an in-place hold to a site, content in the site remains in its original location. Users can still work with the content, but a copy of the content as it was at the time that you initiated the hold is preserved. Additionally, if an in-place hold is applied to a site, any new content that's created or added to the site after it was put on hold will be discoverable, and will be preserved if it's deleted. Also, users don't have to know that their content is on hold.

> ⓘ **Important**
>
> If SharePoint Server runs on a server that uses Alternate Access Mapping (AAM), host-named site collections, or SSL termination format, then users will not be able to edit web pages in a site that has an in-place hold applied. To allow users to edit pages in sites that are on hold, you need to disable loopback checking as described in Method 2 of **KB article 896861**.

An in-place hold is applied at the level of a site. When a hold is placed on a SharePoint site, a preservation hold library is created, if one doesn't already exist. The preservation hold

library is only visible to site collection administrators so most users can't view it. The search crawler also has special permissions to crawl content in the preservation hold library.

> ⓘ **Note**
>
> There is one case in which a user can view the preservation hold library. Users who are granted permissions at the web application level can view all content in all site collections within the web application.

If a user attempts to modify or delete content in a site that's on hold, SharePoint first checks whether the content has been modified since the hold was applied. If this is the first modification since the hold was applied, SharePoint copies the content to the preservation hold library, and then allows the user to modify or delete the original content. Note that any content in the site can be copied to the preservation hold library, even if the content doesn't match the filter of the eDiscovery set that initiated the hold.

A user receives an error if they try to delete a library, list, or site collection that's on hold. Users also receive an error if they try to delete a folder that contains a file that's on hold. If users want to delete a folder that contains one or more files that are on hold, they have to delete those files before they can delete the folder.

The Hold Processing and Reporting timer job generates reports about items on hold and removed item from hold libraries that are pending release. The timer job runs daily and processes eDiscovery in SharePoint Server.

Consider the following when planning for in-place holds:

- To store all versions of content in a site, you have to enable document versioning for the document libraries in the site. For more information about versioning, see Enable and configure versioning for a list or library.

- If a document is deleted from a site that's on hold and document versioning is enabled, all versions of the deleted document will be preserved.

- As previously mentioned, if a site is put on hold, any new content that's created or added to the site after it was put on hold will be preserved if it's deleted.

- If document versioning isn't enabled and an item is placed on hold multiple times, SharePoint preserves the version that's current at the time each hold is placed. For example, if version 27 of an item is the most recent when the site is placed on hold

the first time, and version 51 is the most recent when the site is placed on hold the second time, versions 27 and 51 are preserved.

- Storage space is used efficiently when an in-place hold is implemented. Most content in a site does not change, and content that's not changed is not copied to the preservation hold library.

## Integration with Exchange

You can manage the discovery process for Exchange Servers 2013, 2016, and 2019 from a SharePoint eDiscovery Center. You can do the following:

- Add Exchange mailboxes as sources to either an eDiscovery set or a query.

- Preview content that's discovered in an Exchange mailbox.

- Apply a hold to an Exchange mailbox.

- Export content that's discovered in an Exchange mailbox.

To discover content in Exchange mailboxes, you must first configure a trust relationship between SharePoint and Exchange. You must also grant specific Exchange permissions to the users of the eDiscovery Center. For more information about these tasks, see Configure eDiscovery in SharePoint Server.

**Is this page helpful?**

👍 Yes   👎 No

# eDiscovery in SharePoint

09/24/2017 • 5 minutes to read • 🔲 🔳 ◻ 🔘 🔳

**In this article**

Introduction to eDiscovery in SharePoint

How eDiscovery works in SharePoint

Prerequisites

Site holds

eDiscovery programming model

See also

Learn about eDiscovery features in SharePoint. You can use eDiscovery to provide litigators the ability to discover content in electronic format.

## Introduction to eDiscovery in SharePoint

eDiscovery is how records managers and litigators discover content in electronic format. Typically, eDiscovery requires searching for documents, websites, and email messages spread across laptops, email servers, file servers, and other sources, and collecting and acting on content that meets the criteria for a legal case.

In SharePoint Server 2010, Microsoft added the Hold and eDiscovery feature, which made it possible to place a hold on any site in SharePoint. A records manager could put documents, pages, and list items on hold, which prevented users from deleting or editing them. Exchange 2010 introduced a way to place legal holds on mailboxes, conduct searches across multiple mailboxes, and use a Windows PowerShell cmdlet to export mailboxes.

eDiscovery in SharePoint and includes new ways to reduce the cost and complexity of discovery. These include:

- **The eDiscovery Center**, a central SharePoint site used to manage preservation, search, and export of content stored in Exchange and SharePoint across SharePoint farms and Exchange servers.

- **SharePoint In-Place Hold**, which preserves entire SharePoint sites. In-Place Hold protects all documents, pages, and list items within the site but allows users to

continue to edit and delete preserved content.

- **Exchange In-Place Hold**, which preserves Exchange mailboxes. In-Place Hold protects all mailbox content through the same UI and APIs used to preserve SharePoint sites.

- **Query-based preservation** allows users to apply query filters to one or more Exchange mailboxes and SharePoint sites and restrict the content that is held.

# How eDiscovery works in SharePoint

eDiscovery uses search service applications (SSAs) to crawl SharePoint farms. You can configure SSAs in many ways, but the most common way is to have a central search services farm that crawls multiple SharePoint farms. You can use this one search service to crawl all SharePoint content, or you can use it to crawl specific regions—for example, all SharePoint content in Europe.

To crawl a SharePoint farm, search first uses a service application proxy to connect to it. The eDiscovery Center uses the proxy connection to send preservations to SharePoint sites in other SharePoint farms.

# Prerequisites

Before deploying SharePoint Server eDiscovery features, you should plan the search service application infrastructure for your organization. For example, if you have two separate SSAs that crawl specific sets of SharePoint sites, you'll need one eDiscovery Center for each SSA.

# Site holds

SharePoint preserves content on the site level. When you preserve a site, its lists, libraries, and subsites are preserved. If you preserve a root site collection, all documents, pages, lists, and subsites in that site collection are preserved.

To hold a site, create a Discovery Case in the eDiscovery Center. A case is a container for all of the queries, content, and preservations associated with specific litigation. After you create the case, create a Discovery Set to specify the site. To validate the site, just enter its URL address.

In-Place Hold works by retaining content where it lives at the time the discovery search is completed. When content items are edited or deleted, eDiscovery places a copy of the item in a specific document library, called the Preservation Hold Library, on the SharePoint site where the content was modified. Only the search indexer and users with site collection administrator permission or web application permission can access the Preservation Hold Library. Most users without these permissions do not see the library and do not know it exists or that the content is copied there.

To preserve content in a way that minimizes storage space and maximizes efficiency, eDiscovery uses copy on write to manage identical copies of the same information. Because most content that is placed on hold will never be modified, there is no reason to take up space by creating a copy of it. Instead, in-place preservation creates copies of items only when they are deleted or after they are changed for the first time after preservation is started. If a document is changed again, eDiscovery keeps only the current checked-in or deleted version, and the version created at the time the document was originally preserved.

If multiple holds are placed on a site, the next edit of a document is copied again, even though it may have already been copied for the first hold.

# eDiscovery programming model

SharePoint provides a Microsoft .NET server programming model that you can use to build custom solutions and apps that include eDiscovery functionality. Table 1 lists the types in the **Microsoft.Office.Server.Discovery** namespace.

**Table 1. eDiscovery types**

| Type | Description |
|------|-------------|
| Case | Represents an eDiscovery case. Associated with a specified SPWeb object, a case can be closed by a specified date or as a specific action. Cases can contain source groups, locations, mailboxes, custodians, saved searches, exports, export configurations for specified IDs, queries, and lists of all of the source groups, custodians, and locations in this **Case** object. |
| Custodian | Represents the person who is responsible for keeping records for an eDiscovery case. |

| Type | Description |
|------|-------------|
| CustodianCollection | Represents a collection of **Custodian** objects. |
| **DiscoveryDuplicateSourceCollection** | An exception that is thrown when the value of a **Source** object is not unique. |
| DiscoveryException | An exception specific to the eDiscovery API that takes a message and also can take an inner exception. |
| Export | Represents an export that is associated with a specific **Case** object. The **Export** object can be constructed from a **T:Microsoft.SharePoint.SPListItem** object. You can add a **SavedSearch** object to an **Export** object and optionally rights-manage and download the **Export** object. |
| ExportCollection | Represents a collection of **Export** objects. |
| ExportStatus | Represents the status of an export, which indicates whether the export has started, not started, finished, or finished with failures. |
| SavedSearch | Represents a saved eDiscovery search. **SavedSearch** objects can be copied, deleted, or updated. Statistics that are associated with a saved search can be updated. Search refinements, Exchange 2013 refinements, source IDs, source group IDs, queries, and filters can be associated with a **SavedSearch** object. |
| SavedSearchCollection | Represents a collection of **SavedSearch** objects. |
| Source | Represents the type of data source that is used in eDiscovery operations. A **Source** object takes a specific **Case** object, a type of data source, and a filter (that is, a partial or complete specification of the container that identifies the source) as parameters. Information about the source can be returned, such as its preservation status, the location of the source as indexed by SharePoint, and whether the source is a mailbox. |
| SourceCollection | Represents a collection of **Source** objects. |

| Type | Description |
|------|-------------|
| SourceGroup | Represents a group of **Source** objects. |
| SourceGroupCollection | Represents a collection of **SourceGroup** objects. |
| SourceManagementType | Represents the scale at which sources are managed. Options include the source, the source group, and all content. |
| SourceType | Represents the type of source. Source types include Exchange 2013, both current and older versions of SharePoint Server, and file shares. |
| SourceValidation | Indicates whether the source is valid. |

# See also

- [What's new in SharePoint eDiscovery and compliance](#)

- [Complete basic operations using SharePoint client library code](#)

---

**Is this page helpful?**

👍 Yes   👎 No

---

**Staff Ex. 5**
**[REDACTED FROM PUBLIC VERSION]**

# Staff Ex. 6
# [REDACTED FROM PUBLIC VERSION]

**Staff Ex. 7**
**[REDACTED FROM PUBLIC VERSION]**

# Staff Ex. 8
# [REDACTED FROM PUBLIC VERSION]

**Staff Ex. 9**
**[REDACTED FROM PUBLIC VERSION]**

# Staff Ex. 10
# [REDACTED FROM PUBLIC VERSION]

# Staff Ex. 11
# [REDACTED FROM PUBLIC VERSION]

# Staff Ex. 12
# [REDACTED FROM PUBLIC VERSION]

# Staff Ex. 13
# [REDACTED FROM PUBLIC VERSION]

# Staff Ex. 14
# [REDACTED FROM PUBLIC VERSION]

# Staff Ex. 15
# [REDACTED FROM PUBLIC VERSION]

# Staff Ex. 16
# [REDACTED FROM PUBLIC VERSION]

# Staff Ex. 17
# [REDACTED FROM PUBLIC VERSION]

*Certain Lithium Ion Batteries, Battery Cells, Battery*          Inv. No. 337-TA-1159
*Modules, Battery Packs, Components Thereof, and*
*Processes Therefor*

## CERTIFICATE OF SERVICE

The undersigned certifies that on December 6, 2019, the foregoing **COMMISSION INVESTIGATIVE STAFF'S SUPPLEMENTAL BRIEFING IN CONNECTION WITH MOTION DKT. NO. 1159-013 AND ORDER NO. 28** was filed with the Commission, served upon the Administrative Law Judge, and served upon the parties in the manner indicated below:

**For Complainants LG Chem, Ltd. and LG Chem Michigan, Inc.:**

Bert C. Reiser                                               **BY E-MAIL**
LATHAM & WATKINS LLP                        *LGCHEMITC1159.LWTEAM@lw.com*
555 Eleventh Street NW
Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201

David K. Callahan
LATHAM & WATKINS LLP
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611
Tel: (312) 876-7700
Fax: (312) 637-2201

Louis S. Mastriani                                          **BY E-MAIL**
Deanna Tanner Okun                              *lgchem-001@adduci.com*
Jonathan J. Engler
Asha Allam
Joshua Hartman
Lauren E. Peterson
Joshua W. Rodriguez
Paulina M. Starostka
ADDUCI, MASTRIANI & SCHAUMBERG LLP
1133 Connecticut Avenue NW, 12th Floor
Washington, DC 20036
Tel.: (202) 467-6300
Fax: (202) 466-2006

*Certain Lithium Ion Batteries, Battery Cells, Battery*        **Inv. No. 337-TA-1159**
*Modules, Battery Packs, Components Thereof, and*
*Processes Therefor*

Mark L. Hogge                                       **BY E-MAIL**
Song K. Jung                                        *LGChem.US@dentons.com*
Cass W. Christenson
R. Tyler Goodwyn
Scott Cummings
Younggyu Kim
Nicholas H. Jackson
Bumrae Cho
Derek A. Auito
Rajesh C. Noronha
Debodhonyaa Sengupta, Ph.D.
DENTONS US LLP
1900 K Street NW
Washington, DC 20006
Tel: (202) 496-7500
Fax: (202) 496-7756

Sarah S. Eskandari
DENTONS US LLP
One Market Plaza
Spear Tower
Suite 2400
San Francisco, CA 64105
Tel: (415) 267-4000

Renzo N. Rocchegiani
DENTONS US LLP
4655 Executive Drive
Suite 700
San Diego, CA 92121
Tel: (619) 236-1414

**For Respondents SK Innovation Co., Ltd. and SK Battery America, Inc.:**

Sturgis M. Sobin                                  **BY E-MAIL**
Shara L. Aranoff                                  *COV-SK-INNOVATION-337@cov.com*
Maureen F. Browne
Alexander D. Chinoy
Daniel E. Johnson
Augustus Golden
Kristin M. Cobb
Erin E. Biel
Emily M. Mondry
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Tel: (202) 662-6000

***Certain Lithium Ion Batteries, Battery Cells, Battery***                    **Inv. No. 337-TA-1159**
***Modules, Battery Packs, Components Thereof, and***
***Processes Therefor***

Gregory Nieberg
Heng Gong
Amy Bond
COVINGTON & BURLING LLP
The New York Times Building
620 Eight Avenue
New York, NY 10018-1405
Tel: (212) 841-1000

Robert T. Haslam
COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square
Palo Alto, CA 94306
Tel: (650) 632-4700

Michael K. Plimack
Nitin Subhedar
Stephanie M. Tennant
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street
San Francisco, CA 94105-2533
Tel: (415) 591-6000

William H.Y. Park
Scott A. Schrader
Chang Sik (Charles) Kim
Marian Sooyun Lee
COVINGTON & BURLING LLP
22nd Floor, Meritz Tower
382, Gangnam-daero
Gangnam-gu, Seoul
Korea

                                                   */s/   Claire K. Comfort*

                                        Claire K. Comfort
                                        Investigative Attorney
                                        **OFFICE OF UNFAIR IMPORT INVESTIGATIONS**
                                        U.S. International Trade Commission
                                        500 E Street, SW, Suite 401
                                        Washington, DC 20436
                                        (202) 205-2160
                                        (202) 205-2158 (facsimile)

*Certain Lithium Ion Batteries, Battery Cells, Battery Modules, Battery Packs, Components Thereof, and Processes Therefor*                    **Inv. No. 337-TA-1159**

## CERTIFICATE OF SERVICE

The undersigned certifies that on December 18, 2019, the foregoing **Public Version of Commission Investigative Staff's Supplemental Briefing in Connection with Motion Docket No. 1159-013 and Order No. 28** was filed with the Commission, served upon the Administrative Law Judge, and served upon the parties in the manner indicated below:

**For Complainants LG Chem, Ltd. and LG Chem Michigan, Inc.:**

Bert C. Reiser                                    **BY E-MAIL**
LATHAM & WATKINS LLP                              *LGCHEMITC1159.LWTEAM@lw.com*
555 Eleventh Street NW
Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201

David K. Callahan
LATHAM & WATKINS LLP
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611
Tel: (312) 876-7700
Fax: (312) 637-2201

Louis S. Mastriani                                **BY E-MAIL**
Deanna Tanner Okun                                *lgchem-001@adduci.com*
Jonathan J. Engler
Asha Allam
Joshua Hartman
Lauren E. Peterson
Joshua W. Rodriguez
Paulina M. Starostka
ADDUCI, MASTRIANI & SCHAUMBERG LLP
1133 Connecticut Avenue NW, 12th Floor
Washington, DC 20036
Tel.: (202) 467-6300
Fax: (202) 466-2006

*Certain Lithium Ion Batteries, Battery Cells, Battery*          **Inv. No. 337-TA-1159**
*Modules, Battery Packs, Components Thereof, and*
*Processes Therefor*

| | |
|---|---|
| Mark L. Hogge | **BY E-MAIL** |
| Song K. Jung | *LGChem.US@dentons.com* |
| Cass W. Christenson | |
| R. Tyler Goodwyn | |
| Scott Cummings | |
| Younggyu Kim | |
| Nicholas H. Jackson | |
| Bumrae Cho | |
| Derek A. Auito | |
| Rajesh C. Noronha | |
| Debodhonyaa Sengupta, Ph.D. | |
| DENTONS US LLP | |
| 1900 K Street NW | |
| Washington, DC 20006 | |
| Tel: (202) 496-7500 | |
| Fax: (202) 496-7756 | |

Sarah S. Eskandari
DENTONS US LLP
One Market Plaza
Spear Tower
Suite 2400
San Francisco, CA 64105
Tel: (415) 267-4000

Renzo N. Rocchegiani
DENTONS US LLP
4655 Executive Drive
Suite 700
San Diego, CA 92121
Tel: (619) 236-1414

**For Respondents SK Innovation Co., Ltd. and SK Battery America, Inc.:**

| | |
|---|---|
| Sturgis M. Sobin | **BY E-MAIL** |
| Shara L. Aranoff | *COV-SK-INNOVATION-337@cov.com* |
| Maureen F. Browne | |
| Alexander D. Chinoy | |
| Daniel E. Johnson | |
| Augustus Golden | |
| Kristin M. Cobb | |
| Erin E. Biel | |
| Emily M. Mondry | |
| COVINGTON & BURLING LLP | |
| One CityCenter | |
| 850 Tenth Street NW | |
| Washington, DC 20001 | |
| Tel: (202) 662-6000 | |

*Certain Lithium Ion Batteries, Battery Cells, Battery Modules, Battery Packs, Components Thereof, and Processes Therefor*                    **Inv. No. 337-TA-1159**

Gregory Nieberg
Heng Gong
Amy Bond
COVINGTON & BURLING LLP
The New York Times Building
620 Eight Avenue
New York, NY 10018-1405
Tel: (212) 841-1000

Robert T. Haslam
COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square
Palo Alto, CA 94306
Tel: (650) 632-4700

Michael K. Plimack
Nitin Subhedar
Stephanie M. Tennant
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street
San Francisco, CA 94105-2533
Tel: (415) 591-6000

William H.Y. Park
Scott A. Schrader
Chang Sik (Charles) Kim
Marian Sooyun Lee
COVINGTON & BURLING LLP
22nd Floor, Meritz Tower
382, Gangnam-daero
Gangnam-gu, Seoul
Korea

 _/s/   Claire K. Comfort_____

Claire K. Comfort
Investigative Attorney
**OFFICE OF UNFAIR IMPORT INVESTIGATIONS**
U.S. International Trade Commission
500 E Street, SW, Suite 401
Washington, DC 20436
(202) 205-2160
(202) 205-2158 (facsimile)