# Exhibit B

**PUBLIC VERSION**

## UNITED STATES INTERNATIONAL TRADE COMMISSION
## WASHINGTON, D.C.

**Before the Honorable Cameron Elliot**
**Administrative Law Judge**

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN LITHIUM ION BATTERIES, BATTERY CELLS, BATTERY MODULES, BATTERY PACKS, COMPONENTS THEREOF, AND PROCESSES THEREFOR** | **Investigation No. 337-TA-1159**<br><br>**PUBLIC VERSION** |

### COMPLAINANTS LG CHEM, LTD. AND LG CHEM MICHIGAN INC.'S
### MOTION FOR DEFAULT JUDGMENT, CONTEMPT, AND SANCTIONS

Pursuant to Commission Rules 210.25(a) and 210.33(a)–(b) and Ground Rules 3.4 and 4.1.1, Complainants LG Chem, Ltd. and LG Chem Michigan, Inc. ("LG Chem") respectfully move for an order entering default judgment against Respondents SKI Innovation Co., Ltd. and SK Battery America, Inc. ("SKI"), finding SKI in contempt for failure to comply with Order No. 13, and imposing sanctions for SKI's contempt and spoliation of evidence.

**Ground Rule 3.2 Certification**:  Pursuant to Ground Rule 3.2, counsel for LG Chem certifies that it made reasonable, good faith efforts to resolve all matters in the motion with Respondents at least two business days in advance of filing this motion.  The matters in this motion were discussed during a meet-and-confer held on October 18, 2019, the October 24, 2019 status conference, as well as via numerous written and oral communications between the parties. Despite discussing these issues exhaustively, the issues remain unresolved.

Date:  November 5, 2019

Respectfully submitted,

*/s/ Bert C. Reiser*
Bert C. Reiser
Sarah M. Gragert
**LATHAM & WATKINS LLP**

555 Eleventh Street, N.W.
Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile:  (202) 637-2201
E-Mail:  LGCHEMITC1159.LWTEAM@lw.com

David K. Callahan
**LATHAM & WATKINS LLP**
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Facsimile:  (312) 993-9767

Gabriel S. Gross
Jeffrey G. Homrig
**LATHAM & WATKINS LLP**
140 Scott Drive
Menlo Park, CA 94025
Telephone: (650) 328-4600
Facsimile:  (650) 463-4600

Louis S. Mastriani
Deana Tanner Okun
Jonathan J. Engler
Asha Allam
Joshua Hartman
Lauren E. Peterson
Joshua W. Rodriguez
Paulina M. Starostka
**ADDUCI, MASTRIANI & SCHAUMBERG LLP**
1133 Connecticut Avenue, NW, 12th Floor
Washington, DC 20036
Telephone: (202) 467-6300
Facsimile: (202) 466-2006
E-Mail:  LGCHEM-001@adduci.com

Mark L. Hogge
Song K. Jung
Nicholas H. Jackson
R. Tyler Goodwyn
Younggyu Kim
Bumrae Cho
**DENTONS US LLP**
1900 K Street, NW
Washington, DC 20006
Telephone: (202) 496-7500
Facsimile: (202) 496-7756
E-Mail:  LGChem.US@dentons.com

*Counsel for Complainants LG Chem, Ltd. and LG Chem Michigan Inc.*

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, D.C.**

**Before the Honorable Cameron Elliot**
**Administrative Law Judge**

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN LITHIUM ION BATTERIES,**<br>**BATTERY CELLS, BATTERY MODULES,**<br>**BATTERY PACKS, COMPONENTS**<br>**THEREOF, AND PROCESSES**<br>**THEREFOR** | **Investigation No. 337-TA-1159** |

**COMPLAINANTS LG CHEM, LTD. AND LG CHEM MICHIGAN INC.'S**
**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS**
**MOTION FOR DEFAULT, CONTEMPT, AND SANCTIONS**

# TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ........................................................ 1

II.     FACTUAL BACKGROUND ............................................................ 6

        A.      SKI solicited confidential information from LG Chem's employees
                through sustained and targeted recruiting efforts.................................. 6

        B.      SKI was on notice of potential litigation against LG Chem as early
                as October 2017. ........................................................................ 12

        C.      SKI ran an enterprise-wide search for documents relating to LG
                Chem and its technologies and instructed its employees to delete,
                hide, and rename them. .................................................................. 18

        D.      After evidence of SKI's document deletion campaign came to
                light, the ALJ issued Order No. 13 requiring a thorough forensic
                investigation under LG Chem's observation. .................................... 28

        E.      SKI refused to comply with Order No. 13 and engaged in its own
                secret forensic investigation........................................................... 29

III.    LEGAL STANDARDS ................................................................... 42

        A.      Failure to Comply with a Discovery Order........................................ 42

        B.      Civil Contempt........................................................................... 43

        C.      Spoliation of Evidence ................................................................. 44

IV.     ARGUMENT .............................................................................. 45

        A.      The ALJ should find SKI in contempt. ............................................ 46

        B.      The ALJ should find that SKI spoliated evidence. .............................. 49

        C.      The ALJ should enter default judgment against SKI............................ 59

        D.      At a minimum, the ALJ should issue an order establishing that SKI
                misappropriated LG Chem's proprietary, legally protectable trade
                secrets and used them in each of the Accused Products. ...................... 62

V.      CONCLUSION............................................................................. 67

███████████████

## **TABLE OF AUTHORITIES**

**Page(s)**

### **Cases**

*Certain Asian-Style Kamaboko Fish Cakes*,
  Inv. No. 337-TA-378, Pub. No. 2998 (Sept. 1, 1996) ..................................................... 42, 63

*Certain Cigarettes & Packaging Thereof*, Inv. No. 337-TA-424, USITC Order No. 38 (Feb. 2,
  2000) ............................................................................................................................... 43, 64

*Certain Excimer Laser Sys. for Vision Correction Surgery & Components Thereof & Methods
  for Performing Such Surgery*,
  Inv. No. 337-TA-419, Order No. 49 (Aug. 13, 1999) ............................................................. 63

*Certain Internal Mixing Devices and Components Thereof*,
  Inv. No. 337-TA-317, Order No. 8 (July 30, 1992) ........................................................... 63, 64

*Certain Opaque Polymers*,
  Inv. No. 337-TA-883, Order No. 27  (2014) .................................................................. passim

*Certain Semiconductor Chips & Prod. Containing Same*,
  Inv. No. 337-TA-753, 2012 WL 927056 (Mar. 2, 2012) ......................................................... 61

*Certain Stainless Steel Prods., Certain Processes for Mfg. or Relating to Same, & Certain Prod.
  Containing Same*,
  Inv. No. 337-TA-933, Publ. No. 4904 (June 9, 2016) ...................................................... passim

*Consumer Fin. Prot. Bureau v. Morgan Drexen, Inc.*,
  101 F. Supp. 3d 856 (C.D. Cal. 2015) ................................................................................... 60

*Coquina Investments v. TD Bank, N.A.*,
  760 F.3d 1300(11th Cir. 2014) .............................................................................................. 63

*Goodman v. Praxair Servs., Inc.*,
  632 F. Supp. 2d 494 (D. Md. 2009) ....................................................................................... 51

*In re WRT Energy Sec. Litig.*,
  246 F.R.D. 185 (S.D.N.Y. 2007). ..................................................................................... 50, 53

*Intercept Sec. Corp. v. Code-Alarm, Inc.*,
  169 F.R.D. 318 (E.D. Mich. 1996) ........................................................................................ 43

*Kronisch v. United States*,
  150 F.3d 112 (2d Cir. 1998) ............................................................................................. 50, 53

*LeCompte v. Manekin Constr., LLC*,
  573 B.R. 187 (D. Md 2017.) .................................................................................................. 61

*Lunkenheimer Co. v. Tyco Flow Control Pacific Party Ltd.*,
  2015 WL 631045 (S.D. Ohio Feb. 12, 2015) .......................................................... 52

*Manekin Construction LLC v. LeCompte., LLC*,
  706 F. App'x 811 (4th Cir. 2017) ............................................................................ 61

*Micron Tech. v. Rambus, Inc.,, Inc.*,
  645 F.3d 1311 (Fed. Cir. 2011) ..................................................................... passim

*Ohr ex rel. Nat'l Labor Relations Bd v. Latino Express, Inc.*,
  776 F.3d 469 (7th Cir. 2015) ............................................................................ 43, 47

*OmniGen Research. v. Yongqiang Wang*,
  321 F.R.D. 367 (D. Or. 2017) .................................................................................. 60

*Rockman Company (USA), Inc. v. Nong Shim Co., Ltd.*,
  229 F. Supp. 3d 1109 (N.D. Cal. 2017) .................................................................. 52

*S. New England Tel. Co. v. Glob. NAPs Inc.*,
  624 F.3d 123 (2d Cir. 2010) .................................................................................... 43

*S.E.C. v. Razmilovic*,
  738 F.3d 14 (2d Cir. 2013) ...................................................................................... 61

*Solvay Specialty Polymers USA, LLC v. Zhenguo (Leo) Liu*,
  331 F.R.D. 187 (N.D. Ga. 2019) ............................................................................. 61

*Symons Int'l Grp. v. Cont'l Ca*s.,
  No. 1:01-CV-00799-RLY-MJD, 2016 WL 3124626 (S.D. Ind. June 3, 2016) ............... 43, 47

*SynQor, Inc. v. Artesyn Techs., Inc.*,
  709 F.3d 1365 (Fed. Cir. 2013) .............................................................................. 63

*Transportes Aereos de Angola v. Ronair, Inc.*,
  104 F.R.D. 482 (D. Del. 1985) ................................................................................ 43

*United Constr. Prod., Inc. v. Tile Tech, Inc.*,
  843 F.3d 1363 (Fed. Cir. 2016) .............................................................................. 61

*United States v. Conces*,
  507 F.3d 1028 (6th Cir. 2007) ................................................................................ 43

*Victor Stanley, Inc. v. Creative Pipe, Inc.*,
  269 F.R.D. 497 (D. Md. 2010) ................................................................................ 43

## Other Authorities

19 C.F.R. § 210.33 ..................................................................................................... 42

19 U.S.C. § 1337(h) ................................................................................................................... 45

Fed. R. Civ. P. 37(b)(2) ........................................................................................................... 43

██████████████████████████

## I.     PRELIMINARY STATEMENT

The facts uncovered in discovery establish that SKI engaged in a company-wide effort to destroy or hide the evidence that it misappropriated and used LG Chem's trade secrets to manufacture Accused Products imported and sold in the United States.[1]  SKI began a document-deletion campaign in anticipation of the claims made in this investigation, and even after LG Chem filed its complaint at the ITC, SKI (1) continued to delete documents, (2) failed to preserve evidence of its misappropriation and allowed its evidence destruction to continue while, (3) wilfully ignoring the ALJ's Order No. 13 by refusing to execute the ordered forensic investigation into all of its deleted files, and (4) proceeding, in defiance of Order No. 13, to unilaterally and in secret conduct forensic examinations of internal documents.  Worse, SKI put in charge of this secret examination the very same SKI corporate security team employee who SKI previously tasked with leading its campaign to destroy the evidence of its wrongdoing.  Neither SKI nor its counsel told anyone that this secret side-investigation was ongoing; LG Chem and OUII Staff discovered the truth only when the security employee had to admit its existence in response to direct questions at his deposition.

SKI's deliberate and systematic destruction, hiding, and renaming of evidence has irreparably obstructed LG Chem's ability to discover and prove the full extent and nature of SKI's misappropriation and unlawful use of LG Chem's trade secrets in developing the Accused

---

[1] The Accused Products are certain lithium-ion batteries, battery cells, battery modules, and battery packs, components thereof, and processes thereof.  *See* Compl. of LG Chem, Ltd. and LG Chem Michigan Inc. Under Sec. 337 of the Tariff Act of 1930, As Amended at ¶ 1.  The Accused Products include battery products and components intended for use in Ford Motor Company vehicles as well as Volkswagen's "MEB" generation of electric vehicles, among others.  *Id.* ¶¶ 8, 42, 82.

██████████████████████████

Products.  There must be consequences for intentionally obstructing a Section 337 investigation.[2]
SKI's egregious conduct and contempt for the ALJ's Order and Commission rules and policies
governing Section 337 investigations more than justify the ALJ's imposition of a default judgment
of a violation of Section 337.

At a minimum, nothing short of an order establishing that LG Chem's trade secrets are
protectable and that SKI misappropriated and used LG Chem's trade secrets in the design,
development, manufacture, testing, inspection, packaging, pricing, marketing, and sale of each of
the Accused Products and components in this case would come close to enabling a fair
investigation.  Nor would any lesser remedy begin to offset the extreme prejudice suffered by LG
Chem, or deter SKI—and others—from engaging in this or similar kinds of egregious misconduct.

LG Chem, after a conference with the ALJ on October 24, withdrew its then-pending
motion for an order to show cause why SKI should not be held in contempt for disobeying Order
No. 13, and now files this motion seeking more robust sanctions.  Since the conference, LG Chem
discovered significant new information showing that SKI's spoliation of evidence was both more
organized and pervasive than initially understood and that SKI's defiance of the ALJ's Order No.
13 continues today.  The key facts are as follows:

- On April 8, 2019, under the guise of a "routine security inspection" or "audit" (SKI's words), ██████████████████████ sent a memorandum ████████████████████████████████████████████ to delete "[d]ocuments that can cause unnecessary misunderstanding."  This "routine audit" is the same story he provided to the ALJ in his October 1, 2019 declaration submitted in conjunction with a filing from SKI related to this issue.

---

[2] In particular, SKI has destroyed and hidden evidence of its misappropriation of LG Chem's trade
secrets in connection with the design, development, manufacture, testing, inspection, packaging,
pricing, marketing, and sale of each of the Accused Products in the United States of the batteries
that are the subject of this investigation, including battery cells indisputably imported and supplied
by SKI to Ford Motor Company and other U.S. manufacturers.

██████████████████████████████████
██████████████████████████

- What ██████████ did not inform the ALJ is that on April 12, 2019, he sent follow-up messages to specific teams at SKI—*almost exclusively those in SKI's battery business*—containing instructions about what type of materials to find and delete and attaching spreadsheets listing exemplary materials *specifically related to LG Chem*. ██████████ subsequently sent additional spreadsheets to certain human resources and strategy teams at SKI.  It appears that ██████████ ==sent spreadsheets containing lists of files for deletion to seventy-five different teams at SKI.==

- SKI employees understood that the aim of the "routine" audit was to destroy materials related to LG Chem in anticipation of litigation.  For instance, in an April 19, 2019 email to ██████████ explained, "From the competitors' information, you can sort and delete only the information related to █ ██████████ or change the file name.  (It is said that *other competitor information is not an issue*.)" (**Ex. 1**, SK00969443.)[3]

- SKI managers and employees almost immediately began deleting files as ██████████ instructed, filling up "recycle bins" in their electronic team rooms[4] with LG Chem-related materials to be deleted.

- Some employees, including former LG Chem employee ██████████, knowing they actually ***needed*** these LG Chem materials for their work, simply changed the files' names so that they would not later be discoverable by a file name search.  *See infra* Section II.C.1, **Ex. 70**.

- When instructing its employees to delete, rename, or move these documents (both before and after LG Chem filed this case) several managers also instructed employees to ***delete the deletion instructions*** after reading them, showing both SKI's consciousness of its guilt and intent to cover up the spoliation scheme.  *See infra* Section II.B, **Ex. 47**.

- The destruction of relevant documents continued after LG Chem filed its complaint in this investigation.  For instance, in an email titled "FW: [URGENT] Related to LG Chem lawsuit matter," ██████████████████████████████ ██ (responsible for construction of plants outside Korea), instructed his team to "[d]elete every material related to the ██████████ from every single individual's PC, mail storage archives and team rooms.  ASAP  Make sure to especially scrutinize SKBA [SK Battery America, Inc.]." (**Ex. 2**, SK00815537.)

- ██████████ did nothing to prevent the document deletion campaign from continuing after LG Chem filed this litigation.  He took no steps to preserve the recycle bins that the battery employees had filled with LG Chem-related documents, nor did he do

---

[3] All emphasis in quotations has been added unless otherwise noted.

[4] A "team room" is a shared electronic storage space that SKI teams use to save files.

anything to preserve documents in the team rooms where SKI employees store the majority of their working materials.

- LG Chem received its first clue about SKI's spoliation scheme when SKI produced SK00066125, which we now know was just *one of the seventy-five* spreadsheets ▮▮ distributed containing lists of documents targeted for deletion. SK00066125 contains 980 computer files and emails that ▮▮▮▮ identified for ▮▮▮▮ based on keyword searches related to LG Chem. The other seventy-four spreadsheets contain approximately 33,000 computer files and emails targeted for deletion.

- When LG Chem requested a forensic investigation into the destroyed evidence, the ALJ issued Order No. 13, which required SKI to use a third-party forensics expert to conduct a forensic examination of *all* evidence of deleted documents, "*including but not limited to*" SK00066125. Order No. 13 also ordered SKI to allow LG Chem's own forensic expert to attend and review the examination, to produce internal communications related to the April 2019 "audit," and to recover all deleted materials possible.

- SKI placed ▮▮▮▮ in a central role in responding to Order No. 13. But instead of examining the files targeted for deletion listed across all seventy-five spreadsheets and their respective teams, SKI, ▮▮▮▮, and an outside forensics expert responded to Order No. 13 by considering only one, SK00066125, related to ▮▮▮▮. This is the same spreadsheet the ALJ had called out in Order No. 13 an example of what the forensic examination must include, but to which it should *not* be limited.[5]

- Further, instead of allowing LG Chem's expert full access to observe the forensic investigation as ordered, SKI deliberately excluded him from key aspects of the examination, suggested to LG Chem's expert that the forensic examination was completed when it was not, and then once LG Chem's expert had left Korea, surreptitiously conducted days' more work with ▮▮▮▮ and SKI's internal security team.

- Last week, LG Chem finally learned why SKI so doggedly refused to comply with Order No. 13, and what they did with the other spreadsheets clearly subject to Order No. 13. Specifically, LG Chem deposed ▮▮▮▮ on October 28, and forced him to admit that, *for about the last month,* ▮▮▮▮, *SKI, its counsel, and another forensics vendor privately have been doing additional forensics work into the rest (the vast majority) of SKI's deleted files, without involving either side's forensics expert who took part in SKI's initial deficient response to Order No. 13.* The ALJ, OUII, and/or LG Chem have had zero visibility into how SKI, ▮▮▮▮, and the rest of their team are "managing" any of the documents they may be recovering from this clandestine operation.

---

[5] Indeed, SKI's corporate witness designees have come from multiple teams beyond ▮▮▮▮, including the ▮▮▮▮ ▮▮▮▮, among others.

4

The ALJ cannot turn back the clock and put LG Chem in the position it would have been in but for SKI's calculated and intentional deletion, hiding, and renaming of evidence, much of which SKI did in anticipation of litigation in the United States and *after* LG Chem filed this action. (*See, e.g.*, **Ex. 2**, SK00815537; **Ex. 3**, SK00968270.)  SKI permanently destroyed or hid countless documents pertaining to SKI's misappropriation and the nature and extent of SKI's use of LG Chem's trade secrets.  LG Chem will never be able to ascertain precisely how SKI used the misappropriated trade secrets in developing and marketing the high-performance battery cells imported and sold to Ford Motor Company and other U.S. customers.  SKI witnesses have admitted that until a very short time ago, the company did not have the technical ability to develop and produce these cells.  (**Ex. 4**, ███ Dep. I at 81:22–82:14.)  Crucial evidence about how SKI was able to compress a decade's worth of battery development into little more than a year, using LG Chem's trade secrets, is gone forever.  Still more evidence of SKI's bad acts was erased by those people who complied with the "delete the documents, then delete this e-mail telling you to delete them" directives, which we know about only because a few SKI employees failed to follow those sorts of instructions.  *See infra* Section II.B, **Ex. 47**.

There is no greater affront to the Commission's and the ALJ's authority than SKI's spoliation of evidence, its efforts to cover up, ignore, or alter the evidence of its spoliation, and its deliberate contempt for the ALJ's Order No. 13.  This is just one example of a broader pattern of SKI's egregious litigation misconduct, which also includes SKI's efforts to frustrate, prevent, or delay discovery by wrongly claiming that the Korean Ministry of Trade, Industry and Energy or "MOTIE" precludes it from producing thousands of documents, by delaying its production of other discoverable information to prevent LG Chem and its counsel from making use of it, and by repeatedly reneging on or delaying its compliance with discovery agreements it has made.  Only

the ALJ's imposition of robust sanctions will adequately address such misconduct and ensure that LG Chem receives a fair investigation.

## II.    FACTUAL BACKGROUND

From the outset of this case, LG Chem has had reason to fear that SKI has deprived the Commission of a full record on which to resolve the merits of the trade secret misappropriation claims at the heart of this investigation.  The day after LG Chem filed the complaint, SKI admitted in a Korean news report that it had destroyed relevant evidence.  (**Ex. 5**, KBS News, YouTube (Apr. 30, 2019) https://www.youtube.com/watch?v=FQieayt4eaw.)  This public admission was just the tip of the iceberg.  SKI's systematic collection and destruction of evidence related to LG Chem's trade secrets warrants serious sanctions, and its refusal to obey an unambiguous order intended to recover some of the destroyed evidence provides an independent basis for sanctions.

### A.    SKI solicited confidential information from LG Chem's employees through sustained and targeted recruiting efforts.

LG Chem brought this action after uncovering evidence—documents that former LG Chem employees had left behind in their LG Chem files[6]—indicating that SKI engaged in a scheme to misappropriate LG Chem's trade secrets by (1) recruiting employees in LG Chem's battery division, and (2) requiring those employees to provide to SKI, as part of the recruiting process, detailed curricula vitae and technical presentations disclosing LG Chem trade secrets and other proprietary information.  *See* Complaint at ¶ 5.  Discovery has revealed that the scope of SKI's deliberate efforts to acquire LG Chem's trade secrets through its former employees is far broader than LG Chem initially suspected.  A full recitation of all of the misappropriation evidence

---

[6] LG Chem located some of these communications in its own computer systems.  That SKI has not produced the same information in discovery is emblematic of its inability or refusal to provide relevant evidence that was plainly once in its possession. (**Ex. 6**, LGCHEM000120559–78; **Ex. 7**, LGCHEM000120642–54; **Ex. 8**, LGCHEM000120677–87.)

developed in the investigation to date is beyond the scope of this memorandum, but LG Chem

describes here examples of evidence that managed to survive SKI's purge efforts. These examples

illustrate the type of evidence that was likely destroyed in SKI's deletion campaign.

First, the discovery provided in this investigation indicates that SKI used recruiting to

solicit and acquire LG Chem's trade secrets on a massive scale. Between 2016 and the institution

of this investigation, SKI has interviewed ████████ LG Chem employees who worked on

LG Chem's battery technology, and has ultimately hired away approximately ████████,

installing many in directly competitive positions at SKI. (**Ex. 9**, SKI's Second Suppl. Resp. to

LGC's First Set of Interrog. No. 4 (Aug. 1, 2019); **Ex. 10**, SKI's First Suppl. Resp. to LGC's

Second Set of Interrog. No. 30 (Aug. 22, 2019).) SKI and its recruiters directed applicants who

passed the initial screening to prepare and provide (1) presentation materials describing the

applicants' previous work experience, and (2) detailed "Competency Based" technical CVs in a

specific format dictated by SKI. (*See, e.g.*, **Ex. 11**, LGCHEM000006225–27 (Technical CV); **Ex.

12**, LGCHEM000006270–77 (Presentation).) *See also, e.g.*, LG Chem's Mem. of Points and

Auths. in Supp. of Mot. to Compel Discovery at 3–5, 9–11 (No. 1159-0004) (Aug. 28, 2019)

(discussing the detailed technical nature of these application materials provided by over a hundred

former LG Chem employees and SKI's failure to locate and produce them).

Discovery in this investigation has further revealed that SKI compiled and distributed the

information provided during these presentations to the battery teams for use in developing SKI's

products. For instance, in one email, ████████, a member of SKI's ████████

████████ explained, "[w]hen interviewing experienced research lab employees, we

analyzed and summarized information secured during job capability in-depth interviews," and

attached a summary of LG Chem's electrode development and manufacturing, including granular



details such as ▮▮▮▮▮, ▮▮▮▮▮▮, and ▮▮▮▮. (**Ex. 13**, SK00699429–30.) In another example, ▮▮▮▮, a member of SKI's ▮▮▮▮▮▮▮▮, sent an email with the subject "Information of the ▮▮▮▮▮▮ of ▮▮▮▮,"[7] describing LG Chem's ▮▮▮▮▮, ▮▮▮▮▮, and ▮▮▮▮▮ methods that he gathered from the interviewees from LG Chem. (**Ex. 14**, SK00699268.) ▮▮▮ also indicated that "here is comprehensive information of the ▮▮▮▮▮ of ▮▮▮ from today's LG interviewer," and explained how LG Chem addressed technical issues in battery production by ▮▮▮▮▮. (*Id.*) ▮▮▮▮▮▮▮▮▮▮, responded with additional information regarding LG Chem's ▮▮▮▮▮ and ▮▮▮▮ (**Ex. 15**, SK00699270.) In another example, ▮▮▮▮▮▮▮ provided his team with a PowerPoint presentation from an LG Chem interviewee stating, "[p]lease find attached PPT file containing information about interviewees for ongoing hiring. Please look through them. It may be helpful." (**Ex. 16**, SK00779702.) New hires' work experience presentations were provided to SKI's senior management, including the head of research and development, as early as September 2017. (**Ex. 17**, SK00780849–52.)

SKI's efforts to elicit LG Chem's trade secrets from job applicants was no secret amongst those involved on SKI's side of the hiring process. One criterion SKI used for evaluating applicants was whether it would be able to obtain useful, confidential information if the person was hired. The interview evaluation of one LG Chem employee emphasized that SKI was "likely to be able to obtain a lot of information on other company's mixing technology" and that it would be "[p]ossible to absorb ▮▮▮▮ electrode process know-how in short time." (**Ex. 18**,

---

[7] Although some of SKI's deponents claimed not to know what "▮▮▮▮" means (one posited that it might be L'Oreal!), most conceded that this was in fact a reference to LG Chem. (*Compare* **Ex. 90**, ▮▮▮▮. II at 215:19-217:11 *with* **Ex. 49**, ▮▮▮▮. II at 18:17-19.)

SK00700599.)  Indeed, SKI's scheme was so brazen that recruiting firms stopped working with it. (**Ex. 19**, SK00949522 at 524–25 (informing SKI that because "it became known that [SKI] want[s] access to [LG Chem's] internal information, search firms are not responding to [SKI's] requests any more").)

SKI's business records and witnesses have revealed that the scheme to steal LG Chem's trade secrets and other confidential information extended well beyond the hiring process.  In particular, SKI continued to interview former LG Chem employees about their previous work even after they joined SKI, reserving hours of time on a given day for new hires to give "work experience presentations" and circulating the presentation materials for SKI engineers and executives to "reference."  (**Ex. 17**, SK00780849 (email from ██████████████████ ██████████████████████, stating, "I am sharing the materials used by the new hires during the presentation today.  Please reference this for work."); **Ex. 20**, SK00665167–68 (discussing "Competitor Analysis" involving interviews with lateral hires from LG Chem and Samsung SDI); **Ex. 21**, SK00665155 (discussing interview topics including former employer's battery strategy, organization, and implementation and outlook on the former employer's battery technology).)

Similarly, SKI's production contains many examples of SKI—including senior employees and managers—soliciting LG Chem's trade secrets from the former LG Chem employees. (*See, e.g.*, **Ex. 22**, SK00527187 (requesting former LG Chem and Samsung SDI employees to fill in details regarding "██████████████████" mixing technology); **Ex. 23**, SK00968297 (identifying for deletion an email with the subject line "For those of you who are from LG, there are things that [we] ask you to look into regarding security,"); **Ex. 24**, SK00969472 (identifying email with the subject "Sending ████████ ████████████████████████" for

████████████████████████

deletion.); **Ex. 25**, SK00661843–44 (Oct. 17, 2018 email from ████████ to ████████

providing comments on his Recruited Member Seminar Materials comparing LG Chem and SKI

electrode processes and noting "higher-ups may want to hear more about technical areas that need

improvement"); **Ex. 26**, SK00822854–862 (April 18, 2018 email from ████████ discussing

internal conference on formation process improvement and reporting that information to

supervisors); **Ex. 27**, SK00854589 (April 27, 2018 email from ████████ asking about ████

████████████ issues that arose at LG Chem); **Ex. 28**, SK00839540 (March 21, 2019 email

from ████████ responding to a request for detailed information on LG Chem's production

management indices); **Ex. 29**, SK00488646–647 (Oct. 8, 2016 email from ████████ to his team

leader ████████, providing equipment layout for LG Chem facilities.)[8]

     Likewise, there are numerous examples of former LG Chem employees freely sharing

confidential LG Chem information that they brought with them. One particularly egregious

example is reflected in a spreadsheet that SKI produced from its files, filled with data compiled by

former LG Chem employee ████████ relating to *fifty-seven* of LG Chem's recipes and

specifications for ████████████████████████, which ████

shared among his new colleagues in SKI's ████████. (**Ex. 30**, SK00524683 (Nov. 22, 2018

email from ████████.) The spreadsheet contains LG Chem's proprietary information related

to each recipe, such as "████████," "████████," "████████)," "████

████████," "████████ and "████████ among

dozens of other specifications. (**Ex. 31**, SK00524684 ("████████████████████

████████") ████████ sent an earlier version of the spreadsheet containing additional details on

---

[8] ████ incorporated this slide in a presentation. (**Ex. 94**, SK0081781 (slide 62 entitled "Layout by ████████ ████████").)

████████████████████████████████

five LG Chem products on June 24, 2018, to another former LG Chem employee at SKI, ████

████, stating "Is it not okay if I have this?" (**Ex. 32**, SK00524871.)   The data in this single

document relates at least to Trade Secret Nos. 8, 10, 14, 15, 19, 20, 24, 26, 31, 33, 35, 38, 40, 43,

46, 47, 138–145, and 148 (including all subparts).   Indeed, in many instances, former LG Chem

employees gave presentations disclosing confidential LG Chem information during the course of

their work at SKI.  (*See, e.g.*, **Ex. 33**, SK00847425 (PowerPoint presentation by former LG Chem

employee ████████ regarding LG Chem's ████████); **Ex. 34**, SK00847273

(PowerPoint presentation by former LG Chem employee ████ comparing LG Chem and

SKI's ████████████); **Ex. 35**, SK00838562 (Sept. 18, 2018 email from ████

████ "This is a matter of a report for lateral hire employees [to] grasp the issues and

improvements of SKI. . . . P.S. We request each group leader take special notes as we plan to

require lateral hires to go through this procedure prior to the end of probation period.").)

LG Chem has also uncovered evidence showing that LG Chem employees downloaded

and printed materials to take with them ***after*** SKI recruited them.  (*See*, **Ex. 36**, Excerpts from Ex.

A to LGC's Fourth Suppl. Resp. to Interrog. No. 11 (Oct. 14, 2019) (detailing numerous examples

of former LG Chem employees downloading and printing materials, often after they had applied

to SKI and when they did not otherwise have a need for such documents).)

These are not isolated incidents.  SKI used current and former LG Chem employees to

acquire LG Chem's most sensitive information on a number of occasions that LG Chem now

knows about—and surely on many other occasions too—the evidence of which has been

destroyed.  For instance, former LG Chem employee ████████ prepared a spreadsheet entitled

"180206_MX process summary v.4_Daejeon Final" that shows a comparison of LG Chem's and

SKI's mixing steps, including details of LG Chem's process conditions and mixing specifications,



including █████████████████████████████████████████████████████████████

███████ set forth in Trade Secret No. 10. (**Ex. 37**, SK00527182.) In an email dated

December 12, 2017, from ████████ to the manager of the ██████████████████████

████████████████████ detailed ████████████ information set forth in Trade Secret Nos. 31

and 33 regarding ████████████████████████████████████████████████████

███████████████████████████████. (**Ex. 38**, SK00524111.) Subsequently,

emails featuring ██████████████ discuss a ██████████████ test plan using a ████

████████████████████████████████████ set forth in Trade Secret 31.

(**Exs. 39–40**, SK00525901 and SK00522382.) In yet another example, former LG Chem employee

██████████████ sent ██████████████, a member of ██████████████████████████

████, a document comparing the coater specifications of SK Innovation Seosan manufacturing

lines with LG Chem's Nanjing and Poland plants, as well as descriptions of ██████████████

technologies. (**Ex. 41**, SK00651878–79.) ████████ testified that he created the slides based on his

personal knowledge of LG Chem's plants, and information he gathered from other former LG

Chem employees including ██████████████. (**Ex. 42**, ████████ Dep. I at 93:9-95:11.)

The full extent of SKI's misappropriation will never be known because of its deletion of

countless documents evidencing its misconduct. But there is no doubt that SKI built a mountain

of information related to LG Chem's trade secrets by recruiting LG Chem employees, pumping

them for information about LG Chem once they had joined SKI, and then using that ill-gotten

information to compete against LG Chem in the electric vehicle battery market in the United States.

**B.    SKI was on notice of potential litigation against LG Chem as early as October 2017.**

Concerned about the potential misuse of its trade secrets by departed employees, ==LG==

==Chem notified SKI on October 23, 2017, that the "specialists you have recruited and plan to recruit==

██████████████████████████
████████████████████

. . . [are] equipped with many important trade secrets of LG Chem . . . [that] are highly likely to be disclosed."  (**Ex. 43**, LGCHEM000123385 (October 23, 2017 demand letter).)  ==LG Chem explained that it had "no choice but to take all possible legal action to protect [its] trade secrets."== (*Id.*)  Two days later, LG Chem filed suit in Daejeon District Court seeking to enforce the five non-compete agreements it had with employees who had joined SKI.  LG Chem won an injunction barring the former employees from working for SKI for the term of their non-compete agreement. (**Ex. 44**, Daejeon High Court, Decision of July 19, 2018, Case No. 2018 Ra 126.)

Yet SKI continued to recruit and hire LG Chem employees with knowledge of key trade secrets, knowing that further litigation would likely ensue.  SKI's ████████████████ maintained a spreadsheet identifying the "legal risk of potential lateral hires," ranking the hires as no risk, "intermediate risk," or "high risk."  (**Ex. 45**, SK00717774 (████████████ Spreadsheet.)  Notably, former LG Chem employees hired into marketing or manufacturing positions were labeled "low risk," while those hired into cell development and research teams were labeled "intermediate" or "high" risk.  (*Id.*)  Nonetheless, SKI hired at least ██ LG Chem employees into research and development teams.  (**Ex. 9**, SKI's Second Suppl. Resp. to LGC's First Set of Interrog. No. 4 & App'x A (Aug. 1, 2019).)  SKI employees outside of the ██████ ████████ group recognized the litigation risk as well.  In a July 23, 2018 instant message conversation, ████████████████████████████████████████ told ████████ ████████████████████████ that SKI "can't pull in the experienced [LG Chem employees] anymore," and that if LG Chem sued SKI for using LG Chem's composition, "[SKI] will probably lose." (**Ex. 46**, SK00963689, with excerpted translation at lines 1856–58.) ██ concluded that "this, along with lateral hires . . . looks risky."  (*Id.* at line 1861.)

██████████████████████████████

On February 12, 2018, ████████ a member of SKI's ██████████████

████, explained in an email to his team that "[t]here is ongoing litigation relating to lateral hiring,"

and directed them to move "[d]ocuments you took from the ████████ out of the shared

electronic "Team Room" and into temporary file directories "so that the relevant materials would

not exist in the Team Room."  (**Ex. 47**, SK00993196 (February 12–13, 2018 email chain re

"Transfer Proceedings of ████████ Materials (by this Wednesday).")  In large red text, █████

also instructed the team to delete the email instructing them to delete the evidence:



(Original)



(Translation)

████████████████████████████████

On July 16, 2018, SKI's ██████████, a former LG Chem employee, sent an email to ██████████ attaching material related to ██████████ electrode line equipment main specifications." (**Ex. 48**, SK00748127 (July 2018 email chain between ██████████ ██████████ electrode line equipment main specifications.").)  One week later, and four days after the Daejeon High Court decision imposing the injunction, ██████████ replied, "Please delete everything in the emails that discuss ██████████. You know why." (*Id.*) ██████████, a member of ██████████, admitted during his deposition that this was an instruction to delete information related to LG Chem. (**Ex. 49**, ██████ Dep. II at 139:2–5.)

By December 2018, SKI expected that LG Chem was preparing to start litigation of a far greater scope than the non-compete case, and deleted documents as a result.  On December 21, SKI's ██████████, a former LG Chem employee and a member of SKI's ██████████ ██████████ and ██████████, wrote an instant message advising a coworker that "LG is preparing a lawsuit so, don't leave evidence Lol [ . . . ] Even regular employees who moved from LG to SK are subjected to the lawsuit currently being prepared.  Even texting or messaging on Kakao talk[9] should not happen, I heard.  Lol." (**Ex. 50** SK00963762, with excerpted translation.)  The reference to "regular employees" is telling because it demonstrates that SKI expected litigation beyond the scope of former LG Chem employees subject to non-competes, and it demonstrates that this knowledge was widespread among SKI's rank-and-file employees.

Even after the Korean Supreme Court affirmed the initial injunction in January 2019, SKI continued to recruit and hire LG Chem employees with in-depth knowledge of LG Chem trade secrets.  This led LG Chem to send a second cease-and-desist letter on April 8, 2019.  (**Ex. 51**,

---

[9] Kakao is an instant messaging application where employees can text one another on their cellphones.

LGCHEM000121036  (April 8, 2019 demand letter).)  LG Chem repeated its concern that its "trade secrets, technological information, and knowhow are highly likely to be disclosed" through SKI's ongoing hiring and intelligence-gathering campaign.  (*Id*.)  LG Chem again made it clear that it was contemplating "all possible legal action" against SKI because "our trade secrets are infringed or are at risk of being leaked."  (*Id*.)

By no later than its receipt of the second cease-and-desist letter in April 2019, SKI was on clear and express notice of, and was anticipating "all possible legal action" by LG Chem, including in the United States.  This is the case because LG Chem's letter came on the heels of an important development in the parties' competition as suppliers of batteries for electric vehicles.  SKI and LG Chem competed for a contract to supply batteries for Volkswagen's MEB[10] platform *in* the United States.   In November 2018, Volkswagen announced "that it has selected SK Innovation as a strategic supplier of battery cells for production of electronic vehicles based on [Volkswagen's] modular electric drive (MED) [sic] platform."  (**Ex. 52**, Jung Min-hee, "Volkswagen to Use SK Innovation Batteries for Next Generation Electric Cars," BusinessKorea (Nov. 15, 2018) *accessible at* www.businesskorea.co.kr/news/articleview.html?idxn0=26587.)  After winning this contract, SKI broke ground on a plant in Commerce, Georgia, in March 2019 to manufacture batteries for Volkswagen.  (**Ex. 53**, SK01126056 (**Ex.** 19C to SKI ITC Compl. ¶¶ 5–7; **Ex. 54**, "SK Innovation Announces New Battery Manufacturing Plant in Georgia" BusinessWire (December 3, 2018) *accessible at* https://www.businesswire.com/news/home

---

[10] Modular Electric Drive Matrix, or MEB, is a platform on which Volkswagen intends to build a series electric vehicles.  The platform concept enables the automaker to share components and assembly processes across multiple vehicle models.

███████████████████████████████████

/20181203005133/en/SK-Innovation-Announces-New-Battery-Manufacturing-Plant).)[11]   Had it

not misappropriated LG Chem's trade secrets, SKI never would have secured the Volkswagen

contract, and never could have committed to manufacturing in the United States.   (**Ex. 56**,

SK00499331–35 (June 2018 email chain noting that, in order to meet VW's direct current internal

resistance requirements, SKI must use ████████████████████████████ which

are related to LG Chem Trade Secret Nos. 8, 19, and 31–33).)   In fact, many of the employees that

left LG Chem for SKI worked on the development of LG Chem's MEB battery.

SKI's growing battery business in Georgia and the United States was hardly SKI's only

connection to the United States.   SKI is experienced in handling legal matters in this country,

having litigated patent disputes at the PTO, having been subject to a Department of Justice ("DOJ")

investigation, and having monitored its competitor LG Chem's ITC actions relating to its battery

business.[12]   Any reasonable party in SKI's position—experienced in U.S. litigation, expressly

accused of misappropriating battery trade secrets, expanding its battery business in the United

States with the use of those trade secrets, and knowing its chief competitor had engaged in battery-

---

[11] Volkswagen requested that the MEB batteries be supplied from a facility in the United States to avoid "international trade problems."  (**Ex. 4**, ████ Dep. I at 83:20–84:1; *see also* **Ex. 55**, █. ██ Dep. I at 28:3–8.)

[12] SKI also filed two petitions for *inter partes* review seeking to invalidate the patents-in-suit.  *See* IPR2014-00679, IPR2014-00680.  SKI unsuccessfully defended a petition for *inter partes* review of a patent filed by the Saudi Arabian Oil Company in November 2017.  SKI has since filed its own complaint with the ITC against LGC.  *See SK Innovation Co., Ltd. v. LG Chem*, Inv. No. 337-TA-3411.  SKI also tracked LG Chem's other battery-related ITC litigation.  In a March 8, 2019 email chain, employees from the ███████████████ and ████████████████ discussed the settlement of LG Chem's suit against Amperex Technology Limited.  (**Ex. 57**, SK00684847.)  Separately, SKI agreed to plead guilty and pay criminal fines and civil damages after a DOJ investigation into bid rigging on Department of Defense fuel supply contracts (**Ex. 58**, Nov. 14, 2018 DOJ Press Release *available at* https://www.justice.gov/opa/pr/three-south-korean-companies-agree-plead-guilty-and-enter-civil-settlements-rigging-bids.)  SKI is a sophisticated, experienced litigant in the United States and it could, and did, anticipate litigation against LG Chem in this country.

████████████████████████████████████

related U.S. litigation before—would reasonably have anticipated that LG Chem would seek legal recourse in the United States.

Despite SKI's expanding battery business in the United States and despite the fact that SKI had found itself involved in litigation in the United States with an ever increasing frequency, SKI's ████████ failed to issue a litigation hold after receiving LG Chem's demand letter in April 2019. ████████, a member of the ████████, testified that he was working on contracts related to the Georgia facility in March 2019. (**Ex. 59**, ████ Dep. I. at 111:17-21.) ████ was also aware that litigation holds were required for litigation in the United States. (*Id.* 116:6–10.) Yet even though the ████████ (1) received the April 8, 2019 demand letter, (2) understood that LG Chem threatened to take "all possible legal action" against SKI, (3) was aware of SKI's growing battery business in the United States, (4) was no doubt aware of SKI's involvement in other legal proceedings in the United States, and (5) recognized that litigation holds were required in United States litigation, the ████████ nevertheless failed to issue a litigation hold and preserve SKI's documents. (*Id.* at 112:18–113:3.)

### C.   SKI ran an enterprise-wide search for documents relating to LG Chem and its technologies and instructed its employees to delete, hide, and rename them.

When this deletion issue first surfaced, ████████, a senior manager in SK's ████████, submitted a declaration in conjunction with a submission from SKI on the issue. (**Ex. 73**, ████ Decl., included as Ex. 2 to SKI Opp. to Mot. to Compel (Oct. 1, 2019).) As ████ explained, on April 8, 2019, the same day LG Chem sent its second demand letter to SKI, he sent a memorandum to all project leaders across SKI's seven affiliate companies. (**Ex. 60**, ████ Dep. I at 39:21–40:5.) ████ explained this memo as "part of a routine practice of doing security inspections," and "[t]he purpose . . . [was] to comply with relevant Korean laws and regulations." (**Ex. 73**, ████ Decl. ¶ 4, 7.) The memo requested the project

██████████████████████████████
███████████████████

leaders' cooperation in deleting certain materials from team rooms, virtual desktop work activity

folders ("VDI"), email storage boxes, and PCs, including "documents from obscure sources" and

"documents that can potentially be misunderstood." (**Ex. 61**, SK00755016.) █████ intended

for the project leaders to distribute the memo to each of the approximately ████ employees at the

seven SK Group affiliates. (**Ex. 60**, █████ Dep. I at 40:6–41:6.)

What █████ and SKI did not tell the ALJ in his declaration is that four days ***after*** LG

Chem sent its second demand letter—█████ sent spreadsheets to ***seventy-five*** teams or

business units within SKI.[13] (**Ex. 60**, █████ Dep. I at 129:13–20.)  Although he admits that he

created the one spreadsheet that was subject to that motion (because it was all LG Chem knew of

at the time), he did not advise the ALJ that there were *seventy-four* others. (**Ex. 73**, █████ Decl.

¶¶ 11-19.)  Each of the seventy-five spreadsheets contained a list of files identified by name, which

we now know that █████ created by searching for five keywords related to LG Chem[14] in each

of the seventy-five team's/unit's VDIs, email storage boxes, and team rooms. (**Ex. 63**, A. Garcia

---

[13] SKI initially produced only ***one*** of these seventy-five spreadsheets—SK00066125—without
advising LG Chem that others existed. █████ created this spreadsheet for SKI's
██████████ and the spreadsheet was found in the recycle bin of ████████████████, but
had not yet been permanently deleted.  This spreadsheet was part of what led LG Chem to move
to compel a forensic examination, and in that motion, LG Chem noted that it had "no way of
knowing what other document deletion measures were taken throughout SKI after LG Chem
accused it of trade secret misappropriation."  *See* Compl't's Mot. to Compel. Disc. at 6.

The day ***after*** SKI filed its response to that motion, SKI produced fifty-eight more of the
spreadsheets █████ created for various SKI teams (fifty-five new spreadsheets, plus a
duplicate of SK00066125 and two spreadsheets with no file names).  (**Ex. 62**, Oct. 9, 2019 Letter
from K. Cobb to S. Gragert.)  On October 21, in anticipation of the deposition of ████████
SKI informally produced nineteen additional deletion spreadsheets, which were formally produced
on October 25.  Accordingly, there are seventy-five total relevant spreadsheets reflecting just some
of SKI's evidence-destruction efforts.

[14] The search terms included: █████ ██ ████████ ██ ████████████████
████ ██████████████████ ██████ ███████████

███████████████████████████

Final Report ¶ 10(c); **Ex. 60.**███████ Dep. I at 122:6–17.) ███████ noted that these files are

"[d]ocuments that can be misleading due to their titles if accessed externally," and he instructed

the recipients to "please ***remove the documents*** at the corresponding team's discretion."  (**Ex. 64**,

SK00066125.) ███████ thus instructed ***scores*** of teams at SKI to review their files and "remove"

documents related to LG Chem a mere three days after SKI received LG Chem's second demand

letter.  SKI disclosed neither (1) the existence of the approximately seventy-five spreadsheets akin

to SK0066125, nor (2) the fact that ███████ circulated these spreadsheets after receipt of the

demand letter in its September 9, 2019 letter purporting to explain SK0066125 (**Ex. 65**, Sept. 9,

2019 letter from K. Cobb to S. Gragert), in its opposition to LG Chem's motion to compel

discovery, or in ███████ supporting declaration.  Indeed, LG Chem did not learn that that there

were a total of seventy-five such spreadsheets until October 21, 2019.

        The breadth of SKI's document deletion campaign is astonishing.  ███████

spreadsheets alone target for deletion more than ███ files, including approximately ███ VDI

files, ███ team room files, and ███ emails.  Moreover, consistent with those search terms

that ███████ created, the titles of files targeted for deletion contain terms like ███ and ███

███ in conjunction with descriptions of LG's technology including ███████," "███

███████ and "███████," to name just a few.

*Infra* at Section II.E.6.  ==The titles alone confirm that the files SKI deliberately searched for and==

==targeted for deletion are highly relevant to LG Chem's claims of trade secret misappropriation,==

==and well within the scope of the Notice of Investigation.==

### 1.    SKI deleted and renamed files related to LG Chem.

        Even the limited discovery SKI has provided on its deletion campaign confirms that

multiple teams at SKI deleted evidence related to LG Chem in response to ███████ "security

inspection" request.  Indeed, SKI's documents show that its team leaders understood that the aim

of ████████ "security inspection" was to delete documents related to LG Chem.  (**Ex. 66**,

SK00659635 (April 22, 2019 group leader meeting minutes stating, "[r]egarding document

security, handle them as soon as possible (delete if possible).")

     For instance, on April 15, 2019, ████████, a member of SKI's ████████████,

sent an email to members of his team attaching the spreadsheet ████████ created for the ████████

████████ (**Ex. 67**, SK00968397.)  ████████ instructed the team to "inspect, and on the last

column write what actions were taken (deleted/stored (brief reason)), and F/B [feedback] only to

me." (*Id.*)  Likewise, on April 19, 2019, ████████, a member of the ████████████

██ sent a copy of ████████ spreadsheet to his team and stated that "[l]isted items for those

belonging to me and those not currently belong to the ████████ were deleted, and recipients

should confirm related to deletion of files referencing the attached list." (**Ex. 68**, SK00969418.)

████████ also provided instructions on how to delete the files. (*Id.*)

     Moreover, on April 19, 2019, ████████, a former LG Chem employee and member of

████████ emailed his team and other teams, including ████████████████,

██, regarding ████████ "document security check" and advised them to "[*d*]*elete competitor*

*information if reflected in the data.*" (**Ex. 1**, SK00969443–44.)  In a subsequent email, ████████

████ instructed the team to "sort and delete only the information related to ████████ or change

the file name.  (It is said that *other competitor information is not an issue*.)" (*Id.*)  Not only were

SKI employees specifically targeting and deleting LG Chem information, they were also

attempting to hide the competitor information by changing the names of files, so that they would

avoid detection by keyword searches.

███████████████████████████

Members of ███████ carried out these instructions, deleting and renaming files relating to LG Chem.  In response to ███████ email, ███████ reported that he "[e]rased everything under our name."  (**Ex. 69**, SK00969430.)  Similarly, in his deposition, ███████, the custodian of the SK00066125 spreadsheet produced from the recycle bin, admitted that rather than deleting files, he renamed files because he needed to use the LG Chem-related information they contained in his work:

> Q.  And so you said ***because these documents were necessary for your work, you changed the files so that they would not be indicated based on those search terms***, is that correct?
>
> MS. AHN: Objection.  Form.
>
> A.  ***Yes, I think that's what I did.***  Because from my perspective, I didn't want to do the repetitive work of reviewing these over and over.  So I think I just proceeded with it without really thinking much about it.

(**Ex. 70**, ███ Dep. I at 101:6–15; *see also* **Ex. 71**, ███ Dep. I at 97:17–98:1 (admitting that he deleted materials in response to the document security inspection spreadsheet).)[15]  ███ appears to have annotated the spreadsheet provided by ███, identifying specific documents to be renamed, including "Reference Data Gage RR_███.ppt" to be renamed "Reference Material Gage RR" (**Ex. 72**, SK00969442 (Team Room Tab, Row 773)) and "Competitive Life Cycle Forecast" to be renamed "Life Forecast."  (*Id.* (Email Tab, Row 158).)

---

[15] The fact that SKI employees changed the names of files to avoid discovery also has implications for Order No. 15.  Without informing LG Chem that it intended to do so, SKI undertook an effort to collect the file names of documents in the team rooms and run search terms across them.  It then advocated that any search of its team rooms come from that search of *file names*.  SKI's Opp. To LG Chem's Motion to Compel Discovery (Motion No. 1159-007) at  7 ("[U]sing the filepath information in SK00066125, SKI's IT department examined each document and located and preserved documents that had not been deleted.")  SKI did not inform the ALJ in its opposition brief that its employees had changed file names to avoid detection and discovery.  Without knowing this, Order No. 15 required the parties to proceed with a search based on SKI's devised plan, built on file names.

██████████████████████████████

In addition, SKI produced thirty-three spreadsheets derived from ████████ original document security inspection spreadsheet  from the files of individual custodians.  Many of these spreadsheets had additional columns identifying documents for deletion or renaming, or indicating the document was "no problem."  (**Ex. 24**, SK00969472.)  Still others contained different colors of highlighting on various entries, reflecting that the individual team members not only received the spreadsheets generated by ████████, but also went to efforts to comply with his instruction to analyse and remove problematic documents.  (**Ex. 23**, SK00968297.)  That SKI intentionally deleted and concealed documents relating to LG Chem and its trade secrets, and that those stolen LG Chem documents remained in use by SKI's employees, cannot reasonably be disputed.

## 2. SKI's evidence-destruction campaign was not a "routine" business practice but instead specifically targeted evidence relating to LG Chem and its trade secrets.

As noted above, ████████ informed the ALJ that his memorandum and document deletion instructions were just "part of a routine practice of doing security inspections," echoing an earlier claim SKI's counsel had made that the deletions were merely a part of a routine effort to "improve storage space efficiency."  (**Ex. 73**, ████ Decl. ¶ 4; **Ex.  65**, K. Cobb Letter to S. Gragert at 1 (Sept. 9, 2019).) ████████ said, "I am aware that since 2014 audit requests directed to project leaders or team leaders at SKI have been consistently sent out to those project leaders or team leaders in either April or November."  (**Ex. 73**, ████ Decl. ¶ 8.)  However, ████████ later testified that "often it is actually one particular organization that is being targeted or is subjected to" the audit.  (**Ex. 60**, ████ Dep. I  at 96:1–9.)  This testimony flatly contradicts his earlier claim that what happened in 2019 was part of a "consistent" or "routine" practice.  One need only consider the timing of the document-deletion campaign that ████████ initiated to understand that this campaign was anything but routine.  ████████ sent out his 75 spreadsheets targeting

documents with LG Chem and other LG related terms in the battery business for deletion *only after* SKI received LG Chem April 8, 2019 cease and desist letter.  (**Ex. 51**, LGCHEM000121036 (April 8, 2019 demand letter).)  Indeed, ███████ specifically confirmed that SKI was well aware that it had LG Chem information on its systems when it received LG Chem's April 8, 2019 cease and desist letter from an audit conducted in 2018.  (**Ex. 60**, ███████ Dep. I at 108:3–114:5; **Ex. 73**, ████ Decl. ¶ 16.)

Furthermore, ███████ testimony confirms that the 2019 document-deletion campaign was not part of a "routine" practice because, as ███████ explained under oath, SKI evaluates what documents to delete on an ad hoc basis each year, depending on the company's unique challenges at the moment.  (**Ex. 60**, ███████ Dep. I at 108:22–109:7 ("And then when you do these kind of inspection[s], *we need to actually set a topic* or agenda for this inspection, and since it is— there are so many [departments], it is impossible to really inspect as to all the departments, and so *you normally select the topic* or the subject of that particular year.").)

LG Chem is aware of no evidence that any past security audits used search terms related to LG Chem to identify specific documents for deletion.  Rather, this deletion campaign was specifically tailored to delete materials related to LG Chem at a time when SKI and its employees knew of the threat of litigation from LG Chem based on the very fact that SKI had these materials in their possession.  (*See*, **Ex. 1**, SK00969443 (April 19, 2019 email from ███████: "From the competitors' information, you can sort and delete only the information related to ███████ or change the file name.  (It is said that other competitor information is not an issue.)")

Finally, contemporaneous emails from SKI dispel any suggestion that the April 2019 document security inspection was a "routine" procedure at SKI.  For example, on April 16, 2019, ███████, a member of ███████, circulated meeting minutes to members of his team.

█████████████████████████████████████

Under a bullet point labeled "Document security inspection review," ██████ wrote, "The purpose is to prevent in advance problematic issues should a legal dispute arise with a competitor." (**Ex. 3**, SK00968270.)  Thus, SKI employees fully understood that the motivation behind ██████ document security inspection was to remove information related to LG Chem in preparation for the litigation that SKI fully anticipated.

### 3.   SKI continued to delete documents even after this litigation began.

SKI did not stop deleting evidence even after LG Chem filed its complaint in this case.  On April 29, 2019, three weeks after sending the second demand letter to SKI, LG Chem filed this case.  For example, on April 30, 2019, ██████ a member of SKI's █████████ ██████ sent an email to a variety of teams at SKI with the subject, <mark>"[URGENT] Related to LG Chem lawsuit matter."</mark>  (**Ex. 2**, SK00815537 at SK00815538.)  ██████ reported that "████ was "bringing a lawsuit against our company in the US," and he attached three news articles discussing the lawsuit.  (*Id.*)  The day after the complaint was filed in this investigation, ██████ the team leader for the ████████████ (responsible for construction of plants outside Korea), forwarded ████████ email to his team.  (*Id.* at -537.)  ██████ instructed his team to delete the evidence and delete his instructions telling them to do so:

| | |
|---|---|
| **From:** | ████████████ |
| **Sent:** | <mark>Tuesday, April 30, 2019 3:31 AM</mark> |
| **To:** | ██████████ |
| **Subject:** | FW: [긴급] LG화학 소송 건 관련 |
| **Importance:** | <mark>High</mark> |

<mark>각자 PC, 보관메일함, 팀룸에 경쟁사 관련 자료는 모두 삭제 바랍니다. ASAP 특히 SKBA는 더욱 세심히 봐 주세요. PC 검열 및 압류 들어 올수도 있으니..</mark>

본 메일도 조치후 삭제 바랍니다.

<mark>(Original)</mark>



**From**:
ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=SK10475>
**To**:
<ORG_H60_10863958@skcorp.com>
**Sent**:       2019/04/30 3:31:17
**Subject**:    FW: [URGENT] Related to LG Chem lawsuit matter
**Importance**:  High

Delete every material related to the rival company from every single individual's PC, mail storage archives and team rooms. ASAP
Make sure to especially scrutinize SKBA. PCs may even be subject to seizure and examination..

Delete this email after completing this directive.

(Translation)

In his deposition, ███████████ a member of the ████████████████ acknowledged receiving ███████ email. (**Ex. 74,** █████ Dep. I at 103:4–9.) ████ testified that he believes he deleted materials in response to ████████ email immediately after receiving it and that, in any event, he would have followed ████████ instructions to delete the rival's information from his PC, storage mail archives, and team rooms. (*Id.* 103:4-9; 104:2-6.) He also testified that he believes he would have complied with ███████ order to delete his email after completing the instructions. (*Id.* at 104:11-105:13.)[16]

Even more troubling, when SKI's Legal Department learned about ████████████ email, it did nothing to follow up. The Legal Department did not contact ██████████ did not contact any of the recipients of the email, and did not conduct any investigation. Simply put, apart from speaking with SKI's outside counsel about the email, SKI's Legal Department took no action

---

[16] Tellingly, ████████ was not able to say whether he believed ████████ instruction to delete rival information was ethical, and he confirmed that SKI has never provided him information about how SKI expects its employees to behave ethically. (*Id.* at 109:16-110:16.)

████████████████████████████

whatsoever to ensure it would not violate its discovery obligations in light of impending U.S.

litigation.  (**Ex. 59**, ████ Dep. I at 175:18-177:19.)

> **4.      SKI failed to stop the deletion efforts or adequately preserve documents even after this litigation began.**

After LG Chem filed its complaint, SKI's Legal Department sent a litigation hold notice to

a narrow set of ten executives and department heads but left it up to those individuals to

disseminate the notice.  (**Ex. 75**, October 24, 2019 letter from M. Plimack to S. Gragert, Exhibit

A; **Ex. 59**, ████ Dep. I at 185:2–15.)  Many key SKI employees did not receive any hold notice

until later in May 2019, and still others did not receive any hold notice from SKI's Legal

Department until *October 2019.*  (**Ex. 75**, October 24, 2019 letter from M. Plimack to S. Gragert,

Exhibits D–E; (**Ex. 59**, ████ Dep. I 189:22-190:4.)  For instance, it appears that former LG

Chem employees such as ████████ (the custodian of the SK00066125 spreadsheet produced

from the recycle bin) and ████████ (the custodian of copies of two additional deletion

spreadsheets), did not receive notices from the Legal Department until just *weeks* ago on October

15.  (**Ex. 75**, October 24, 2019 letter from M. Plimack to S. Gragert, Exhibits D–E.)  Further, even

those employees who received the litigation hold in a timely manner failed to take it seriously.

(**Ex. 55**, ████ Dep I at 175:21–176:5 (admitting that he cannot remember if he deleted anything

after receiving the hold on April 30.)

SKI also failed to take steps to stop the deletion efforts that were already underway at SKI

as a result of ████████ "document security inspection" that began just a few weeks earlier.  In

his declaration, ████████ asserts that "[b]y no later than May 7, I had been informed that

numerous individuals in the company had received document preservation instructions" and that

SKI "immediately took steps to preserve email files of relevant individuals, including, beginning

on May 7, downloading existing emails from the email servers into a PST file, and also enabling

the archiving of emails." (**Ex. 73,** ███ Decl. ¶ 20.)  But ████████ deposition revealed just

how inadequate SKI's "steps to preserve" evidence were once the company knew it had been

named as a respondent in the Commission's Notice of Institution of Investigation.

First, ████ admitted that ***SKI did not preserve any documents in the team rooms*** due

to their *size*.  (**Ex. 60,** ███ Dep. I at 142:7–145:15.)  Nor did SKI image any smaller subset of

team rooms relevant to this litigation because, according to ████ , "we have never heard what

is important and what is not."  (**Ex. 60,** ███ Dep. at II 281:4–8.)

Second, ***SKI took no steps after May 7 to stop the deletion of the documents still stored***

***in SKI's recycle bins***, into which employees had been, for the past month, dumping LG-Chem

related documents at ████ instruction.  (**Ex. 60,** ███ Dep. I at 147:17–149:1.)  SKI's

recycle bins retain files for only 30 days, which means that even if the recipients of ███

seventy-five spreadsheets started deleting files by moving them to recycle bins on April 12—the

day they started receiving the spreadsheets—those deleted materials remained in the recycle bins

until May 12, two weeks after the Complaint was filed and after the company issued document

preservation instructions.  (*Id.* at 132:13–17.)  Yet according to ████ , "the thought of keeping

the recycling bin from [deleting the files] had never really crossed my mind."  (*Id.* at 147:17–

148:2.)   Finally, ████ admitted that ***he never told the recipients of the spreadsheets***

***instructing them to delete LG Chem-related documents to cease their deletion efforts once this***

***litigation was underway***.  (*Id.* at 153:8–155:8.)  ████ admitted it was something he had not

"really thought about."  (*Id.*)

> **D.**   **After evidence of SKI's document deletion campaign came to light, the ALJ**
> **issued Order No. 13 requiring a thorough forensic investigation under LG**
> **Chem's observation.**

After learning of "discrepancies" in SKI's document production and seeing evidence that

SKI had "flagged for potential deletion" many documents relevant to LG Chem, the ALJ issued

Order No. 13 requiring SKI to perform a thorough examination of its deleted evidence.  Order No. 13 at 2.  At the time, ██████ had not been deposed, and none of the facts exposing the true scope of the deletion campaign, or the fact that it was hardly "routine," had yet come to light.  Nor had SKI produced the seventy-five other spreadsheets[17] detailing LG Chem documents targeted for deletion.  Nonetheless, in Order No. 13, the ALJ found that "the needs of the investigation, the importance of the discovery, and the public interest weigh heavily in favor of a thorough examination"—even if the results of that examination may be "potentially very bad" for SKI.  *Id.* at 2–3 (quoting SKI's Opposition).  Instead of complying with the mandate of Order No. 13, SKI intentionally limited its forensic analysis in a way that falls well short of what Order No. 13 requires.

E.     **SKI refused to comply with Order No. 13 and engaged in its own secret forensic investigation.**

The facts showing SKI's behavior in contempt of Order No. 13 are well-documented and largely undisputed.  Order No. 13 requires that SKI have its forensic consultants "search for and attempt to recover ***all*** documents and associated electronic information relating to either LG Chem or the subject matter of this investigation that have been deleted by Respondents . . . ."  *Id.* at 4.  Order No. 13 made the breadth of the required examination clear.  First, SKI was to search for files including but not limited to those contained in SK00066125.  *Id.*  Second, the ALJ ordered SKI to follow a list of "specific review directives" to guide the examination.  These directives include a requirement that SKI fully document its work and compare SKI's recent April 2019 document deletion campaign that targeted LG Chem-related documents with SKI's earlier purportedly

---

[17] This is profoundly troubling given that SKI created the deletion spreadsheets at substantially the same time and as part of the April 2019 document deletion campaign.  SKI has never provided any explanation for why it produced only one such spreadsheet, producing fifty-seven others after the ALJ issued Order No. 13, and an additional nineteen in late October.

"routine" security audits or inspections.  (**Ex. 76**, Attachment A: Protocol for SKI Forensic Investigation.)   Third, Order No. 13 required SKI to "permit one of LG Chem's retained consultants to attend and observe the process."  Order No. 13 at 4.  SKI failed to meet any of these requirements.

1.      **SKI limited its forensic investigation in defiance of the ALJ's order.**

Order No. 13 is not ambiguous.  It required SKI to search for "***all*** documents and associated electronic information relating to either LG Chem or the subject matter of this Investigation that have been deleted by Respondents, including ***but not limited to*** the documents referenced in SK00066125."  *Id.* at 4.  Nothing in Order No. 13 allows SKI to unilaterally limit its forensic search to ***less than all*** of the relevant documents, or to ***only*** the documents listed in SK00066125.

From day one, LG Chem was concerned that SKI too narrowly focused its work on the documents generated by a single specific business unit, █████████, and stored on the █████ ████████████ team room out of more than seventy-five such locations.[18]  However, LG Chem believed SKI was specifically searching only for those documents referenced in SK00066125, despite Order No. 13's requirement to search more broadly.  LG Chem raised this issue in writing on October 8 and 9, 2019 (as well as numerous phone calls) asking SKI to confirm it would ***not*** limit its examination in this manner and asking to confer on the issue "before SKI gets too far down the road."  (**Ex. 78**, Oct. 8, 2019 Email from B. Reiser to S. Sobin *et al.*; **Ex. 79**,

---

[18] SKI should have known that relevant documents would have been located in other teams' team rooms.  For example, in order to testify on the corporate deposition topics, SKI designated witnesses from the ███████████████████████████████████████████████████, among others.  Former LG Chem employees who had been accused of misappropriation were employed by SKI on several teams, including █████████████████████, ████████      (**Ex. 77**, SKI's Sixth Supplemental Objections and Responses to LG Chem's First Set of Interrogatories, Appendix A.)

█████████████████████████

Oct. 9, 2019 Email From B. Reiser to S. Sobin *et al.*)  SKI would not give LG Chem the assurances it requested.

Then, four days into its forensic examination, SKI provided the interim report of its forensic expert, Arnold Garcia of iDiscovery Solutions, Inc.  This report confirmed that, ignoring Order No. 13, SKI was focusing on only the ***single*** set of documents listed in SK00066125.  In response, LG Chem's counsel again wrote to SKI on October 13, 2019 and expressed its concerns with SKI's unduly narrow search in violation of the ALJ's order.  (**Ex. 80**, Oct. 13, 2019 Email from B. Reiser to S. Sobin *et al.*)  SKI did not respond.

LG Chem was right to be concerned, for SKI proceeded to do the opposite of what the ALJ expressly ordered, and ***unilaterally limited its examination to the files listed in SK00066125***.  Mr. Garcia confirmed in his final report dated October 17, 2019, that he ***only*** searched SKI's repositories of electronic information for files listed in the SK00066125 spreadsheet, not for any other deleted documents that relate to LG Chem or the subject matter of this Investigation.  (**Ex. 63**, A. Garcia Final Report.)

- Reporting on analysis of VDI Snapshots: "This data was processed and searched for the file names or email subject name ***from the 6125 List***," and "The 6125 List was used for the search and tagging purposes . . . ."  (*Id.*, ¶ 7.)

- Reporting on analysis of OST Files: "All items were searched based on file names of attachments as well as the subject of the emails ***from the 6125 List***."  (*Id.*, ¶ 8.)

- Reporting on analysis of Team Room Indices: "A list of 18 Team Rooms was provided to perform a search and comparison of ***file names from the 6125 List***."  (*Id.*, ¶ 9.)

(*See also id.*, ¶¶ 10-15, 17 (same).)  Nothing in Mr. Garcia's report suggests that SKI directed him to search for ***all*** deleted documents relating to LG Chem or the subject matter of this Investigation, or ***not*** to limit his search to just those documents referenced in SK00066125 as the ALJ ordered.  Moreover, SKI failed to undertake any search of local computers, where relevant LGC documents were likely to have been stored by SKI personnel for later use.

██████████████████████████████

### 2.   SKI refused to investigate email communications surrounding the April 2019 "audits" to ascertain the intent behind deleting documents relating to LG Chem.

Order No. 13 preceded ████████ deposition, which revealed that the so-called "audit" was not a routine business practice, but instead was a specific effort to destroy evidence relating to LG Chem.  Because the motivation behind the document deletions had not yet been exposed, the ALJ ordered SKI to conduct "a targeted review of email communications surrounding the April 2019 audits, so as to determine and document any discussions which relate to the intent of the audits."  (**Ex. 76**, Attachment A: Protocol for SKI Forensic Investigation.)  One would expect, given the wide scope of SKI's enterprise-wide search for LG Chem-related documents to delete, that the examination would turn up email or other communications explaining the intent behind the deletion campaign.  But nothing in Mr. Garcia's interim or final reports suggests that SKI even attempted to carry out this essential aspect of the ordered investigation.   To the contrary, Mr. Garcia's forensic work regarding emails was limited to his search of email repositories for the files named on SK00066125, which in its narrowness already violates Order No. 13.  *Infra* Section II.E.5.  This is a far cry from complying with the ALJ's requirement that SKI find email relating to the April 2019 audits to determine the intent behind them.  The emails LG Chem now knows about that reflect SKI's plans to destroy evidence that could be used against it in litigation, *supra* at Section II.C, were not even the subject of Mr. Garcia's investigation.

### 3.   SKI excluded LG Chem's forensic consultant from key aspects of the examination and led him to believe that SKI had completed its work by October 13.

Order No. 13 also required SKI to "permit one of LG Chem's retained consultants to attend and observe the process" of carrying out the ordered forensic examination and inspection.  Order No. 13 at 4.  Nothing in the order suggests that SKI may conduct parts of the examination in private

███████████████████████████████

or exclude LG Chem's consultant. Mr. Garcia's final report, however, reveals that SKI excluded

LG Chem's expert, Axel Bolanos, from significant portions of the process.

Mr. Garcia's work included steps that Mr. Bolanos was unaware of and was not invited to

observe. In reporting on his "Forensic Analysis and Results," Mr. Garcia describes analyzing data

pulled from a system called "Nate on Biz," and concludes that he found no "file name matches"

when searching it for documents listed on SK00066125.[19] (**Ex. 63**, A. Garcia Final Report, ¶ 13.)

Mr. Bolanos was never made aware of the Nate on Biz data and thus could not and did not attend

or observe the forensic analysis of it. (**Ex. 82**, Declaration of Axel Bolanos, ¶ 16.) Mr. Garcia

continues to describe another aspect of his forensic analysis on SKI's network attached storage, or

NAS, which he also "compared against the 6125 List." (**Ex. 63**, A. Garcia Final Report, ¶ 14.)

Mr. Bolanos was not made aware of this system either, and thus could not and did not attend or

observe the forensic analysis of it. (**Ex. 82**, Declaration of Axel Bolanos, ¶ 17.)

SKI's decision to exclude Mr. Bolanos from its examination of the Nate on Biz and NAS

data likely stems from the fact that SKI only told its own expert, Mr. Garcia, about these data

repositories in interviews it conducted out of Mr. Bolanos' presence. Mr. Bolanos was permitted

to attend interviews of ████████ on October 8 and 11, 2019 (**Ex. 63**, A. Garcia Final Report, ¶¶

---

[19] That Mr. Garcia could find no file name matches is unsurprising given that SKI's witnesses explicitly testified that they deleted or changed file names (**Ex. 70**, ██████ Dep. at 96:21–98:12 ("Q: . . . Why did you delete the word 'competitor' in the title or subject? A: "To my understanding, as it is indicated on the document itself, these were documents that were extracted based on search words. . . . But as a matter of fact, if you look at the details, then some were actually related -- some were emails that were actually necessary for my work and whatnot. And if that's the case, I didn't delete those. So I just changed the names so that these would not come up again by guessing at the search words."); **Ex. 81**, ██████ Dep. II at 177:2-9 ("Q. So how do you know what documents to delete? A. I don't know about that. I just understood that this was at my own discretion. Q. So you could either delete a file or change its name, is that correct, at your own discretion? Mr. Shafroth: Objection to form. A. Although I do not remember exactly, that was my understanding.").)

██████████████████████
████████████████

27–28, 46), but apparently Mr. Garcia, along with SKI's counsel and other SKI insiders, returned

for a "follow up" meeting with ████████ on October 11 (*Id.* ¶ 55.)—***without telling LG Chem or***

***Mr. Bolanos***.  (*Id.*)  While LG Chem will never know the full content of the second meeting with

████████, Mr. Garcia reported that he gathered extensive information about SKI's information

technology at that meeting and learned about IT systems from a ████████████████.  (*Id.* ¶¶ 55–

64.)  Mr. Bolanos did not know about or have any opportunity to attend or observe this meeting.

(**Ex. 82**, Declaration of Axel Bolanos, ¶18.)

Worse, SKI actively led Mr. Bolanos to believe that SKI was going to complete the in-

person (in Korea) forensic and other investigatory work that SKI intended to do by October 12,

2019.  This induced Mr. Bolanos to leave Korea and return the United States on October 12, after

which SKI carried out additional investigative work.  Mr. Garcia's final report reveals that after

Mr. Bolanos left the country, Mr. Garcia and SKI's counsel held ***more "follow up" meetings with***

████████ ***without Mr. Bolanos's knowledge or participation*** over the course of two more days.

(**Ex. 63**, A. Garcia Final Report, ¶ 65.)

The facts of the subsequent meetings are as follows.  Mr. Bolanos, Mr. Garcia, and SKI's

counsel Mr. Sobin had arranged flights from Korea back to the United States on Saturday, October

12.  This appeared timely because ████████ informed  Mr. Garcia and Mr. Bolanos that the

remaining forensic searches had been fully completed on October 11.  (**Ex. 82**, Declaration of Axel

Bolanos, ¶¶ 4–6.)  On October 12, Mr. Bolanos suggested to Mr. Garcia that they share a ride from

SKI's offices in Seoul to the airport, but Mr. Garcia declined.  (*Id.*, ¶¶ 6–8.)  Mr. Garcia said his

flight had been delayed, and Mr. Sobin said he had changed his plans and would leave the

following day.  Accordingly, Mr. Bolanos left for the airport alone on October 12.  (*Id.*, ¶¶ 7–9.)

Upon his return to the United States on Sunday, October 13, and in response to Mr. Bolanos'

request to be advised whether there was any other ongoing activity, he received a message from Mr. Garcia confirming, "***there are no other pending tasks***. I have completed the tasks and searches we went over." (*Id.*, ¶¶ 10–13; *id.* at Attachment A, Oct. 13, 2019 Email from A. Garcia to A. Bolanos.)

Mr. Garcia's statement proved to be false.  Unbeknownst to Mr. Bolanos (or LG Chem or its counsel), SKI, its expert, and its counsel carried out additional "tasks" on the investigation on October 15 and 16, including another "interview" with ▮▮▮▮▮ that spanned two days.  (**Ex. 63**, A. Garcia Final Report, ¶ 65.)  Mr. Bolanos was unaware of these meetings and was not invited to attend or observe them.  (**Ex. 82**, Declaration of Axel Bolanos, ¶¶ 15–19.)  That SKI continued with its investigation without permitting Mr. Bolanos to observe the process is beyond dispute; SKI admits that "Mr. Garcia requested [from SKI] additional data sets to be included in his analysis" after Mr. Bolanos had left Korea and without his knowledge.  (**Ex. 83**, Oct. 20, 2019 Email from S. Sobin to D. Callahan and C. Comfort.)  This violates Order No. 13, which required SKI to "permit LG Chem's retained consultants to attend and observe the examination," without qualification, and goes on to require SKI to confirm it "provided full access and cooperation," which SKI plainly did not provide.  Order No. 13 at 4–5.  SKI has not offered any satisfactory explanation for violating Order No. 13 by having Mr. Garcia and counsel conduct private meetings with ▮▮▮▮▮ and others on October 11, 15, and 16 as part of the investigation.

### 4.  SKI refused to explain how it developed the search terms it used to identify documents relating to LG Chem for deletion.

Order No. 13 also required SKI to follow directives listed in a protocol that LG Chem had provided.  (**Ex. 76**, Attachment A: Protocol for SKI Forensic Investigation.)  That protocol requires the examiners to investigate not just ***what*** documents SKI searched for and targeted for deletion in

████████████████████████

April 2019, but also **how** SKI developed the search terms and **who** developed them.  (*Id.*[20])  This

part of SKI's investigation should have confirmed whether, as SKI was contending, its efforts to

destroy LG Chem-related documents were part of "routine" business practices or whether they

were a concerted effort to eliminate evidence relevant to the dispute between the parties, as all the

evidence suggests.

SKI simply chose not to investigate or report on the origins of the April 2019 deletion

campaign or how it developed the search terms that resulted in SKI identifying thousands of

documents for potential deletion.  Rather, SKI had its forensic consultant interview ████,

who apparently never shared how or why SKI (really, ████ himself) developed terms that

would target documents relating to LG Chem.  Mr. Garcia's report is devoid of any explanation of

who developed the search terms and how, as Order No. 13 requires.  (**Ex. 63**, A. Garcia Final

Report, ¶¶ 28–34.)  At most, Mr. Garcia reports that ████ told him that some documents,

somewhere, located through "previous information security inspections" had "referenc[ed] LG,

and therefore ████ focused on LG key search terms for the 6125 List." (*Id.*, ¶ 30.)  This says

nothing about what SKI chose to search for or how it developed the search terms in its deletion

campaign, or the genesis of this so-called "audit" in April 2019, as the ALJ ordered.

### 5.  SKI limited its forensic examination to a single business unit, Battery Cell Team 2.

There is no reasonable reading of Order No. 13 by which SKI could unilaterally limit the

forensic investigation to files relating to just a single business unit at SKI.  Yet SKI and its forensic

consultant improperly did just that, limiting their work to documents relating to ████ while

---

[20] "SKI's investigations will determine exactly who and how the search terms were developed for the April 2019 inspections as well as both prior and subsequent inspections"; "SKI's investigations will determine the specific genesis of both the timing and content of the April 2019 audits."



ignoring all other business units relevant to this Investigation, like the ███████ ██████████ or even ██████. SKI's failure to search for deleted materials related to ██████ is particularly troubling because ██████ develops batteries and processes for Asia, whereas ██████ covers all other countries, including the United States. (**Ex. 84,** █. ██ Dep. I at 124:1–12; **Ex. 93,** ██████ Dep I. at 15:21–16:2 (confirming that ████████ is not "involved with the development of a lithium ion battery for any customer in the United States.)

Once again, LG Chem's counsel immediately raised the problem with SKI's counsel during the investigation:

> Based on events of the first day on-site at SKI's Offices in Korea, it appears that SKI[] intends to ***narrowly focus the ordered forensic examination on*** ██████ █ and on the email and file server 'Team Room' that ██████ members primarily utilize. In other words, it appears that SKI proposes to limit its examination to the documents referenced in SKI00066125. This scope of examination is ***far too narrow*** and directly violates the terms of Order No. 13 . . . . Even if this focus on ██████ is merely an initial or preliminary effort, we note (given that ██████ is a secondary team after ████████) that ***this initial effort should also encompass at least*** ██████

(**Ex. 78**, Oct. 8, 2019 Email from B. Reiser to S. Sobin *et al.*) SKI never addressed this problem. As explained above, Mr. Garcia's report demonstrates that he focused exclusively on the documents reflected in SK00066125, which pertain to ██████

Mr. Garcia also claims that LG Chem's forensic consultant and observer "Axel Bolanos and I ***agreed*** to focus on the █ custodians from the ████████." (**Ex. 63**, A. Garcia Final Report, ¶ 29 (emphasis added).) This is false. Although Mr. Bolanos observed as much of the forensic work as SKI permitted, he did not exercise any control over SKI's and Mr. Garcia's work, and thus did not (and could not) "agree" that SKI's narrow focus on custodians "from the ██████ was appropriate. (**Ex. 82**, Declaration of Axel Bolanos, ¶ 15.) Mr. Garcia also ignores or was never told that LG Chem had expressly put SKI on notice that focusing exclusively on ██████ was a violation of the Order, and that the examination should include

███████████████████████████████████

inspection of files relating to all of the other teams, including ███████ (**Ex. 63**, A. Garcia

Final Report, ¶ 29.)

      **6.**     **SKI secretly carried out its own forensic investigation outside
LG Chem's observation.**

Only after the ALJ issued Order No. 13, SKI revealed that in addition to the SK00066125

spreadsheet, which showed how SKI had instructed ███████ to delete documents relating to

LG Chem, there are seventy-four additional spreadsheets evidencing similar document deletion

efforts across the battery business.  Even as late as October 9, 2019, SKI's counsel maintained the

utterly implausible position that its ███████ prepared the [SK00066125] spreadsheet as part

of a routine document security inspection."  (**Ex. 62**, Oct. 9, 2019 Letter from K. Cobb.)  But it

also admitted for the first time that SKI had "prepared similar document security inspection

spreadsheets for other teams within SKI's battery business," spreadsheets containing lists of

LG Chem-related files and similar deletion instructions.  (*Id.*)  SKI had "been able to locate 58

document security inspection spreadsheets" it used to guide other "battery business teams" in

destroying evidence.  (*Id.*)  SKI later disclosed that ███████ generated similar spreadsheets for

nineteen ██████████████████████.  (**Ex. 85**, October 21, 2019 Email from M.

Browne to LG Chem Counsel attaching nineteen additional spreadsheets.)[21]

These newly revealed spreadsheets show that SKI instructed various other business teams

to destroy potentially huge numbers of documents relevant to LG Chem, its technology, and its

trade secret misappropriation claims—not just ███████.  As an example, one of the recently

produced spreadsheets lists over ████ files from a ████████████████████████" that SKI

---

[21] A total of seventy-seven spreadsheets were produced. Two, however, contain cover pages with
instructions but no documents. Accordingly, SKI produced a total of seventy-five spreadsheets
identifying documents for potential deletion.



stated "may be misunderstood from outside by the title" and thus targeted for deletion. (**Ex. 86**, SK00894814, with translated excerpt.) As with the SK00066125 spreadsheet, some documents on the list seem to be false positives, having names with "LG" in them that do not refer to the company, including words like "a**lg**orithm," "Fil**lG**ap," and "Ce**lg**ard." But many files directly implicate LG Chem and its trade secrets, for example:

- "                                        .docx";
- "                              .pdf";
- "                                      .msg";
- "                        **LGC**   1020080126798.pdf";
- "180223_1632                          ";
- "                        kr20180039453a _ p.pdf";
- "                      pdf";
- "                      pdf";
- "              130723.ppt";
- "                                _            xls";
- "                      xlsx";
- "              xlsx";
- "                        – 20110530_ Pack Developmemt.ppt";
- "              pdf";
- "                                pptx"

(*Id.*).

It appears that the spreadsheets also targeted interview materials of former LG Chem employees for deletion. For instance, the spreadsheet created for the              unit includes file names such as:

- Korean resume_        86_Aju University Master's degree_LG Chem_Battery Cell R&D.doc

██████████████████████████████

- Korean   resume_████████   ██████85_Chonnam   National   University   Master's degree_LG Chem_Battery R&D.doc (the file path for this document suggests that the document may be a technical CV)

(**Ex. 92**, SK01106996.).  Other file names in the spreadsheet contain instructions for the recipient to delete the files after reading information related to LG Chem.  (*See, e.g., id.* ("180725_1437_████████_(Request to destroy after reading) Sharing interview results with people involved in the ████████ litigation.msg").)

It bears repeating that these are only examples from **two** of seventy-five document deletion spreadsheets that SKI produced.  Despite the revelation that on at least seventy-five instances SKI instructed various teams to target LG Chem-related evidence for destruction, in addition to the deletion efforts reflected in SK00066125, SKI still limited its forensic investigation led by outside consultant Mr. Garcia, to just the documents referenced in SK00066125.  *Supra* at Section II.E.5.

We know now that behind the scenes, SKI has been conducting in parallel a broader, secret forensic inspection of its own files, outside the parameters and restrictions of Order No. 13.  During his deposition on October 28, ████████ admitted that at the end of September, SKI hired another vendor, Fronteo (with which SKI had previously worked), to conduct a forensic investigation to determine what files from the other seventy-four spreadsheets were deleted.  (**Ex. 60**, ████████ Dep. I at 164:22–165:11.)  And in response to OUII Staff's repeated questioning, ████████ admitted that the forensic work is currently ongoing:

> Q. During October 2019, has Fronteo been actively engaged in extracting documents from the team rooms in connection with the April 2019 document security inspection?
>
> A. Yes, and it's ongoing even now.  And not only that, also there have been occasions where the extractions was made based on the search words.  And my understanding is that the documents or the materials related to the April 11th inspection and the April 9th inspection are still continuously being extracted.  And

████████████

then I've been also told that searching for the things with the – that have to do with the e-mails have been also ongoing.

(**Ex. 60,** ████ Dep. II at 329:14–330:5.)  SKI has no explanation for why it hired yet another forensic consultant to do this, and do it in private, when the documents it is now investigating are plainly part of the "all documents" SKI should have pursued with Mr. Garcia in response to Order No. 13 under LG Chem's consultant's observation.

████—again, the person responsible for the deletion efforts in the first place—has been charged with supervising Fronteo's work in searching for the deleted documents.  (**Ex. 60,** ██ ██ Dep. I at 165:12–14.)  Counsel for SKI, both in-house and outside, also have been involved in Fronteo's process.  (*Id.* at 175:14–177:5.)  ████ could not provide an estimate of how long Fronteo's analysis would take.   Three days later, however, counsel for SKI indicated that "documents potentially subject to outstanding discovery requests identified in" the seventy-four spreadsheets apart from the SK00066125 spreadsheet would be produced "on a rolling basis starting later this week." (**Ex. 87**, Oct. 31, 2019 Email from S. Tennant to S. Gragert.)  But because SKI has not conducted any part of this private inspection in accordance with Order No. 13, LG Chem and its consultant Mr. Bolanos have had no opportunity to observe it, and there has been no transparency whatsoever into how SKI has searched for, collected, or "managed" any of the documents it has recovered.

### 7.      SKI never sought relief from Order No. 13 or requested more time to comply.

If SKI was truly interested in complying with Order No. 13 but had concerns about its breadth or deadlines, then it was required to immediately seek relief from the ALJ.  SKI never did this, and the ALJ cannot now allow SKI to seek forgiveness, having failed to ask for permission. SKI made a calculated decision to disobey the order and wait for discovery to nearly end—while engaging in a secret forensic investigation that does violence to both the letter and spirit of Order

No. 13.  SKI's misconduct has deprived the ALJ, Staff, and LG Chem of central evidence of SKI's misappropriation and use of LG Chem's trade secrets.  SKI's efforts to destroy, hide, and rename documents have ensured that many documents are completely unavailable.  Even evidence of the spoliation itself is gone, since some SKI employees surely followed the "delete the evidence, then delete these messages" instructions.

SKI's discovery delays, violations, and its flouting of Order No. 13 have prevented LG Chem from receiving anything resembling full and complete discovery in this Investigation.  SKI's successful document-deletion tactics and violations of the ALJ's Order have ensured that the ALJ, Staff, and LG Chem will never know the full scope of SKI's destruction of evidence relating to its misappropriation and use of trade secrets.  Nor can the ALJ, Staff, and LG Chem trust that any documents SKI produces from its secret forensic investigation in defiance of Order No. 13 will accurately, completely, or reliably reflect the facts.  The damage has been done, and no orders compelling further discovery can undo it.  More vigorous sanctions are required.

## III.    LEGAL STANDARDS

### A.      Failure to Comply with a Discovery Order

If a party (or officer or agent thereof) fails to comply with an order compelling discovery, Commission Rule 210.33 provides for the imposition of sanctions "for the purpose of permitting resolution of relevant issues and disposition of the investigation without unnecessary delay despite the failure to comply."  19 C.F.R. § 210.33.  The rule authorizes the ALJ to "take such action in regard thereto as is just," including any relief available under Fed. R. Civ. P. 37(b).  *Id.*; *Certain Asian-Style Kamaboko Fish Cakes*, Inv. No. 337-TA-378, Publ. No. 2998, at *16 (Sept. 1, 1996).

Federal Rule 37 enumerates sanctions a court can impose "For Not Obeying a Discovery Order," which include "rendering a default judgment against the disobedient party," "directing that

the matters embraced in the order or other designated facts be taken as established for purposes of the action," and "treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination." Fed. R. Civ. P. 37(b)(2) (A)(vi)–(vii).  Thus, the ALJ has broad discretion in deciding the appropriate sanction, and "the language of [Commission Rule 210.33(b)] suggests that the sanction should be tailored 'to compensate for' the non-compliance." *Certain Cigarettes & Packaging Thereof*, Inv. No. 337-TA-424, Order No. 38, at *2 (Feb. 2, 2000) (internal quotation omitted).

### B.   Civil Contempt

Courts weighing civil contempt motions consider whether (1) the court's order set forth an unambiguous command; (2) a party violated that command; (3) the violation was significant, meaning that a party did not substantially comply with the order; and (4) the party made a reasonable and diligent effort to comply.  *See Ohr ex rel. Nat'l Labor Relations Bd v. Latino Express, Inc.*, 776 F.3d 469, 474 (7th Cir. 2015); *Symons Int'l Grp. v. Cont'l Ca*s., No. 1:01-CV-00799-RLY-MJD, 2016 WL 3124626, at *2 (S.D. Ind. June 3, 2016) (applying civil contempt standard for a party's failure to comply with a discovery order);  *see also S. New England Tel. Co. v. Glob. NAPs Inc*., 624 F.3d 123, 145 (2d Cir. 2010) ("A court may, however, hold a party in contempt for violation of a court order when the order violated by the contemnor is clear and unambiguous, the proof of non-compliance is clear and convincing, and the contemnor was not reasonably diligent in attempting to comply.") (internal quotation omitted)); *United States v. Conces*, 507 F.3d 1028, 1041–42 (6th Cir. 2007).  Failure to comply with an explicit order compelling discovery warrants a civil contempt sanction under Rule 37(b)(2)(A)(vii).  *See, e.g.*, *Victor Stanley, Inc. v. Creative Pipe, Inc.,* 269 F.R.D. 497, 540 (D. Md. 2010); *Intercept Sec. Corp. v. Code-Alarm, Inc.,* 169 F.R.D. 318, 324 (E.D. Mich. 1996); *Transportes Aereos de Angola v. Ronair, Inc.,* 104 F.R.D. 482, 504 (D. Del. 1985).

███████████████████████

### C.     Spoliation of Evidence

Spoliation sanctions are warranted when (1) the party with control over the evidence had an obligation to preserve it at the time it was destroyed or materially altered; (2) the evidence was destroyed or materially altered with a "culpable state of mind"; and (3) the destroyed or materially altered evidence was "relevant" to the claim or defense of the party that sought the discovery. *Certain Opaque Polymers*, Inv. No. 337-TA-883, Order No. 27, at *6 (Oct. 20, 2014).  "The duty to preserve evidence begins when litigation is "pending or reasonably foreseeable." *Micron Tech. v. Rambus, Inc.,, Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011) (internal quotation omitted).  This is an objective standard, and courts consider whether "a reasonable party in the same factual circumstances would have reasonably foreseen litigation." *Id*.  "[S]poliation sanctions may be imposed as long as the destruction of evidence was 'blameworthy' (*i.e.*, with fault), with the degree of culpability impacting the severity of the sanction." *Certain Opaque Polymers*, Inv. No. 337-TA-883, Order No. 27, at *9; *see also Certain Stainless Steel Prods., Certain Processes for Mfg. or Relating to Same, & Certain Prod. Containing Same* ("*Certain Stainless Steel Prods.*"), Inv. No. 337-TA-933, Publ. No. 4904, at *27 (June 9, 2016).  The "burden placed on the moving party to show that the lost evidence would have been favorable to it ought not to be too onerous, lest the spoliator be permitted to profit from its destruction." *Certain Opaque Polymers*, Inv. No. 337-TA-883, Order No. 27, at *11 (quotation omitted).  Further, "failure to preserve documents in bad faith, such as intentional or wilful conduct, alone establishes that the destroyed documents were relevant." *Id*. at *12 (collecting cases).  "Generally, courts find prejudice where a party's ability to present its case or to defend is compromised." *Id.* (quotation omitted).

Section 337(h) authorizes the Commission to issue sanctions "'for abuse of discovery and abuse of process to the extent authorized by Rule 11 and Rule 37 of the Federal Rules of Civil

Procedure.'" *Certain Stainless Steel Prods.*, Pub. No. 4904, at *26 (citing 19 U.S.C. § 1337(h)) (internal quotation omitted).  In crafting a sanction for spoliation, courts seek to "vindicate the trifold aims of: (1) deterring future spoliation of evidence; (2) protecting the [complainants'] interests; and (3) remedying the prejudice [complainants] suffered as a result of [respondents'] actions." *Certain Opaque Polymers*,  Order No. 27, at *13 (citing *Micron Tech., Inc.*, 645 F.3d at 1329).

A sanction of default in particular may be appropriate when "there is clear and convincing evidence of both bad-faith spoliation and prejudice to the opposing party." *Micron Tech., Inc.*, 645 F.3d at 1328–29.  "To make a determination of bad faith, the district court must find that the spoliating party 'intended to impair the ability'" of the party to present its case. *Id.* at 1326.

## IV.   ARGUMENT

SKI engaged in a systematic campaign to steal LG Chem's confidential information and then took extraordinary measures to destroy the evidence of its wrongdoing, including its use and implementation of the stolen trade secrets in the development of the Accused Products.  Starting on April 8, SKI commenced a company-wide effort to sanitize its computer systems of any evidence that could be used against it or, in SKI's words, could lead to a "misunderstanding." What followed was the destruction of LG Chem documents and hiding of evidence on a massive scale, which continued even after LG Chem filed the Complaint in this Investigation.

SKI knew that the evidence of its trade secret misappropriation was damaging, and, expressly in anticipation of litigation, took extensive steps to try to dispose of it.  It knew that its document-deletion efforts were improper, so it tried at the same time to destroy the evidence of its deletion campaign.  And when the ALJ ordered SKI to explain itself and to take reasonable measures to try to recover the evidence it had destroyed, SKI made the conscious choice to disobey

Order No. 13—apparently concluding that there is nothing the ALJ could do to punish it that would be worse than the harm that would befall the company if the true facts of SKI's trade secret theft were exposed.

SKI's bad-faith conduct—whereby it deliberately set out to destroy evidence of its misappropriation of LG Chem's trade secrets—supports case-terminating sanctions. That is the appropriate remedy to cure the irreparable prejudice that LG Chem and the Commission have both suffered, to mitigate SKI's contempt of the authority of the ALJ and the rules and the policies of the Commission, and to deter future spoliation of evidence by SKI and other companies that appear before the Commission. As a matter of fundamental fairness, the absolute minimum remedy needed to even begin to offset SKI's destruction of evidence and violations of the ALJ's Order is an order establishing that SKI misappropriated LG Chem's trade secrets; that those trade secrets are entitled to legal protection and owned by LG Chem; and that SKI used LG Chem's trade secrets in the design, development, manufacture, testing, inspection, packaging, pricing, marketing, and sale of the Accused Products. SKI's destruction of the evidence has been so pervasive and effective (and its attempt to cover it up so fervent) that at this point, neither LG Chem nor the ALJ ever could have confidence that the evidence within SKI's custody produced in this litigation relating to LG Chem's trade secrets, or the misappropriation and use thereof, was derived from a factual record that was fully and fairly developed.

### A.    The ALJ should find SKI in contempt.

SKI's open and ongoing defiance of Order No. 13 justifies a contempt finding. Its deliberate refusal to conduct the full scope of the investigation ordered by the ALJ alone demonstrates its contempt. And SKI's decision to conduct its own secret, parallel forensic

investigation in contravention of the safeguards and restrictions of Order No. 13 further underscores the need to find SKI in contempt.

The well-known four-factor contempt standard is clearly met here. *See Symons Int'l*, 2016 WL 3124626, at *2 (citing *Ohr ex rel. NLRB*, 776 F.3d at 474). First, Order No. 13 sets forth an unambiguous command: "search for and attempt to recover ***all*** documents and associated electronic information relating to either LG Chem or the subject matter of this investigation that have been deleted by Respondents, ***including but not limited to*** the documents referenced in SK00066125," and follow the "specific review directives" in the protocol. Order No. 13 at 4. The Order is clear. "All" means all, and "not limited" means not limited.

Second, it is beyond dispute that SKI violated the command of Order No. 13. Although its violations are numerous as explained above, *supra* Section II.E, perhaps the clearest and most convincing example of SKI's intentional failure to comply with Order No. 13 is its deliberate decision to ***limit its investigation*** to the documents referenced in the SK00066125 spreadsheet after the ALJ expressly ordered it ***not to limit its investigation*** to those documents. SKI chose this path after LG Chem's counsel repeatedly warned it not to unilaterally limit its efforts this way, and while SKI and its counsel knew that at least seventy-four[22] other spreadsheets existed that reflected similar document deletion activities. (*See* **Ex. 78** Oct. 8, 2019 Email from B. Reiser to S. Sobin; **Ex. 79** Oct. 9, 2019 Email from B. Reiser to S. Sobin; **Ex. 80** Oct. 13, 2019 Email from B. Reiser to S. Sobin.)

Third, there can be no serious question that SKI failed to "substantially comply" with Order No. 13. Indeed, SKI did the ***opposite*** of what that Order requires, unilaterally narrowing its search

---

[22] LG Chem's prior motion for contempt referred to fifty-eight other spreadsheets. LG Chem now understands that the fifty-eight additional spreadsheets produced by SKI after Order No. 13 included a duplicate of SK00066125.

██████████████████████

to only those documents listed on a single spreadsheet related to a single business unit (1) despite the order requiring a search for "all" relevant deleted documents, (2) despite LG Chem's counsel warning SKI that other business units, such as ████████ plainly were relevant and needed to be searched, and (3) despite SKI itself turning over seventy-four other spreadsheets confirming the relevance of documents housed within the control of other business units.  This is defiance, not substantial compliance.

Fourth, SKI did not make a reasonable and diligent effort to comply with Order No. 13. From the outset, LG Chem's counsel pointed out the ways in which SKI was straying from and violating the Order, yet SKI would not be deterred.  (*See* **Ex. 78** Oct. 8, 2019 Email from B. Reiser to S. Sobin.)  To be sure, Mr. Garcia and certain SKI personnel and their lawyers worked for several days, but only within the confines of SKI's artificial, unilaterally narrowed forensic search, solely focusing on a single spreadsheet.  No matter how hard SKI may have worked, this is not a reasonable or diligent attempt to comply with the Order, especially given the sweeping breath of SKI's document deletion efforts that were the subject of the forensic investigation required by Order No. 13 (*e.g.*, seventy-five spreadsheets, thousands of files marked for deletion, multiple business teams implicated, hard evidence of hiding and destroying files, etc.).

SKI may try to argue that its ongoing secret investigation will result in the collection and production of enough information to satisfy its discovery obligations and comply with Order No. 13.  This is entirely unpersuasive.  SKI's secret investigation is yet another clear and convincing example of SKI's violation of Order No. 13.  Compliance, of course, was required weeks ago while there remained time to take discovery in an orderly manner, and to use the fruits of such discovery in the parties' investigations and preparations for trial.  That time has passed and

there can be no confidence in the accuracy, completeness, or selectiveness of any further documentation that SKI provides.

But more fundamentally, SKI has been carrying out its "shadow forensic investigation" in blatant violation of, and with none of the procedural safeguards required by, Order No. 13: no interim or final reporting on the progress of the investigation, no opportunity for observation or oversight by LG Chem's forensic expert, no investigation into the intent behind SKI's document deletion campaign.  (**Ex. 60**, ████ Dep. I at 164:14–21.)  And of course, SKI's shadow investigation is being led by the same person, ████, whom SKI tapped to serve as the architect of the company-wide evidence-destruction campaign at the outset.  This is the same person who also failed to make any reasonable effort—after SKI found itself in this litigation—to put a stop to any of the document deletion processes he had set in motion.  This is not just the fox guarding the henhouse, this is the fox running the henhouse.  LG Chem and the ALJ cannot trust anything that results from SKI's shadow forensic investigation.  All four factors of the civil contempt standard are satisfied.  The ALJ should find SKI in contempt.

**B.     The ALJ should find that SKI spoliated evidence.**

Anticipating litigation in the United States—and fully aware of its discovery obligations in United States courts—SKI methodically identified, hid, and attempted to destroy the evidence of its misappropriation of LG Chem's trade secrets across its entire battery division.  Even after this Investigation began, SKI took no action to remediate those efforts instead choosing to allow its automatic deletion programs to purge the company's system of relevant evidence that its employees had dutifully moved to their recycle bins as the company instructed.  In short, SKI engaged in spoliation of key evidence of its misconduct on an immense scale long after it was under a duty to preserve evidence.  Separate and apart from its contempt for the ALJ's authority

and Order No. 13, SKI's spoliation provides an independent and separate basis for the ALJ to enter default against SKI or impose other sanctions.

### 1.    SKI had a duty to preserve the destroyed evidence.

SKI had a duty to preserve evidence relevant to litigation involving theft of LG Chem's trade secrets at least by April 2019 when it received LG Chem's cease and desist letter.  Indeed, SKI anticipated litigation in 2018 long before receiving this letter.  *See supra* Section II.B.  The duty to preserve is objective, and triggered when "a reasonable party in the same factual circumstances would have reasonably foreseen litigation."  *Micron Tech., Inc.*, 645 F.3d at 1320 (internal citation omitted).  Not only would a *reasonable* party have anticipated litigation by April 2019, the evidence demonstrates that SKI *in fact* anticipated litigation with LG Chem at that time, if not earlier. SKI explicitly conducted the deletion campaign because of its fear of the upcoming litigation. (**Ex. 3**, SK00968270 ("The purpose is to prevent in advance problematic issues should a legal dispute arise with a competitor.")  Regardless of when SKI first anticipated or should have anticipated this litigation, the facts also show that it continued to destroy evidence *after* this Investigation began—removing any doubt that SKI violated its duty to preserve relevant and discoverable documents.

SKI cannot reasonably dispute that it had a duty to preserve evidence as of April 30, 2019, when it learned of LG Chem's complaint in this Investigation.   *See Certain Stainless Steel Products,* Inv. No. 337-TA-933, Publ. No. 4904, at *71 (June 1, 2019) (noting that the "duty to preserve the evidence" was triggered when the respondent was served with the Complaint); *see also Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998); *In re WRT Energy Sec. Litig*., 246 F.R.D. 185, 195 (S.D.N.Y. 2007).  Moreover, a reasonable party in SKI's position also would have anticipated litigation regarding the misappropriation of trade secrets much earlier, at least

upon receipt of LG Chem's April 8, 2019 cease-and-desist letter.  LG Chem had previously filed

suit to block certain highly experienced employees from working for SKI during the term of their

non-compete agreements, a decision the Supreme Court of Korea upheld in January 2019.  On

April 8, 2019, LG Chem sent another cease-and-desist letter, which SKI received the following

day.  A reasonable party in SKI's position would reasonably foresee litigation following this letter.

*See, e.g.*, *Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 511 (D. Md. 2009) (finding that

a duty to preserve indisputably arose when the plaintiff sent a demand letter).

SKI's own documents illustrate that it anticipated litigation with LG Chem long before LG

Chem's April 8, 2019 demand letter.  *See supra* at Section II.B.  For instance, months before LG

Chem's letter, SKI's employees believed litigation was forthcoming, telling one another not to

"leave evidence."  (**Ex. 50**, SK00963762.)  And lest there be any doubt that SKI was deleting

documents because it anticipated litigation with LG Chem, the ALJ need only refer to SKI's own

internal communications on this point.  In an April 22, 2019, ███████, a member of SKI's

███████ sent his co-workers notes from an internal SKI meeting, reporting that team members

were told "regarding document security, handle them as soon as possible (delete if possible)" while

at the same time being told that SKI was anticipating a "lawsuit."  (**Ex. 66**, SK00659635, Apr. 22,

2019 email from ███████

Moreover, by at least by April 2019, litigation in the United States was reasonably

foreseeable, and SKI in fact anticipated litigation in the United States.  SKI affiliates in the U.S.—

including Respondent SK Battery America, Inc.—are registered to do business in Delaware and

Georgia and have agents for service of process in this country.  (**Ex. 88**, Georgia Registration; **Ex.

89**, Delaware Registration.)  SKI itself has filed petitions for *inter partes* review before the U.S.

Patent Trial and Appeal Board, and had its own patents invalidated by the PTAB.  And in March

████████████████████████

2019, SKI employees were discussing patent infringement litigation between LG Chem and Amperex in the U.S.  *See also supra* Section II.B.  SKI is an experienced, sophisticated litigant in the United States, and thus could reasonably expect to face suit here.[23]

SKI also knew that the U.S. market for electric vehicle batteries was the focal point of competition between SKI and LG Chem.  Indeed, SKI specifically specifically contracted Volkswagen to supply MEB batteries in the United States, which is central to LG Chem's misappropriation claims—but for SKI's misappropriation, it would not have won the contract. *Supra* Section II.B.  Any reasonable party in SKI's position would have anticipated that LG Chem would file suit in the country where SKI has reaped a significant benefit from its trade secret misappropriation at LG Chem's expense—in the U.S.

Finally, the very fact that SKI deleted documents because LG Chem was "preparing a lawsuit" demonstrates that SKI anticipated litigation in the United States.  In response to LG Chem's Motion to Compel Discovery, SKI argued that it did not instruct its employees to preserve documents in response to LG Chem's cease-and-desist letters because—unlike in the United States—the duty to preserve does not exist "in such situations under Korean law." *See* SKI's

---

[23] SKI previously relied on *Lunkenheimer Co. v. Tyco Flow Control Pacific Party Ltd*. and *Rockman Company (USA), Inc. v. Nong Shim Co., Ltd*. to support its argument that SKI did not reasonably anticipate litigation in the United States.  SKI's reliance is misplaced.  In *Lunkenheimer*, the court held that the defendant had no duty to preserve until it was served with the complaint, in part because the Australian defendant made "no significant sales of Licensed Products . . . into the U.S., and [the defendant] had (and has) no U.S. presence. 2015 WL 631045, at *6 (S.D. Ohio Feb. 12, 2015).  Unlike the *Lunkenheimer* defendant, SKI markets and sells its products directly in the United States and has a significant (and growing) United States presence. Similarly, in *Rockman*, the court held that the defendant had no preservation duty enforceable in the United States arising from a Korean agency investigation into price collusion "in their own domestic market." 229 F. Supp. 3d 1109, 1123 (N.D. Cal. 2017).  The court noted that there was no "evidence showing that the alleged conspiracy was specifically directed at the United States." *Id*. (emphasis in original).  Here, however, SKI's misappropriation is specifically directed and related to its business in the United States.  Indeed, SKI utilized the misappropriated trade secrets to obtain contracts to supply batteries for electric vehicles for the U.S. market.

Opposition to LG Chem's Motion to Compel Discovery at 6.  This logical is because of the limited scope of document discovery in Korean civil litigation.  Therefore, SKI would have no reason destroy the documentation of its misappropriation of LG Chem's trade secrets **_unless it was aware of the reasonable possibility—indeed, probability—of litigation in the United States._**  Thus, from SKI's own action of deleting LG Chem-related documents the ALJ can reasonably infer that SKI anticipated litigation with LG Chem by at least April 2019 and that SKI anticipated this litigation to be in the United States.

Regardless of when SKI first anticipated or should have anticipated this litigation, the facts also show that it continued to destroy evidence **_after_** this Investigation began—removing any doubt that SKI violated its duty to preserve relevant and discoverable documents.  SKI's duty to preserve began no later than April 30, 2019 when it learned of LG Chem's complaint in this investigation. *See Certain Stainless Steel Products,* Inv. No. 337-TA-933, Publ. No. 4904, at *71 (June 9, 2019); *see also Kronisch v. United States,* 150 F.3d 112, 126 (2d Cir. 1998); *In re WRT Energy Sec. Litig.,* 246 F.R.D. 185, 195 (S.D.N.Y. 2007).  Yet **_after_** the litigation was announced—and in response to an email containing a link to an article about the present litigation—an SKI team leader specifically instructed employees to "[d]elete every material related to the ▮▮▮▮▮▮▮ from every single individual's PC, mail storage archives and team rooms. ASAP  Make sure to especially scrutinize SKBA [SK Battery America, Inc.]." (**Ex. 2**, SK00815537.)  This email removes any doubt that SKI violated its duty to preserve relevant and discoverable documents, and by including an article about the present investigation, SKI made it clear that this was a result of the **_US ITC_** investigation.  It is impossible to know how many documents were deleted as a result of this directive. Accordingly, SKI spoliated documents explicitly in response to the present investigation.

████████████████████

### 2.    SKI destroyed evidence with a culpable state of mind.

SKI's destruction and concealment of documents has been, and continues to be, intentional and willful.  Based on this record, there can be no doubt that SKI's conduct is "blameworthy."  *See Certain Opaque Polymers*, Inv. No. 337-TA-883, Order No. 27, at *9.  In *Certain Stainless Steel Products*, the ALJ considered several factors in determining whether the respondents acted with a culpable state of mind, including (1) the significance of the spoliated evidence, (2) the timing of the spoliation, (3) the similarities between the accessed files and the stolen information, (4) the respondent's failure to produce relevant materials, and (5) the respondent's silence as to its actions. *Certain Stainless Steel Prods.*, Publ. No 4904, at *5 (June 9, 2016).  Applying the same factors here demonstrates that SKI's spoliation was intentional and willful.  There is perhaps no greater indication of SKI's culpability than its failure to produce thousands of relevant documents from dozens of relevant team rooms, and its feigned ignorance as to the documents' importance. *Supra* at Section II.E.  But a full consideration of the five factors removes any doubt that SKI destroyed evidence with a culpable state of mind.

First, the evidence that SKI deleted (or hid through renaming and/or relocation) is essential to the issues being litigated in this Investigation.  SKI admitted that it deleted technical presentations and other materials provided by LG Chem employees who were interviewing for positions at SKI, materials that SKI did not produce in this Investigation.  (**Ex. 5**, KBS News, YouTube (Apr. 30, 2019) https://www.youtube.com/watch?v=FQieayt4eaw.)  Based on the level of detail contained in similar technical presentations that LG Chem found on its own computer network for employees that left to work at SKI, the now deleted technical presentations undoubtedly contained highly technical and proprietary LG Chem information directly related to the LG Chem's claims in this investigation.

SKI did not confine its misappropriation of trade secrets to those disclosed in materials provided by job applicants.  Rather, the targeting and use of LG Chem employees by SKI to gain access to LG Chem's confidential and proprietary information persisted long after the job interview process finished.  SKI routinely solicited LG Chem confidential information from the former LG Chem employees.  *See supra* Section II.A.  And in many instances, former LG Chem employees brought with them confidential LG Chem documents and information when they departed LG Chem and then presented this information to SKI.  *Id.*  Documents and information related to these activities would have indisputably been among the materials SKI deleted.

Moreover, the ALJ need only consider the file names of some the documents that SKI deleted—a record of which was preserved on the seventy-five spreadsheets—to reach the inescapable conclusion that the contents of the deleted documents would be directly probative of the issues involved in this investigation but were destroyed late April and early May.  *Supra* at Section II.E.6.  The available facts about the file names of the deleted documents, the technical presentations, the purged emails, and the renamed files, *supra* at Section II.E.6, lead to the inescapable conclusion that the massive amount of documents that SKI disposed of, hid or renamed reflect its misappropriation and use of LG Chem's protectable trade secrets.  And of course, now that we know that some SKI employees deliberately changed their file names to hide LG Chem-related information, the ALJ can infer that those hidden documents too reflect SKI's misappropriation and use of LG Chem's trade secrets.

Second, the timing and nature of the spoliation demonstrates that SKI intentionally destroyed evidence.  ███████████—the orchestrator of this mass deletion—developed the search terms to identify documents for deletion after receiving LG Chem's April 8 cease-and-desist letter.  (**Ex. 60**, Deposition of ██████ at 111:16–112:10.)  The deletion efforts began in

earnest the week of April 15, 2019, but the documents remained in employees' recycle bins for 30

days—meaning the documents had not been permanently deleted when SKI received LG Chem's

ITC Complaint and issued litigation hold notices.  (*Id*. at 121:16–20.)  SKI could have preserved

the documents in recycle bins, but it did not attempt to do so.  (*Id*. at 137:5–13.)  Likewise, SKI

took no affirmative steps to preserve any documents in the team rooms that—less than one month

earlier—had been the subject of deletion efforts because they contained information related to LG

Chem.  (*Id*. at 131:1–7.)  The timing of the spoliation—beginning around the time of LG Chem's

cease-and-desist letter and continuing unabated after this litigation began—confirms SKI's

intentional destruction of evidence.

Third, █████████ and others at SKI targeted documents for deletion or renaming based on

the fact that *file name of a document contained "LG Chem,"* ██████████ or some other

reference to LG Chem.  This fact alone demonstrates that SKI sought to, and did, destroy

information derived from or relating to LG Chem and its trade secrets.  (*See, e.g.*, **Ex. 64**,

SK00066125.) *See also* LG Chem's Motion to Compel Forensic Information at 11.

Fourth, as a direct consequence of SKI's campaign destroy evidence related to LG Chem

that might cause a "misunderstanding," SKI cannot produce thousands of documents that it

possessed when it had a duty to preserve evidence.[24]  SKI's ongoing failures to produce documents

(as well as its delays when it did produce some documents) weigh heavily toward a finding of

spoliation under the standard set forth in *Certain Stainless Steel Products*.

---

[24] Indeed, SKI's failure to produce the documents from its team rooms is simply the latest example
of SKI withholding relevant documents until forced to produce them.  SKI withheld over ███████
documents due to purported restrictions from the Korean Ministry of Trade, Industry and Energy
or "MOTIE", but did not (a) disclose that it was withholding any documents on this basis until
September 28, 2019; and (b) did not even review the individual documents to determine if they
were subject to the restrictions until this month.

████████████████
████████████████

Fifth, SKI was silent as to the existence of spreadsheets identifying LG Chem documents that might cause a "misunderstanding" for *months*, further demonstrating its culpable state of mind.  ████████  created seventy-five spreadsheets targeting LG Chem-related documents for deletion in April 2019.  Yet SKI did not even admit that these highly relevant and responsive documents existed until late August 2019, after a custodian produced just one of them from a recycle bin on a computer that he had failed to clear.  Moreover, when the SK0066125 spreadsheet was produced, SKI *remained silent* as to the existence of *over seventy-four* additional spreadsheets until *after* the ALJ issued Order No. 13 compelling the forensic examination.  Indeed, as recently as last week, SKI produced previously undisclosed spreadsheets targeting over ████ of documents containing LG Chem information for deletion.

Moreover, when LG Chem confronted SKI with the evidence of its own document deletions, SKI provided an explanation that can only be described as misleading, and which ultimately proved false, further demonstrating its culpable state of mind.  SKI initially claimed that its document deletion efforts were merely part of a biannual routine audit "to improve storage space efficiency" and comply with unidentified company policies and unspecified "Korean privacy laws." (**Ex. 65**, K. Cobb Letter to S. Gragert at 1 (Sept. 9, 2019).)  However, what SKI failed to mention was that the search terms were developed *after* receiving LG Chem's cease-and-desist letter.  The record now shows that SKI's massive document deletion campaign was not the "routine" business practice that SKI first claimed it to be, but rather a specific, deliberate effort on the part of SKI to destroy, hide or alter evidence relating to LG Chem after LG Chem had accused it of misappropriating trade secrets.  *Supra* Section II.C.

SKI's legal department also remained largely silent throughout this Investigation.  SKI's deletion campaign included an initial company-wide email, a concerted effort by ████████ to run

his own searches, and customized spreadsheets for each team room based on LG Chem-related search terms. *See supra* Section II.C.2. At the same time, SKI's legal team made only a superficial effort to implement a litigation hold. SKI's legal team sent an initial notice to a very small number of people; failed to take any steps to actually preserve evidence, such as halting the automatic deletion of recycle bins or imaging the team rooms; failed to follow up with any employees regarding the litigation hold; and failed to document any steps to ensure compliance. *See supra* Section II.C.4. Indeed, many employees at SKI failed to receive *any* litigation hold until October 2019. *Id*. SKI's culpability is beyond dispute.

### 3.   SKI deleted highly relevant evidence.

A party's intentional destruction of documents, by itself, can establish the relevance of those documents. *Certain Opaque Polymers*, Inv. No. 337-TA-883, Order No. 27, at *12. This makes sense: there would be no incentive to delete documents in anticipation of litigation if the documents themselves were not problematic. Perhaps the most telling evidence of the relevance and damaging nature of the evidence SKI destroyed is the swiftness and effectiveness of SKI's deletion campaign—a campaign that has immeasurably prejudiced LG Chem's "ability to present its case." *Id*.

Moreover, LG Chem has indisputably offered "plausible, concrete suggestions as to what [the destroyed] evidence might have been." *Id*. (quoting *Micron Tech., Inc.*, 645 F.3d at 1328) (alteration in original). The employee applications and presentations contained in the deleted files plainly contained LG Chem's technical trade secret information, and represent evidence of the economic value and confidentiality of LG Chem's technical information. (*See e.g.*, **Ex. 91**, SK00060533, ███████████ presentation regarding the Dream Cost Project.) Additionally, based on the file names on the document deletion spreadsheets, the destroyed evidence

indisputably included technical information related to LG Chem's manufacture of electric vehicle batteries—information highly relevant to LG Chem's trade secret claims in this Investigation. *Supra* Section II.E.6.  Moreover, the documents that SKI did produce demonstrate that it engaged in a concerted effort to steal and convert an untold number of LG Chem trade secrets, the true extent of deleted files cannot be ascertained because of SKI's deletion campaign.  *See supra* Section II.A.  (*See also* **Ex. 30**, SK00524683–84 Email from ███████ to ███████ (Nov. 22, 2018) , with attachment (detailing LG Chem's recipes and specifications for █████ ████████████████████████████.) That SKI destroyed the documentation of its wrongdoing on a massive scale and through a systematic, deliberate document-deletion campaign is beyond serious dispute.  This is spoliation of evidence.

### C.    The ALJ should enter default judgment against SKI.

SKI's misconduct warrants default.  Its own egregious actions—deleting, moving, hiding, and altering evidence, the continuous cover up, and violations of  the ALJ's Order—demonstrate a clear intent to impair the Commission's ability to investigate SKI's unfair acts.  SKI's spoliation and violations of Order No. 13, independently and in combination, have caused significant prejudice to LG Chem and its ability to investigate its claims and present its case.  *See Micron Tech., Inc.*, 645 F.3d at 1326.

In *Certain Stainless Steel Products*, the Commission upheld the ALJ's finding that default was warranted after the respondent installed a new operating system on a named custodian's computer, permanently overwriting data, and then failed to produce thirty-six USB devices corresponding to the respondent's operating practices.  Inv. No. 337-TA-933, Publ. No. 2998, at *4–5 (June 9, 2016).  The ALJ found that no other sanction would suffice because "all aspects of the investigation have been tainted," noting that "it will never be clear whether the record before the ALJ and the Commission is complete and accurate."  *Id*. at *6.  So too here.  SKI's massive,

company-wide efforts to delete and hide evidence have tainted every part of this Investigation and

has left LG Chem, the Staff, and the ALJ with a record that neither completely nor accurately

reflects the true facts.

Similarly, in *Certain Opaque Polymers*, the ALJ found that default was appropriate after

the respondent's employees overwrote and deleted "potentially hundreds of thousands of files"

from several laptops, claimed to have lost laptops and USBs, and physically destroyed additional

hard drives with hammers.  Inv. No. 337-TA-883, Order No. 27, at *21, 25, 54, 66.  The ALJ held

that "Organik Kimya's bad faith conduct has precluded this action from being decided on the

merits" because it "arrogated to itself the right to decide what evidence would be made available

for hearing"—precisely as SKI has done here.  *Id.* at *66.

Federal courts grant terminating sanctions for spoliation when the destruction of evidence

"threatens the orderly administration of justice."  *OmniGen Research. v. Yongqiang Wang*, 321

F.R.D. 367, 371 (D. Or. 2017) (granting default judgment because of the defendant's intentional

spoliation and noting that "[d]efault [j]udgment and terminating sanctions for the spoliation of

evidence is warranted in instances wherein a party has intentionally hidden or destroyed evidence

to the extent it severely undermines the Court's ability to render a judgment based on the evidence

and threatens the orderly administration of justice) (internal quotation omitted); *see also Consumer

Fin. Prot. Bureau v. Morgan Drexen, Inc.*, 101 F. Supp. 3d 856, 869 (C.D. Cal. 2015) (granting

default judgment and noting that "[i]t is well settled that the entry of default judgment is warranted

when 'a party has engaged deliberately in deceptive practices that undermine the integrity of

judicial proceedings.'")  SKI's bad faith conduct has limited the evidence available for hearing

and compromised the orderly administration of justice by denying the ALJ, Staff, and LG Chem

the right to weigh the merits of the case on a full and fair record.

Similarly, federal courts grant terminating sanctions under Rule 37(b) based on a party's intentional failure to comply with discovery orders. *See, e.g.*, *Solvay Specialty Polymers USA, LLC v. Zhenguo (Leo) Liu*, 331 F.R.D. 187, 191 (N.D. Ga. 2019) (imposing default as a sanction under Fed. R. Civ. P. 37(b) for failing to comply with the court's discovery orders in bad faith); *S.E.C. v. Razmilovic*, 738 F.3d 14, 27 (2d Cir. 2013), as amended (Nov. 26, 2013) (affirming the imposition of default judgment under Fed. R. Civ. P. 37(b)); *LeCompte v. Manekin Constr., LLC*, 573 B.R. 187, 197 (D. Md 2017.), *aff'd*, 706 F. App'x 811 (4th Cir. 2017) (upholding the bankruptcy court's default judgment for the party's refusal to comply with the Court's discovery orders).  The ALJ would be well within his authority to follow suit and enter default for SKI's violations of Order No. 13 alone.

SKI engaged in a widespread scheme to permanently destroy and alter the evidence of its trade secret misappropriation, both before and after this investigation began.  Neither LG Chem nor this Commission will ever know the full extent of its unfair acts that gave rise to this Investigation because of SKI's intentional and willful destruction and concealment of evidence.  SKI's misconduct has eroded the "integrity of the discovery process" and now "there can never be assurance of proceeding on the true facts." *United Constr. Prod., Inc. v. Tile Tech, Inc.*, 843 F.3d 1363, 1370 (Fed. Cir. 2016).  "A less drastic sanction is not useful because [any other sanction] would leave [LG Chem] in the same substantially unfair position that [the spoliating party] put them in at the outset." *Certain Semiconductor Chips & Prod. Containing Same,* Inv. No. 337-TA-753, 2012 WL 927056 at *174 (Mar. 2, 2012).  SKI's egregious behavior has immeasurably prejudiced LG Chem's ability to present its case and the Commission's ability to investigate the full extent of harm caused by SKI's conduct.  Accordingly, the ALJ should find that SKI's

spoliation and contempt of Order No. 13 each independently justifies entering default judgment against SKI.

**D.    At a minimum, the ALJ should issue an order establishing that SKI misappropriated LG Chem's proprietary, legally protectable trade secrets and used them in each of the Accused Products.**

If the ALJ declines to enter default judgment, then at a minimum to ensure a measure of fairness at the hearing, the ALJ should enter an order establishing that (1) LG Chem owns protectable trade secrets (*i.e.* the trade secrets were subject to reasonable measures to maintain their confidentiality, have economic value derived from being secret, and are not generally known or readily ascertainable), (2) SKI misappropriated LG Chem's trade secrets, and (3) SKI used LG Chem's trade secrets in the design, development, manufacture, testing, inspection, packaging, pricing, marketing, and sale of each of the Accused Products.

Because of SKI's spoliation and its contempt in refusing to search for and produce untold numbers of documents, LG Chem and the Commission have been deprived of essential evidence regarding, for example, (1) SKI's scheme to use LG Chem employees to learn LG Chem's propriety information, (2) its efforts to thwart LG Chem's reasonable security measures, (3) its research and development, or lack thereof, to develop its own technology, (4) the lengths SKI undertook to ascertain this propriety information, (5) its recruitment campaign to misappropriate the trade secrets, (6) its inability to glean such valuable confidential LG Chem information through legitimate means or from other sources, and (6) its use of the misappropriated information. Without a sanction establishing as fact for purposes of this investigation that SKI misappropriated and used LG Chem's protectable trade secrets, SKI's efforts to avoid the consequences of its wrongdoing by destroying the evidence may well succeed.

A limited establishment order that removes from dispute the facts surrounding SKI's misappropriation and use of LG Chem's protectable trade secrets would be "just" and directly

related to the claims at issue here, and would require LG Chem to prove at trial the other elements

of its case, including the importation of the Accused Products, the existence of a domestic industry,

and the injury or threat of injury to that domestic industry.  *Certain Asian-Style Kamaboko Fish*

*Cakes*, Inv. No. 337-TA-378, Order No. 15, at \*16 (Sept. 1, 1996).

In fashioning remedies to cure discovery violations, courts routinely accept facts as

irrebuttably established.  *See, e.g.*, *Certain Excimer Laser Sys. for Vision Correction Surgery &*

*Components Thereof & Methods for Performing Such Surgery*, Inv. No. 337-TA-419, Order No.

49, at \*5 (Aug. 13, 1999) (taking as established a technical finding); *In the Matter of Certain Asian-*

*Style Kamaboko Fish Cakes*, Inv. No. 337-TA-378, Publ. No. 2998, Order No. 15, at \*17 (Sept. 1,

1996) (taking as established various facts regarding the Accused Products based on respondent's

failure to provide discovery); *Coquina Investments v. TD Bank, N.A.*, 760 F.3d 1300, 1319 (11th

Cir. 2014) (upholding the district court's sanction finding that elements of claims were taken as

established based on the defendant's failure to comply with discovery orders); *SynQor, Inc. v.*

*Artesyn Techs., Inc.*, 709 F.3d 1365, 1386 (Fed. Cir. 2013) (upholding the district court's sanction

of taking additional evidence as established based on the defendant's "conscious and wilful

decision to withhold this relevant sales data from production).

In another ITC investigation involving allegations of trade secret misappropriation, the

ALJ established as fact an element of the claimant's misappropriation claim after it failed to

comply with an order to produce all drawings of its current models but rather selectively limited

its production to items currently manufactured.  *Certain Internal Mixing Devices and Components*

*Thereof*, Inv. No. 337-TA-317, Order No. 8, at \*1–4 (July 30, 1992).  The ALJ found that

respondent "unilaterally narrowed the scope of [the ALJ's] order," and failed "to set forth why

these particular documents were not found when originally requested."  *Id.* at \*9.  In crafting a

"just" sanction that "related to the particular claim at issue," the ALJ established that the unproduced drawings contained the complainant's technical information, leaving the claimant to prove domestic industry and injury at trial. *Id*. (internal quotation omitted). *Id*. Similarly, the limited establishment order LG Chem requests will remove certain factual disputes related to SKI's misconduct, of which untold amounts of evidence has been destroyed, while leaving LG Chem to prove the remaining elements of its claims.

SKI avoided disclosing its campaign to destroy, move, hide, and rename documents that might cause a "misunderstanding" for as long as possible. SKI only began to disclose details after LG Chem uncovered evidence of SKI's deception campaign. Even now, SKI continues to conceal the full scope of the problem—forcing LG Chem to seek relief from the ALJ. Moreover, when the ALJ issued Order No. 13 requiring SKI conduct a transparent forensic investigation to recover the documents that SKI cleansed from its systems, SKI unilaterally narrowed the scope of that order, limiting its forensic search to one of seventy-five spreadsheets, while continuing its own separate shadow investigation.

LG Chem's requested remedy is related to the claim at issue and specifically "tailored" to account for SKI's misconduct. *Id*.; *Certain Cigarettes & Packaging Thereof*, Inv. No. 337-TA-424, Order No. 38, at *2 (Feb. 2, 2000) (internal quotation omitted). More specifically, the establishment order LG Chem requests is needed to because SKI's destruction of evidence and its related contempt of Order No. 13 have irreparably prejudiced LG Chem's ability to prove certain elements of its claims.

First, at the hearing, LG Chem would have shown in part through SKI's own evidence that LG Chem owned each and every trade secret it has accused SKI of misappropriating, and that they were not generally known or readily ascertainable. But for SKI's destruction of evidence, LG

███████████████████

Chem would have adduced facts through discovery that SKI needed LG Chem's confidential information, and that SKI thus extracted this secret, propriety information directly from LG Chem itself, rather than independently developing it or acquiring it legitimately from other sources. LG Chem has been deprived of evidence that SKI sought to extract these secrets from LG Chem employees—knowing that LG Chem alone owned them—because the trade secrets were not owned by or available from anyone else.

Second, using evidence of SKI's own extensive efforts to circumvent LG Chem's security measures, LG Chem would have established that those security measures, including confidentiality agreements, annual security training, posting of policies, and internal checkpoints (such as external mail popup warnings) were eminently reasonable—even if SKI succeeded in evading them. But due to SKI's spoliation and contempt, LG Chem is prejudiced in its ability to present its full case about these security measures and SKI's efforts to defeat them.

Third, LG Chem would have used the evidence SKI destroyed to demonstrate that the trade secrets derive their economic value from their secrecy. LG Chem invested millions of dollars over the past two decades in its propriety, confidential technology. However, LG Chem has been deprived of crucial evidence demonstrating SKI's failure to invest in its own research and development, the desperate measures to which SKI resorted to steal LG Chem's trade secrets precisely because they were so valuable, and SKI's use of LG Chem's secret and propriety technology which allowed SKI to avoid making the investments that LG Chem made.

Fourth, LG Chem would conclusively prove through SKI's own business records, had they not been destroyed on a massive scale, that SKI misappropriated its trade secrets. The evidence still available confirms SKI did this in part through its campaign to interview ████████ of former LG Chem employees, hire approximately ████████ of them, and then induce them to share LG

Chem's proprietary information.  SKI implemented its destruction and concealment campaign by searching for, and deleting, LG Chem documents.  Without this spoliated evidence, LG Chem is necessarily unable to prove the full scope of SKI's misappropriation.

Finally, LG Chem would prove through the spoliated evidence that that SKI used the misappropriated information by demonstrating that it incorporated this information in the design, development, manufacture, testing, inspection, packaging, pricing, marketing, and sale of each of the Accused Products.  SKI's deletion and concealment of LG Chem-related documents, however, indisputably prejudices LG Chem's ability to show exactly how SKI used LG Chem's technology for the ultimate purpose of competing against LG Chem in the U.S. market for electric vehicle batteries.

The proposed establishment order that LG Chem requests is specifically tailored to account for the evidence that SKI intentionally deleted, moved, hid and renamed.  In the alternative to a finding of default, an order establishing these facts is commensurate with SKI's culpability and the prejudice suffered by LG Chem.  *See Certain Opaque Polymers*, Inv. No. 337-TA-883, Order No. 27, at *13 (citing *Micron Tech., Inc.*, 645 F.3d at 1329).  Additionally, there is no "lesser sanction that will avoid substantial unfairness." *Id*.  SKI's discovery abuses and order violations have left LG Chem in the untenable position of trying to prove each element of its trade secret misappropriation claims through a record that has been largely stripped of the documentation of its wrongdoing.  Indeed, the very destruction of such evidence shows that SKI considered the trade secrets to be valuable, not generally known or readily ascertainable, and improperly acquired. Accordingly, the ALJ should establish as fact for purposes of this investigation that SKI owns protectable trade secrets, and that SKI misappropriated and used LG Chem's proven trade secrets.

██████████████████████

## V.       CONCLUSION

For the foregoing reasons, LG Chem respectfully asks that the ALJ issue an order (1) finding SKI in contempt of Order No. 13, (2) finding that SKI willfully and intentionally deleted, moved, hid, and altered evidence in violation of its duty to preserve evidence, and, as a consequence, (3) issue a default judgment against SKI or, alternatively, issue an order establishing that (a) LG Chem owns protectable trade secrets (*i.e.* the trade secrets were subject to reasonable measures to maintain their confidentiality, have economic value derived from being secret, and are not generally known or readily ascertainable), (b) SKI misappropriated LG Chem's trade secrets, and (c) SKI used LG Chem's trade secrets in the design, development, manufacture, testing, inspection, packaging, pricing, marketing, and sale of each of the Accused Products and components thereof.  Further, LG Chem reserves its rights to seek attorneys' fees in connection with this issue as appropriate.  LG Chem is available for a hearing should the ALJ find that one would aid his deliberations.


Date:  November 5, 2019                    Respectfully submitted,

                                           */s/ Bert C. Reiser*
                                           Bert C. Reiser
                                           Sarah M. Gragert
                                           **LATHAM & WATKINS LLP**
                                           555 Eleventh Street, N.W.
                                           Suite 1000
                                           Washington, DC 20004
                                           Telephone: (202) 637-2200
                                           Facsimile:  (202) 637-2201
                                           E-Mail:  LGCHEMITC1159.LWTEAM@lw.com

                                           David K. Callahan
                                           **LATHAM & WATKINS LLP**
                                           330 North Wabash Avenue
                                           Suite 2800
                                           Chicago, IL 60611

Telephone: (312) 876-7700
Facsimile:  (312) 993-9767

Gabriel S. Gross
Jeffrey G. Homrig
**LATHAM & WATKINS LLP**
140 Scott Drive
Menlo Park, CA 94025
Telephone: (650) 328-4600
Facsimile:  (650) 463-4600

Louis S. Mastriani
Deana Tanner Okun
Jonathan J. Engler
Asha Allam
Joshua Hartman
Lauren E. Peterson
Joshua W. Rodriguez
Paulina M. Starostka
**ADDUCI, MASTRIANI & SCHAUMBERG LLP**
1133 Connecticut Avenue, NW, 12th Floor
Washington, DC 20036
Telephone: (202) 467-6300
Facsimile: (202) 466-2006
E-Mail:  LGCHEM-001@adduci.com

Mark L. Hogge
Song K. Jung
Nicholas H. Jackson
R. Tyler Goodwyn
Younggyu Kim
Bumrae Cho
**DENTONS US LLP**
1900 K Street, NW
Washington, DC 20006
Telephone: (202) 496-7500
Facsimile: (202) 496-7756
E-Mail:  LGChem.US@dentons.com

*Counsel for Complainants LG Chem, Ltd. and LG Chem Michigan Inc.*