# Exhibit H



**大成 DENTONS**

**Mark L. Hogge**
Partner

mark.hogge@dentons.com
D  +1 202 496 7386

Dentons US LLP
1900 K Street, NW
Washington, DC  20006
United States

dentons.com



April 29, 2019

**VIA HAND DELIVERY**

The Honorable Lisa R. Barton
Secretary
**U.S. International Trade Commission**
500 E Street, SW, Room 112-A
Washington, DC 20436

Re:   *Certain Lithium Ion Batteries, Battery Cells, Battery Modules, Battery Packs, Components Thereof, And Production And Testing Systems And Processes Therefor,* Inv. No. 337-TA-_____ [DN: _____]

Dear Secretary Barton:

Enclosed for filing on behalf of Complainants LG Chem, Ltd. and LG Chem Michigan Inc. (collectively, "LGC" or "Complainants") are the following documents in support of LGC's request that the Commission commence an investigation pursuant to Section 337 of the Tariff Act of 1930, as amended:

1.  One (1) original plus (8) paper copies of the verified Non-Confidential Complaint and the Public Interest Statement. (19 CFR §§ 210.8(a)(1)(i), 210.8(b));

2.  One (1) original and eight (8) paper copies of the verified Confidential Complaint and the Public Interest Statement. (19 CFR § § 210.8(a)(1)(ii), 210.8(b));

3.  One (1) original plus eight (8) copies of LGC's letter and certification requesting confidential treatment for the information contained in Confidential Exhibit Nos. 1, 2, 6, 17-22, 35-39 and 49.  (19 CFR §§ 210.4(f)(7)(i), 210.5 (d), 201.6 (b));

4.  One (1) copy, on DVD of the accompanying non-confidential exhibits and public versions of Confidential Exhibits (19 CFR § 210.8(a)(1)(i));

5.  One (1) copy, on DVD with Confidential Exhibits Nos. 1, 2, 6, 17-22, 35-39 and 49 (19 CFR §§ 201.6(c));

**大成 DENTONS**

April 29, 2019
Page 2

dentons.com

6.   Three (3) additional copies of the verified Non-Confidential Complaint, Public Interest Statement, Request for Confidential Treatment and Certification and three (3) DVD's of the Non-Confidential exhibits for each proposed respondent. (19 CFR §§ 210.8(a)(1)(iii) and 210.11(a)(1)(i));

7.   Three (3) additional copies of the verified Confidential Complaint and the Public Interest Statement, Request for Confidential Treatment and Certification and three (3) DVD's of the Confidential exhibits for each of the proposed respondents. (19 CFR §§ 210.8(a)(1)(iii));

8.   Two (2) additional copies of the verified Non-Confidential Complaint and the Public Interest Statement for service upon the Embassy of the Republic of Korea and the Embassy of Hungary in Washington, D.C. (19 CFR §§ 210.8(a)(1)(iv) and 210.11(a)(1)(ii));

9.   One (1) video file containing LG Chem, Ltd. Advanced Automotive Battery & Polymer Pouch Cell PR YouTube presentation (Physical Exhibit 1 to the Verified Complaint).

Please contact me with any questions regarding this submission.  Thank you for your attention to this matter.

Respectfully Submitted,

Mark L. Hogge
R. Tyler Goodwyn
Nicholas H. Jackson
Rajesh C. Noronha
**DENTONS US LLP**
1900 K Street, NW
Washington, DC 20006
Telephone: (202) 496-7500
Facsimile: (202) 496-7756
E-mail: LGChem.US@dentons.com

Timothy Carroll
**DENTONS US LLP**
233 South Wacker Drive
Suite 5900
Chicago, Illinois 60606
Telephone: (312) 876-8000
Facsimile: (312) 876-7934



April 29, 2019
Page 3

dentons.com

Louis S. Mastriani
Jonathan J. Engler
Asha Allam
Lauren E. Peterson
Joshua Hartman
Joshua W. Rodriguez
Paulina M. Starostka
**ADDUCI, MASTRIANI & SCHAUMBERG LLP**
1133 Connecticut Avenue, NW, 12th Floor
Washington, DC 20036
Telephone: (202) 467-6300
Facsimile: (202) 466-2006
E-Mail: LGCHEM-001@adduci.com

*Counsel for Complainants LG Chem, Ltd. and LG Chem Michigan Inc.*

Enclosures

**大成 DENTONS**

**Mark L. Hogge**
Partner

mark.hogge@dentons.com
D    +1 202 496 7386

Dentons US LLP
1900 K Street, NW
Washington, DC  20006
United States

dentons.com

April 29, 2019

**VIA HAND DELIVERY**

The Honorable Lisa R. Barton
Secretary
**U.S. INTERNATIONAL TRADE COMMISSION**
500 E Street, SW, Room 112-A
Washington, DC 20436

**REQUEST FOR
CONFIDENTIAL TREATMENT**

Re:    *Certain Lithium Ion Batteries, Battery Cells, Battery Modules, Battery Packs,
       Components Thereof, And Production And Testing Systems And Processes Therefor*,
       Inv. No. 337-TA-_____    [DN:_____]

Dear Secretary Barton:

Pursuant to Commission Rules 210.5(d) and 201.6(b)(1), Complainants LG Chem, Ltd.,
and LG Chem Michigan Inc. (collectively, "LGC" or "Complainants") respectfully request
confidential treatment of the business information contained in Exhibits Nos. 1, 2, 6, 17-22, 35-
39, 49 ("Conf. Exhibits") to the Verified Complaint.

The information contained in the Confidential Exhibits 1, 2, 6, 17-22, 35-39, 49 qualifies
as confidential business information pursuant to Commission Rule 201.6(a) because:

- It is not available to the general public;
- The disclosure of such information would cause substantial harm to LGC and
  the competitive position of LGC; and
- Unauthorized disclosure of the information could impair the Commission's
  ability to obtain information necessary to perform its statutory function.

Please contact me with any questions regarding this submission. Thank you for your
attention to this matter.

Hamilton Harrison & Mathews ► Mardemootoo Balgobin ► HPRP ► Zain & Co. ► Delany Law ► Dinner Martin ► Maclay Murray & Spens ►
Gallo Barrios Pickmann ► Muñoz ► Cardenas & Cardenas ► Lopez Velarde ► Rodyk ► Boekel ► OPF Partners ► 大成

dentons.com

Respectfully submitted,

Mark L. Hogge
**DENTONS US LLP**
1900 K Street, NW
Washington, DC 20006
Telephone: (202) 496-7500
Facsimile: (202) 496-7756
E-mail: LGChem.US@dentons.com


*Counsel for Complainants LG Chem, Ltd., and LG Chem Michigan Inc.*

# UNITED STATES INTERNATIONAL TRADE COMMISSION
## WASHINGTON, D.C.

| | |
|---|---|
| **In the Matter of** | Investigation No. 337-TA- __ [DN:____] |
| **CERTAIN LITHIUM ION BATTERIES, BATTERY CELLS, BATTERY MODULES, BATTERY PACKS, COMPONENTS THEREOF, AND PRODUCTION AND TESTING SYSTEMS AND PROCESSES THEREFOR** | |

## CERTIFICATION REGARDING REQUEST FOR CONFIDENTIAL TREATMENT

I, Mark L. Hogge, counsel for Complainants LG Chem, Ltd., and LG Chem Michigan Inc. (collectively, "LGC" or "Complainants"), declare as follows:

1.      I have reviewed LGC's Verified Complaint and Confidential Exhibit Nos. 1, 2,6, 17-22, 35-39 and 49 ("Conf. Exhibits") filed concurrently with this Certification.

2.      Conf. Exhibits Nos. 1,2,6,17-22, 35-39 and 49 contain the following confidential business information of LGC:

      a.      proprietary information not available to the public;

      b.      methodologies and processes of the misappropriated technology;

      c.      activities related to LGC's domestic industry investments such as manufacturing and equipment, and labor and capital.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 29th day of April, 2019 in Washington, D.C.

_____
Mark L. Hogge

1

**DENTONS US LLP**
1900 K Street, NW
Washington, DC 20006
Telephone: (202) 496-7500
Facsimile: (202) 496-7756

*Counsel for Complainants LG Chem, Ltd., and LG Chem Michigan Inc.*

2

PUBLIC VERSION

## UNITED STATES INTERNATIONAL TRADE COMMISSION
## WASHINGTON, D.C.

| | |
|---|---|
| **In the Matter of** | **Investigation No. 337-TA-____** |
| **CERTAIN LITHIUM ION BATTERIES, BATTERY CELLS, BATTERY MODULES, BATTERY PACKS, COMPONENTS THEREOF, AND PRODUCTION AND TESTING SYSTEMS AND PROCESSES THEREFOR** | |

### COMPLAINANTS LG CHEM, LTD. AND LG CHEM MICHIGAN INC. 'S STATEMENT ON THE PUBLIC INTEREST

Pursuant to Commission Rule 210.8(b), Complainants LG Chem, Ltd. and LG Chem Michigan Inc. (collectively, "LGC" or "Complainants") respectfully submit this Statement on the Public Interest regarding the remedial orders they have requested against the proposed Respondents in the complaint accompanying this Statement.

This proceeding involves unfair competition arising from the misappropriation of LGC's trade secrets. As described in the complaint, proposed Respondents SK Innovation Co., Ltd., SK Battery America, Inc., and SK Battery Hungary Kft. (collectively, "Respondents") misappropriated LGC's trade secrets and now manufacture lithium-ion battery products, including battery cells, battery modules, and battery packs, components thereof, testing processes and systems, and manufacturing processes and systems therefor using those trade secrets. The requested remedial orders, which would exclude the lithium-ion battery products manufactured using Complainants' trade secrets, as well as components and production and testing systems used to manufacture battery products, are in the public interest. Indeed, the Commission has long recognized the strong public interest in enforcing intellectual property rights. *Certain Baseband Processor Chips and Chipsets, Transmitter*

PUBLIC VERSION

*and Receiver (Radio) Chip, Power Control Chips*, Inv. 337-TA-543, USITC Pub. 4258, at 136-137 (October 2011).   Furthermore, as explained in the accompanying complaint, Respondents' misappropriation of LGC's trade secrets have substantially injured, and threaten to substantially injure, LGC's domestic industry related to manufacturing and development of lithium-ion battery products for electric vehicles, and this injury only will increase if Respondents' misconduct continues unabated.

By contrast, the requested orders would not adversely affect public health and welfare in the United States, competitive conditions in the United States economy, the production of like or directly competitive articles in the United States, or United States consumers.   The public interest in protecting LGC's intellectual property rights and domestic industry therefore outweighs any adverse impact on the public.   This is particularly the case given Respondents' very small market share (less than 4%), which can easily be replaced by LGC or others.   The Commission thus should decline to delegate public interest issues to the Administrative Law Judge ("ALJ") for fact-finding and a Recommended Determination.

**A. The Accused Products Potentially Subject to a Limited Exclusion Order Are Battery Cells, Battery Modules, Battery Packs, Products Incorporating Those, and Production and Testing Systems and Processes Therefor**

The articles potentially subject to a limited exclusion and cease and desist orders are battery products, including sample products, for use by vehicle manufacturers, as well as components, including the battery cells, battery modules, battery packs, components thereof, and production and testing systems, and components of such systems, used for manufacturing battery products.   Respondents manufacture the accused products outside of the United States for importation into and sale in the United States.   Respondents also intend to manufacture and assemble accused products in the United States using imported components and production and testing systems that incorporate LGC's misappropriated trade secrets.

2

PUBLIC VERSION

The requested remedial orders would cover the importation into the United States of battery products, including battery cells, modules, and packs, and components of those products that embody or are made using LGC's trade secrets.  In addition, the requested remedial orders also would cover the importation into the United States of infringing production and testing systems and related components to the extent that they are used in the United States based on LGC's misappropriated trade secrets.  LGC also seeks cease and desist orders barring the domestic infringing sale, offer for sale, and use of imported battery products and components, and battery manufacturing and testing systems, processes, and components.

**B. There Are No Public Health, Safety, or Welfare Concerns Relating to the Requested Remedy**

The issuance of a limited exclusion and cease and desist orders in this matter would not adversely affect the public health, safety, or welfare of the United States.  The accused products are battery-related products for electric vehicles ("EVs") and are not the type of products that have raised concerns by the Commission about public health, safety, or welfare.  *See, e.g.,* *Certain Fluidized Supporting Apparatuses & Components Thereof,* Inv. No. 337-182/188, USITC Publ. No. 1668, Comm'n Op. at 23-25 (October 1984) (finding that access to medical equipment implicates the public interest).  Respondents' accused products represent a small portion of the battery marketplace, and other manufacturers—including LGC itself—easily have the capacity to replace the volume of accused products.  The issuance of the requested orders thus would implicate no public health, safety, or wellness concerns, and the requested orders would serve the public interest in protecting intellectual property rights and LGC's domestic manufacturing and development operations.

3

PUBLIC VERSION

**C. The Requested Remedy Would Not Adversely Affect Competitive Conditions in the United States Economy**

Complainants and other competitors in the industry design, manufacture, and sell numerous EV battery products that compete with each other and with Respondents' battery products. Moreover, Respondents are only a few of the many companies that manufacture EV battery products. Even if the Commission were to exclude the accused products, consumers and other purchasers of battery products still would have an abundant and available supply of reasonably substitutable products manufactured by Complainants and other competitors, both in the United States and overseas. Respondents are relative newcomers to the EV battery product market and represent a very small percentage of overall global EV battery production, accounting for less than 4% of the global market for EV batteries [1] and, as of 2017, approximately 2% of the U.S. installed base.[2]

**D. The Production of Like or Directly Competitive Articles in the United States Would Not be Adversely Affected by the Requested Remedy**

Currently, EV batteries produced by Respondents account for a *de minimis* share of the U.S. EV battery market. Complainants and other manufacturers have the ability and capacity to replace any and all sales of the accused EV products by Respondents. Moreover, Complainants' requested remedial orders will advance the production of like or directly competitive articles within the United States by protecting Complainants' domestic manufacturing and development operations and facilities.

---

[1] Ex. 4, Jung Min-hee, "SK Innovation's EV Battery Shipments Surged 160% This Year", Business Korea, October 10, 2018, *available at* http://www.businesskorea.co.kr/news/articleView.html?idxno=25566.

[2] Ex. 5, D. Coffin & J. Horowitz, *The Supply Chain for Electric Vehicle Batteries*, J. OF INT'L COMMERCE AND ECONOMICS at 11 (U.S.I.T.C., Dec. 2018) (hereinafter, "Coffin & Horowitz") *available                at*                www.usitc.gov/ publications/332/journals/the_supply_chain_for_electric_vehicle_batteries.pdf .

4

PUBLIC VERSION

**E. The Requested Remedy Would Not Adversely Impact Consumers**

The issuance of exclusion and cease and desist orders in this Investigation will not adversely impact consumers. The potentially excluded products comprise only a small portion of the global and United States market for battery products and production and testing systems and processes for the same. Should the accused products become subject to exclusion and cease and desist orders, the legitimate manufacture and sale of battery products by various manufacturers, both foreign and domestic, will continue to provide the United States market with numerous choices of battery products without disruption.

Issuance of the requested remedial orders will provide effective relief in the face of Respondents' ongoing and open sale and importation into the United States of unfair articles manufactured through the misuse of Complainants' trade secrets. Protecting Complainants' intellectual property rights and associated domestic industry in the United States through the requested remedial orders accordingly will serve the public interest with essentially no adverse effects. For these reasons, there is no need to divert public, party, and Commission resources to consider the public interest factors during the investigation while it is before the ALJ, and for the purpose of the ALJ's Recommended Determination on the Public Interest.

PUBLIC VERSION

Date: April 29, 2019

Respectfully submitted,

Mark L. Hogge
R. Tyler Goodwyn
Nicholas H. Jackson
Rajesh C. Noronha
**DENTONS US LLP**
1900 K Street, NW
Washington, DC 20006
Telephone: (202) 496-7500
Facsimile: (202) 496-7756
E-mail: LGChem.US@dentons.com

Timothy Carroll
**DENTONS US LLP**
233 South Wacker Drive
Suite 5900
Chicago, Illinois 60606
Telephone: (312) 876-8000
Facsimile: (312) 876-7934

Louis S. Mastriani
Jonathan J. Engler
Asha Allam
Joshua Hartman
Lauren E. Peterson
**ADDUCI, MASTRIANI & SCHAUMBERG LLP**
1133 Connecticut Avenue, NW, 12th Floor
Washington, DC 20036
Telephone: (202) 467-6300
Facsimile: (202) 466-2006
E-Mail: LGCHEM-001@adduci.com

*Counsel for Complainant LG Chem, Ltd. and LG Chem Michigan Inc.*

PUBLIC VERSION

**UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C.**

| | |
|---|---|
| **In the Matter of** | |
| **CERTAIN LITHIUM ION BATTERIES, BATTERY CELLS, BATTERY MODULES, BATTERY PACKS, COMPONENTS THEREOF, AND PRODUCTION AND TESTING SYSTEMS AND PROCESSES THEREFOR** | Investigation No. 337-TA-____ |

**COMPLAINT OF LG CHEM, LTD. AND LG CHEM MICHIGAN INC. UNDER
SECTION 337 OF THE TARIFF ACT OF 1930, AS AMENDED**

**COMPLAINANTS:**

**LG CHEM, LTD.**
128 Yeoui-daero, Yeongdeungpo-gu
Seoul 07336
South Korea
Telephone: +82-2-3773-1114

**LG CHEM MICHIGAN, INC.**
1 LG Way
Holland, MI 49423
Telephone: (616) 494-7100

**COUNSEL FOR COMPLAINANTS:**

Mark L. Hogge
R. Tyler Goodwyn
Nicholas H. Jackson
Rajesh C. Noronha
**DENTONS US LLP**
1900 K Street, NW
Washington, DC 20006
Telephone: (202) 496-7500
Facsimile: (202) 496-7756

Timothy Carroll
**DENTONS US LLP**
233 South Wacker Drive
Suite 5900

**PROPOSED RESPONDENTS:**

**SK INNOVATION CO., LTD.**
26 Jong-Ro, Jongno-Gu
Seoul 03188
South Korea
Telephone: +82-2-2121-5114
Facsimile: +82-2-2121-7001

**SK BATTERY AMERICA, INC.**
201 17th Street NW, Suite 1700
Atlanta, GA 30363
Telephone: (404) 923-1254

**SK BATTERY HUNGARY KFT.**
H-1117 Budapest,
Október huszonharmadika u. 8-10
Hungary
Telephone: +36-20-357-0680

PUBLIC VERSION

Chicago, Illinois 60606
Telephone: (312) 876-8000
Facsimile: (312) 876-7934

Louis S. Mastriani
Jonathan J. Engler
Asha Allam
Joshua Hartman
Lauren E. Peterson
**ADDUCI, MASTRIANI & SCHAUMBERG LLP**
1133 Connecticut Avenue, NW, 12th Floor
Washington, DC 20036
Telephone: (202) 467-6300
Facsimile: (202) 466-2006

PUBLIC VERSION

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................... 1

II.     LGC: A GLOBAL LEADER IN ADVANCED ELECTRIC VEHICLE
        BATTERY TECHNOLOGY.................................................................... 5

III.    THE PARTIES........................................................................................ 7
        A.      Complainants .......................................................................... 7
        B.      Respondents ........................................................................... 9

IV.     THE TECHNOLOGY AT ISSUE ........................................................ 11

V.      THE PRODUCTS AT ISSUE .............................................................. 13

VI.     INTELLECTUAL PROPERTY AT ISSUE ......................................... 18
        A.      The Misappropriated Trade Secrets ..................................... 18
                1.      Research and Development Trade Secret Categories ............... 18
                2.      Manufacturing Process Trade Secret Categories ..................... 18
                3.      Manufacturing System Trade Secret Categories....................... 18
                4.      Battery Assembly Trade Secrets Categories............................ 19
                5.      Quality Control and Testing Trade Secret Categories .............. 19
                6.      Procurement Trade Secret Categories....................................... 19
                7.      Sales/Business Trade Secret Categories ................................... 19
        B.      LGC's Development of Trade Secrets .................................. 19
        C.      LGC Took Reasonable Measures to Maintain the Secrecy of
                Misappropriated Trade Secrets. ........................................... 23

VII.    SPECIFIC INSTANCES OF IMPORTATION AND SALE ................. 24

VIII.   UNLAWFUL AND UNFAIR ACTS COMMITTED BY THE
        RESPONDENTS................................................................................... 28
        A.      SKI's Specific Unfair Acts of Trade Secret Misappropriation............ 28

IX.     DOMESTIC INDUSTRY ..................................................................... 33
        A.      Substantial Manufacturing In The United States ................. 35
        B.      Substantial Investment in Exploitation, Including Engineering and
                Research and Development, in the United States .................. 38
        C.      Investment in Plant and Equipment in the United States...... 39

iii

PUBLIC VERSION

|  | D. | Employment of Labor and Capital in the United States | 40 |

| X. | SUBSTANTIAL INJURY, THREAT OF SUBSTANTIAL INJURY AND TENDENCY TO SUBSTANTIALLY INJURE A DOMESTIC INDUSTRY | 41 |

| XI. | HARMONIZED TARIFF SCHEDULE NUMBERS | 47 |

| XII. | RELATED LITIGATION | 48 |

| XIII. | REMEDY | 48 |

| XIV. | RELIEF REQUESTED | 50 |

iv

PUBLIC VERSION

**EXHIBIT LIST**

| **No.** | **Title** | **Confidentiality Designation** |
|---|---|---|
| 01 | Confidential Declaration of Nicholas Kassanos (Injury Declaration) | Confidential |
| 02 | Confidential Declaration of Jaewook Jung (Domestic Industry) | Confidential |
| 03 | Song Su-hyun, "SK Innovation takes leap in electric vehicle market" (Sept. 6, 2018), *available at* www.koreaherald.com/common/newsprint.php?ud=201809060 00627 | Public |
| 04 | Jung Min-hee, "Sk Innovation' EV Battery Shipments Surged 160% This year", Business Korea, October 10, 2018, *available at* http://www.businesskorea.co.kr/news/articleView.html?idxno= 25566 | Public |
| 05 | D. Coffin & J. Horowitz, The Supply Chain for Electric Vehicle Batteries, J. OF INT'L COMMERCE & ECONOMICS (U.S. Int'l Trade Comm'n Dec. 2018) *available at* www.usitc.gov/publications/332/journals/the_supply_chain_for _electric_vehicle_batteries.pdf | Public |
| 06 | Trade Secret Categories Chart | Confidential |
| 07 | Chris Randall, "VW & SK Innovation looking into battery manufacturing," electrive.com (Oct. 25, 2018) *available at* https://www.electrive.com/2018/10/25/vw-sk-innovation-looking-at-battery-manufacturing/ | Public |
| 08 | "SK Innovation to invest 10 trillion on EV battery business through 2025" (May 31, 2017) iTers News, *available at* http://itersnews.com/?p=105904 | Public |

PUBLIC VERSION

| 09 | LG Chem R&D Achievements, *available at* https://www.lgchem.com/us/research-and-development/research-result | Public |
|----|----|----|
| 10 | SK Battery Hungary Main Page, *available at* https://www.skbhungary.com/ | Public |
| 11 | Claire Curry, "Lithium-ion Battery Costs and Market," Bloomberg New Energy Finance (June 20, 2017) *available at* https://data.bloomberglp.com/bnef/sites/14/2017/07/BNEF-Lithium-ion-battery-costs-and-market.pdf | Public |
| 12 | Joey Capparella "An All-Electric Ford F-150 Pickup Truck Is Happening," Car and Driver (Jan. 17, 2019) *available at* https://www.caranddriver.com/news/a25933730/ford-f-150-electric-pickup-truck-confirmed/ | Public |
| 13 | Chester Dawson "Auto Supplier Sees Its EV Battery Business Breaking Even by 2021" (March 18, 2019) (Bloomberg News) *available at* https://www.bloomberg.com/news/articles/2019-03-18/sk-innovation-ceo-sees-ev-battery-business-breaking-even-by-2021 | Public |
| 14 | Mike Pare, "Chattanooga VW Will Source EV Batteries from New Georgia Factory," Chattanooga (Tenn.) Times Free Press (Mar. 20, 2019), *available at* https://www.ttnews.com/articles/chattanooga-vw-will-source-ev-batteries-new-georgia-factory | Public |
| 15 | Industry - EV Battery Makers, "Charging the car of tomorrow" (Deutsche Bank Markets Research June 2, 2016) *available at* https://rocktechlithium.com/wp-content/uploads/2016/11/Deutsche-Bank-Lithium-Research.pdf | Public |
| 16 | LG Chem – Automotive Battery – Differentiation | Public |
| 17 | Presentation, "Opportunities and Issues of Enormously growing EV and battery Industry" (SNe Research) | Confidential |

PUBLIC VERSION

| 18 | Example of the Self-Declaration Regarding Prohibition on the Use of Trade Secrets | Confidential |
|----|-----------------------------------------------------------------------------------|--------------|
| 19 | Self-Declaration Regarding In-House Inventions and Trade Secrets for an Individual Terminating Employment with LG Chem, Ltd. | Confidential |
| 20 | Declaration R&D Information Security Policy | Confidential |
| 21 | JDA OI Policy | Confidential |
| 22 | ISO Certifications | Confidential |
| 23 | Bengt Halvorson, Green Car Report, "2019 Kia Niro EV: first drive of 239-mile electric crossover" (Feb. 4, 2019) *available at* https://www.greencarreports.com/news/1121294_2019-kia-niro-ev-first-drive-of-239-mile-electric-crossover | Public |
| 24 | News Release: "All-New 2019 Kia Niro EV Crossover Utility Makes North American Debut" (Nov. 28, 2018) *available at* https://www.kiamedia.com/us/en/print/14816 | Public |
| 25 | Kia Order form from Herson's Auto Group (Rockville, Maryland), Odometer Discount Statement, Certificate of Title/Temporary Registration and Tag Application for Washington DC | Confidential |
| 26 | Website with New Niro EV for Sale in Rockville, MD available at Herson's Kia, 2019 Kia Niro EV EX for Sale in Rockville, Maryland, *available at* https://www.hersonskia.com/search/new-niro-ev-rockville-md/?cy=20855&tp=new&md=8562 | Public |
| 27 | 2019 Kia Niro EV EX Window Sticker (indicating "Sold To: MD047 Herson's Kia, 15531 Frederick Road, Rockville, MD 20855," "Final Assembly Point: Hwasung, Korea" and "Port of Entry: Philadelphia.") | Public |

PUBLIC VERSION

| 28 | Green Car Congress: "2019 Kia Niro EV crossover utility makes North American debut at LA Auto Show" (Nov. 29, 2018) *available at* https://www.greencarcongress.com/2018/11/20181129-niro.html | Public |
|----|---|---|
| 29 | U.S. News & World Report Best Cars "2018 LA Auto Show: 10 Biggest Electric Car Debuts" (Nov. 29, 2018) *available at* https://cars.usnews.com/cars-trucks/la-auto-show-electric-cars | Public |
| 30 | Business Korea, Jung Min-hee, "Volkswagen to Use SK Innovation Batteries for Next Generation Electric Cars," Business Korea (Nov. 15, 2018) *available at* http://www.businesskorea.co.kr/news/articleView.html?idxno=26587 | Public |
| 31 | SK Innovation Sustainability Report (2015) *available at* http://eng.skinnovation.com/company/she_05.asp | Public |
| 32 | SK Innovation Co., Ltd. Offering Circular (July 9, 2018) *available at* http://infopub.sgx.com/FileOpen/SK%20Innovation%20Final%20Offering%20Circular%20(July%209%202018).ashx?App=Prospectus&FileID=35567 | Public |
| 33 | SKI Presentation, "SK Pursuit of Super Excellence 2017" *available at* https://australianmines.com.au/application/third_party/ckfinder/userfiles/files/Introduction%20to%20SK%20Innovation(1).pdf | Public |
| 34 | Green Car Congress, "SK Innovation to begin production of NCM-811 batteries" (Sept. 1, 2017) *available at* https://www.greencarcongress.com/2017/09/20170901-sk.html | Public |
| 35 | Representative examples of the agreements signed by employees | Confidential |
| 36 | Internal Messenger Narrative | Confidential |

PUBLIC VERSION

| 37 | Internal Messenger Narrative | Confidential |
|----|------------------------------|--------------|
| 38 | Internal Messenger Narrative | Confidential |
| 39 | Internal Messenger Narrative | Confidential |
| 40 | Claycorp – SK Battery Project – Commerce, Georgia *available at* https://claycorp.com/project/sk-battery-america-inc/ | Public |
| 41 | Michigan Smart Coast website homepage, *available at* http://michigansmartcoast.com/we-make-it-here/ | Public |
| 42 | Christie Schweinsberg, "LG Chem Details Cell Making Process at Michigan Plant" (Nov. 3, 2015) *available at* https://www.wardsauto.com/industry/lg-chem-details-cell-making-process-michigan-plant | Public |
| 43 | David Ferris, "Is energy storage the next job creator?: Part 2" (Mar. 27, 2017) *available at* https://www.vanadiumcorp.com/news/sustainability-news/is-energy-storage-the-next-job-creator-part-2 | Public |
| 44 | LG Chem Michigan Inc., "LG Chem's Holland Plant Accelerates Battery Production" (Oct. 21, 2015) *available at* https://www.prnewswire.com/news-releases/lg-chems-holland-plant-accelerates-battery-production-300163934 | Public |
| 45 | Michael Herh, "Orders from Volkswagen Give a Breakthrough to Korean Battery Makers," BusinessKorea (Mar. 16, 2018) *available at* http://www.businesskorea.co.kr/news/articleView.html?idxno=21085 | Public |
| 46 | Fred Lambert, "Volkswagen announces 2 new factories to go electric, partners with SK Innovation for battery cells," *available at* https://electrek.co/2018/11/14/volkswagen-electric-factories-sk-innovation-battery-cells/ partners with SK Innovation for battery cells | Public |

PUBLIC VERSION

| 47 | Edward Taylor (Reuters), "Volkswagen pushes battery partners to build Gigafactories" (Apr. 14, 2019) *available at* https://www.reuters.com/article/us-autoshow-shanghai-vw/volkswagen-pushes-battery-partners-to-build-gigafactories-idUSKCN1RR09A | Public |
| 48 | Anton Wahlman, "Ford Suggests Its All-Electric F-150 Pick-Up Truck Could Be Ready in 2021" (Apr. 24, 2019) *available at* https://www.thestreet.com/investing/stocks/ford-all-electric-pickup-truck-news-14936356 | Public |
| 49 | Photos of the Kia Niro taken April 27, 2019 | Confidential |
| 50 | Nora Manthey, "VW Sets up Battery Task Force with LG Chem" (Oct. 4, 2018), available at https://www.electrive.com/2018/10/04/vw-sets-up-battery-task-force-with-lg-chem/. | Public |
| 51 | Christoph Rauwald, Bloomberg, "VW Increases Electric Vehicle Target by 50%" (Mar. 12, 2019) *available at* https://www.bloomberg.com/news/articles/2019-03-12/vw-s-audi-porsche-margins-sag-in-costly-shift-to-electric-era | Public |

## **PHYSICAL EXHIBIT LIST**

| **No.** | **Title** | **Confidentiality Designation** |
|---|---|---|
| 1 | LG Chem Advanced Automotive Battery & Polymer Pouch Cell PR YouTube presentation at https://www.youtube.com/watch?v=Q2Lczd7MjGc&feature=youtu.be | Public |

PUBLIC VERSION

# I.    INTRODUCTION

1.    Complainants LG Chem, Ltd. ("LG Chem") and LG Chem Michigan Inc. ("LGCMI") (collectively "LGC" or "Complainants") request that the United States International Trade Commission ("ITC" or "Commission") institute an investigation pursuant to Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337 ("Section 337"), to remedy the unlawful importation into the United States, sale for importation into the United States, and/or sale within the United States after importation, of certain lithium-ion batteries, battery cells, battery modules, and battery packs, components thereof, and production and testing systems, including equipment, for manufacturing same, (collectively, "Accused Products") that result from the misappropriation of Trade Secrets owned by LGC.[3]

2.    LGC develops and manufactures lithium-ion batteries at its facilities in Holland, Michigan, including individual battery cells as well as fully-assembled battery packs for customer applications. Currently, LGCMI has ▮▮▮ U.S. employees devoted to the manufacture, engineering, quality control, sales, and marketing of its lithium-ion battery products. In addition to U.S. manufacturing, LGCMI has research and development, testing and engineering, and business offices in Holland, where it has invested hundreds of millions of dollars in its U.S. facilities. LGCMI also has research and development, testing and engineering, manufacturing, sales and marketing, and business offices in Troy, Michigan, where it has also invested millions of dollars and employs hundreds of workers.

3.    The proposed Respondents are SK Innovation Co., Ltd. ("SKI"), SK Battery America, Inc. ("SKBA"), and SK Battery Hungary Kft. ("SKBH") (collectively, "SKI

---

[3] This Complaint for trade secret misappropriation is brought under the Commission's well-established authority to investigate trade secret misappropriation and under the Defend Trade Secrets Act. *See Tianrui Group Co. v. ITC,* 661 F.3d 1322, 1337 (Fed. Cir. 2011);18 U.S.C. § 1836, et seq. ("DTSA").

1

PUBLIC VERSION

Respondents," "Respondents," or "SKI"). Respondents have engaged in unfair acts in violation of Section 337 through and in connection with the unauthorized importation into the United States, sale for importation into the United States, and/or sale within the United States after importation of accused products that result from the misappropriation of LGC's trade secrets (the "Trade Secrets").

4.      Respondents, between 2016 and 2018, misappropriated a vast number of LGC Trade Secrets directed to the design, development and manufacture of electric vehicle ("EV") batteries. The SKI Respondents did so by conspiring with then-LGC employees—who have since moved to Respondents—to transfer LGC's most sensitive Trade Secrets. These Trade Secrets include highly proprietary manufacturing processes and systems for the production of EV batteries. A vast number of these Trade Secrets were surreptitiously downloaded by these former LGC employees and electronically copied and given to SKI in a deliberate and wide-ranging operation over an extended period of time. Other Trade Secrets were unlawfully disclosed to SKI by the former LGC employees after joining SKI. Some of these former LGC employees went so far as to identify the Trade Secrets they intended to misappropriate on the very curricula vitae they sent to SKI seeking employment.

5.      The misappropriated Trade Secrets related to all aspects of electric vehicle battery development, manufacturing and sales, and fall into the following general categories: (1) Research and Development; (2) Manufacturing Processes and Systems; (3) Assembly; (4) Quality Control and Testing; (5) Procurement; and (6) Sales/Business. The misappropriation by Respondents was systematic, intentional, and involved deliberate and continuous activity by Respondents and the former LGC employees now employed by SKI. Beginning in 2016 and continuing through 2018, SKI hired more than seventy key LGC engineers and technical employees who illegally transferred

2

PUBLIC VERSION

to Respondents a large number of LGC's most valuable Trade Secrets.  Upon information and belief, many of these former LGC employees began the illegal transfer of LGC's Trade Secrets to SKI while still employed by LGC and that they did so with SKI's knowledge. Upon information and belief, SKI targeted Former LGC Employees based on their ability to provide SKI with the benefit of fundamental LGC Trade Secrets.  Upon information and belief, SKI required LGC employees to submit Trade Secret information belonging to LGC in their curricula vitae provided to SKI, including detailed descriptions of their work and knowledge of proprietary LGC technologies of competitive value, as well as business and technical plans, strategies, improvements, and other proprietary information.  The information that SKI obtained from the Former LGC Employees relates to many categories of LGC's Trade Secrets, ranging from manufacturing processes and systems, plant operation, design, and R&D information to quality control, material supply and vendors, sales, and cost reduction information, and this misappropriated information was secret, proprietary, and highly valuable. *See* Conf. Ex. 6.  SKI obtained LGC Trade Secrets directly (such as from messages requesting Trade Secrets from current LGC employees, while still employed at LGC, including the unlawful transfer to and/or photographs or other information improperly taken, downloaded, and/or transmitted by Former LGC Employees) and through the employment of LGC employees who, given their expertise and the nature of the jobs they took at Respondents, would inevitably disclose the Trade Secrets.

6.      LGC has taken and continues to take reasonable efforts to maintain the secrecy of its Trade Secrets including by, *inter alia*, restricting access to LGC's facilities through physical security measures, restricting access to LGC's computer network and IT systems, limiting access to the Trade Secrets to employees with the need-to-know, training employees on trade secret

PUBLIC VERSION

protection practices, and requiring the execution of confidentiality and non-disclosure agreements from those granted access to LGC's Trade Secrets.

7.       On information and belief, SKI has used the misappropriated Trade Secrets to produce SKI electric vehicle battery products in Korea that are now imported, sold for importation, and sold after importation in the United States.  SKI produces the batteries in Korea using LGC's Trade Secrets, including LGC's proprietary Trade Secret manufacturing processes and systems. These batteries are contained, *inter alia*, in the 2019 Kia Niro EV, which is imported and sold in the United States.

8.       SKI is also using the misappropriated Trade Secrets to design, develop, and produce battery products for future car models. SKI has signed long-term contracts to supply infringing batteries to Volkswagen to support its "MEB" generation of electric vehicles, to be imported into the United States in the near future.[4] SKI is also working with other foreign companies to jointly develop next generation batteries.  To the extent these joint ventures involve technology transfer from SKI, such projects will necessarily involve the transfer of the Trade Secrets misappropriated by Respondents from LGC.[5]

9.       To remedy SKI's continuing violations of Section 337, LGC respectfully requests that the Commission determine to institute an investigation into SKI's misappropriation of LGC's Trade Secrets, find SKI in violation of the statute, and issue the relief requested herein, including limited exclusion orders, cease and desist orders, a bond during the 60-day Presidential review

---

[4] "MEB" is an acronym for "Modularer E-Antriebs-Baukasten," which translates to "Modular Electric-Drive Toolkit." LGC has also developed valuable Trade Secrets specifically for Volkswagen's MEB platform.

[5] *See* Ex. 7, Chris Randall, "VW & SK Innovation looking into battery manufacturing," https://www.electrive.com/2018/10/25/vw-sk-innovation-looking-at-battery-manufacturing/ (Oct. 25, 2018).

PUBLIC VERSION

period to prevent further injury, and any other relief that the Commission is authorized to grant and deems proper.

## II.     LGC: A GLOBAL LEADER IN ADVANCED ELECTRIC VEHICLE BATTERY TECHNOLOGY.

10.     LGC is a global leader in broad-ranging chemical, material, and energy technologies, and it is an industry leader in the research, design, development, manufacture, and sale of state-of-the-art lithium-ion batteries that are widely used in various electronic and automotive applications around the world.  Of particular significance to this Complaint, LGC has become an industry leader and pioneering innovator in connection with lithium-ion batteries for use in U.S.-made electric vehicles ("EV"), including vehicles made by Chevrolet and Ford.[6]

11.     LGC, as a result of its significant investments in developing fundamental EV technology and the Trade Secrets, has become one of the top suppliers of EV battery products in the world, including for electric vehicles assembled in the United States.  LGC's battery technology investments culminated in the construction of a massive factory in the Holland, Michigan in 2012 and 2013.  That factory was greatly expanded in 2017 and employs hundreds of U.S. workers.  LGC uses its Trade Secrets in the Holland plant to manufacture battery products for use in U.S.-assembled vehicles, including Chevrolet, Ford, and Chrysler electric vehicles.  LGC battery packs are installed in tens of thousands of vehicles in the United States, making it the second leading EV supplier by installed base by a considerable margin.[7]

12.     LGC's commitment to innovation led it to develop numerous important proprietary technologies related to the design and production of EV batteries, including the Trade Secrets, expending billions of dollars.  The development of the LGC Trade Secrets stands on a foundation

---

[6] Ex. 5,  Coffin & Horowitz at 56, Fig. 83.

[7] *Id.* at 11, Table 3.

PUBLIC VERSION

of fundamental, ground-breaking LGC research and development into battery technology, developed over the course of approximately 30 years. As a result of its commitment to technical and business innovations and significant R&D investments, LGC's MEB technology recently is valued at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

13.     These significant LGC investments of time and money resulted in EV battery cells, modules, and packs that are exceptionally strong and versatile and that can be produced efficiently and at substantially lower cost than competing batteries. The research and development efforts have involved vigorous and innovative testing and quality control techniques, requiring heavily customized production and testing equipment and machinery. As a result, LGC's Trade Secrets have substantial independent economic value.

14.     In addition to its investment in innovation, LGC has invested heavily in developing effective sales and business strategies, leading to the development of "Sales and Marketing" and "Purchasing and Vendor" Trade Secrets. As a result, LGC's Trade Secrets have substantial independent economic value.

15.     Upon information and belief, Respondents, before misappropriating the LGC Trade Secrets, significantly lagged behind LGC in R&D and manufacturing and production technology with respect to EV battery products. Respondents, as recently as 2017, were "not among the global industry leaders, meaning the top six global cell suppliers" and had projected market share as of 2021 of only about 2%.[8] LGC, in contrast, was on a trajectory "expected to reach 30%" by 2021.[9]

---

[8] Ex. 7, Chris Randall, "VW & SK Innovation looking into battery manufacturing," https://www.electrive.com/2018/10/25/vw-sk-innovation-looking-at-battery-manufacturing/ (Oct. 25, 2018).

[9] Id.

6

PUBLIC VERSION

16.     In 2016, SKI embarked on a corporate initiative to become the largest global battery supplier, with an intent to eclipse LGC.[10]  To support that effort, and compensate for its inferior technical ability, Respondents commenced a deliberate and systematic effort to misappropriate Trade Secrets from LGC, the technological and market leader.   Respondents engaged in a campaign to raid dozens of key LGC employees who were involved in virtually all core aspects of LGC's highly proprietary battery business (the "Former LGC Employees").  Many Former LGC Employees worked on products and technology concerning Volkswagen, one of LGC's key customers, and Volkswagen's next-generation MEB platform for electric vehicles, which was built around LGC technology.

III.    **THE PARTIES**

    A.    **Complainants**

17.     LGC is a corporation organized and existing under the laws of South Korea that maintains its principal place of business at 128 Yeoui-daero, Yeongdeungpo-gu, Seoul 07336, South Korea.

18.     LGCMI is a wholly-owned subsidiary of LGC, existing under the laws of the State of Delaware with its principal place of business at 1 LG Way, Holland, Michigan 49423. An image of LGCMI's facility in Holland, Michigan is reproduced below.

---

[10] *See* Ex. 8,  iTers News, "SK Innovation to invest 10 trillion on EV battery business through 2025" (May 31, 2017).

PUBLIC VERSION



LGCMI also has a facility at 1857 Technology Dr., Troy, Michigan. An image of LGCMI's facility in Troy, Michigan is reproduced below.



19.    Since its founding in 1947, LGC has grown to encompass about 16,000 employees

(███████████████████████████) devoted to research, design, engineering,

8

PUBLIC VERSION

testing, marketing, technical and business support services, and sales of its lithium-ion battery products. LGC's innovative battery technology and solutions have resulted in over 1,725 U.S. patents and 20,000 patents and applications world-wide. LGC has been recognized and received numerous awards in the battery industry for its products and technological advances. Information about LGC's battery technology can be found at https://www.lgchem.com/us/research-and-development/research-result, excerpts of which are attached as Exhibit 9.

20.   LGC leads the future eco-friendly energy industry with the development of proprietary materials and next-generation battery cells. Positioned as a leader in the battery industry for EVs and Energy Storage Systems (ESS), LGC has actively developed new products based on its proprietary technologies and has secured the battery production capacity as a global player to raise its dominance in the next-generation energy market.

21.   In sum, Complainants have made and continue to make significant investments in the U.S. design, development, and production of products using the Trade Secrets. Complainants use the Trade Secret technology in their Michigan facilities to manufacture EV battery products, as well as to conduct related research and development, engineering, manufacturing, and sales activities. As discussed more fully below, these U.S. LGC activities are the target of SKI's unfair acts in the importation of EV batteries, components, and systems. LGC's U.S. operations are suffering from, and threatened by, substantial injury by reason of the unfairly traded SKI imports.

**B.    Respondents**

22.   On information and belief, respondent SK Innovation Co., Ltd. ("SKI") is a corporation organized under the laws of South Korea with a principal place of business at 26 Jong-Ro, Jongno-Gu, Seoul 03188, South Korea.

23.   On information and belief, SKI conducts business in South Korea, including research, development, manufacturing and sales, in various industry segments, including

9

PUBLIC VERSION

petroleum, petrochemicals, lubricants, alternative energies, and batteries for electronic vehicles, grid energy systems, and other applications.

24.     On information and belief, respondent SK Battery America, Inc. ("SKBA") is a wholly-owned subsidiary of SKI and is a corporation organized under the laws of Delaware with a principal place of business at 201 17th Street NW, Suite 1700, Atlanta, GA, 30363. On further information and belief, SKBA also maintains an office at 289 South Culver Street, Lawrenceville, GA 30046.

25.     On information and belief, SKBA focuses on the research, development, manufacturing and sales of battery technology in the United States.

26.     On information and belief, SKBA was incorporated in Delaware on or about February 26, 2019 by SKI to further Defendants' scheme to misappropriate and utilize LGC's Trade Secrets by creating a manufacturing plant in the United States, using imported Trade Secret manufacturing processes and systems. These processes and systems, which will incorporate the Trade Secret LGC processes and systems misappropriated and applied by SKI at its plants in Korea and elsewhere, include highly customized imported equipment. SKI's U.S. facility will use these imported systems and processes to directly compete with LGC's Michigan manufacturing operations for U.S. market share for EV lithium-ion batteries, battery cells, and battery modules.

27.     On information and belief, SK Battery Hungary Kft. ("SKBH") is a wholly-owned subsidiary of SKI and is a corporation organized under the laws of Hungary with a principal place of business at H-1117 Budapest, Október huszonharmadika u. 8-10, Hungary.

28.     On information and belief, SKBH has announced the construction of a 430,000 square meter plant in Komárom, in Komárom-Esztergom county, approximately 110 km northwest

10

PUBLIC VERSION

of Budapest, with plans to start production of lithium-ion vehicle batteries in 2020.[11]  The batteries that will be produced at this factory are likely to be incorporated into forthcoming Volkswagen products that will be imported to the United States in the near future.  On information and belief, SKI's Hungary plant, like its plant in Korea, will use the Trade Secret technology misappropriated from LGC, including highly proprietary production, testing and quality control systems and processes.

## IV.    THE TECHNOLOGY AT ISSUE

29.    The technology and intellectual property at issue generally relates to lithium-ion battery technology and the processes and systems used to manufacture and test the same.  As will be described in detail below, the Trade Secrets are directed to designing, manufacturing, improving, testing, marketing and selling lithium-ion battery products for electric vehicles, including battery electric vehicles (BEV), plug-in hybrid electric vehicles (PHEV), hybrid electric vehicles (HEV), and micro hybrid electric vehicles (micro-HEV).

30.    Lithium ion batteries are currently one of the most popular rechargeable batteries for consumer electronics on the battery market. There are a number of lithium ion variations with their own unique chemistries–and their own unique characteristics–but in general these have a high energy density, a modest memory effect, and exhibit only a gradual loss of charge when not in use.

31.    A lithium-ion battery is made up of an anode including a negative current collector, a cathode including a positive current collector, separator, and electrolyte. The anode and cathode store the lithium. The electrolyte carries positively charged lithium ions from the anode to the cathode and vice versa through the separator. The movement of the lithium ions creates free

---

[11] See Ex. 10,
https://translate.google.com/translate?hl=en&sl=hu&u=https://www.skbhungary.com/
&prev=search.

PUBLIC VERSION

electrons in the anode, which creates a charge at the positive current collector.  The electrical current then flows from the current collector through a device being powered (cell phone, computer, EV, etc.) to the negative current collector. The separator blocks the flow of electrons inside the battery.

32.     While the battery is discharging and providing an electric current, the anode releases lithium ions to the cathode, generating a flow of electrons from one side to the other. When charging the battery, the opposite happens: lithium ions are released by the cathode and received by the anode.

33.     The anodes and cathodes in lithium cells are of similar form and are made by similar processes on similar or identical equipment. The active electrode materials are coated on both sides with metallic foils which act as the current collectors conducting the current in and out of the cell. The anode material is a form of carbon and the cathode is a lithium metal oxide.

34.     The metal electrode foils are delivered on large reels with copper for the anode and aluminum for the cathode, and these reels are mounted on the coating machines where the foil is unreeled as it is fed into the machine through precision rollers.

35.     For the coating process, the first stage is to mix the electrode materials with a conductive binder to form a slurry, which is spread on the surface of the foil as it passes into the machine. The coated foils are fed to a roll press to secure uniform porosity with a consistent electrode thickness to enhance adhesiveness.  It is subsequently fed into slitting and notching machines to conform to the size of the cell. Then the coated foil is fed into a drying process and as the coated foil exits, it is re-reeled.

36.     The first stage in the assembly process is to build the electrode sub-assembly in which the separator is sandwiched between the anode and the cathode. Two basic electrode

PUBLIC VERSION

structures are used depending on the type of cell casing to be used, a stacked structure or a spiral wound structure.

37.     The next stage is to connect the electrode structure to the terminals together and to insert this sub-assembly into the package. The package is then sealed, leaving an opening for injecting the electrolyte into the pouch.  The following stage is to fill the cell with the electrolyte and seal it.

38.     Once the cell assembly is complete, the cell is put through at least one precisely controlled charge / discharge cycle to activate the working materials.  Subsequently, degassing of the package is performed to complete the cell manufacturing process.

## V.     THE PRODUCTS AT ISSUE

39.     Complainants' products are used in the operation of electric vehicles. "Electric vehicles [EVs] are becoming an increasingly important part of the automotive landscape." [12] "Batteries are the key differentiator between the various EV manufacturers." [13]

40.     "The battery manufacturing supply chain has three main parts: cell manufacturing, module manufacturing, and pack assembly" as shown in the following figure from a recent article:

Figure 1: The three stages of electric vehicle battery production



Source: Compiled from industry representative, interview with USITC staff, Washington DC, November 14, 2018; industry representative, telephone interview with USITC staff, June 12, 2018.

---

[12] Ex. 5, Coffin & Horowitz at 2.

[13] *Id*. at 4.

PUBLIC VERSION

Ex. 5, Coffin & Horowitz at 5 (Figure 1).

41.     The battery industry is forecasting explosive growth in demand and is projected to grow globally from 19 GWh in 2015 to 1,293 GWh in 2030.[14]  For example, Ford Motor Company even intends to introduce electric versions of its popular F-150 pickup truck in the near future.[15] Many future U.S.-assembled automobiles are likely to incorporate imported EV batteries, and SK has indicate its intention to expand its U.S. customer base. [16]

42.     "Lithium-ion batteries made up 70% of the rechargeable battery market in 2016; since then, EV-driven demand for lithium-ion batteries has risen, and will likely continue to rise as long as lithium-ion batteries are the primary power source for EVs."[17]

43.     Batteries are devices that store energy electrochemically.  At minimum, a battery includes four key components: a positive electrode (i.e., cathode), a negative electrode (i.e., anode), a separator, and an electrolyte.  The separator provides a physical separation between the two electrodes, and the electrolyte enables the movement of ions between the electrodes.  Lithium-ion batteries are charged and discharged through the movement of ions between the electrodes.

44.     During charging, lithium ions travel from the cathode, through the electrolyte, to the anode.  During discharging, lithium ions travel from the anode, through the electrolyte, to the cathode.  During both of these processes, the separator provides a barrier between the cathode and the anode to prevent electrical short circuits.

---

[14] See Ex. 11, Claire Curry, "Lithium-ion Battery Costs and Market," Bloomberg New Energy Finance (June 20, 2017) at 4.

[15]  Ex. 12, https://www.caranddriver.com/news/a25933730/ford-f-150-electric-pickup-truck-confirmed/

[16]  Ex. 13, https://www.bloomberg.com/news/articles/2019-03-18/sk-innovation-ceo-sees-ev-battery-business-breaking-even-by-2021 ("[SK's] Kim said his company also is in talks with other carmakers, which he declined to name. Invited guests expected to attend SK Innovation's groundbreaking event Tuesday include executives from BMW AG, Ford Motor Co. and VW.").

[17] Ex. 5, Coffin & Horowitz at 4.

PUBLIC VERSION

45.    "The smallest, but most important, component of the lithium-ion batteries that power EVs is the electrochemical cell . . . ." *Id.* at 6. "Multiple cells in a case with terminals attached form a module." *Id.* at 8. "EV battery packs are the final stage of EV battery production" and "consist of battery modules, electrical connections, and cooling equipment." *Id.* at 9. In other words, the basic electrochemical unit that contains the electrodes, separator, and electrolyte is referred to as a "cell," and a collection of cells that are assembled for use is referred to as a "module." For a more detailed explanation, see Physical Ex. 1, https://www.youtube.com/watch?v=Q2Lczd7MjGc&feature=youtu.be.

46.    Below is a flow chart that describes at a high level LGC's production process for the products at issue:



15

PUBLIC VERSION

47.     LGC provides its suppliers with the specifications to customize all equipment used in the systems and processes for manufacturing and testing lithium-ion batteries including a pilot line for producing non-commercial samples and commercial production lines.  Thus, all equipment used by LGC for manufacturing lithium-ion batteries contains valuable Trade Secrets.  The following are exemplary categories of the customized equipment used in the manufacture of the lithium-ion battery cells:

    a.  Mixing

    b.  Coating

    c.  Pressing

    d.  Notching & Drying

    e.  Lamination

    f.  Stacking

    g.  Packaging

    h.  Degassing

    i.  Jig Formation

    j.  Charge/Discharge

    k.  Single Side Folding / End of Line

    l.  Laminating & Stacking Packaging

    m. Equipment for Formation

    n.  Smoke Detection

    o.  Assembly – Automated Guided Vehicle

    p.  Testing

    q.  Quality Inspection

16

PUBLIC VERSION

48. SKI has begun the construction of a manufacturing plant in Georgia to build batteries that incorporate the misappropriated Trade Secrets, with production to start in 2022.[18] SKI's Georgia plant has implemented or will implement designs for specific equipment for manufacturing and testing lithium-ion batteries. Moreover, SKI will imminently import, if it does not do so already, such equipment in Georgia. Initially, equipment for the pilot line is or will be imported to the Georgia plant to produce samples. The customized equipment for the pilot line and the commercial manufacturing lines for use in the Georgia plant contain LGC's valuable Trade Secrets. This equipment, based on LGC's own experience, is only available from a very small number of Korean equipment suppliers. Given the small number of lithium-ion battery production equipment suppliers, and the near-absence of U.S. suppliers in this business, it is almost certain that SKI will rely on foreign suppliers for importing into Georgia customized equipment incorporating the Trade Secrets. Until the Georgia plant comes on line in 2022, SKI will continue to import infringing batteries from its non-U.S. facilities to meet U.S. demand. On information and belief, SKI's Georgia plant will also apply the LGC Trade Secret manufacturing and production processes.

49. On information and belief, SKI's Korean factories have implemented misappropriated Trade Secrets in the production of current generation EV battery products (including the 2019 Kia Niro EV, which is imported to the United States with SKI batteries). Those manufacturing implementations use misappropriated Trade Secrets to produce lithium-ion batteries being imported into the U.S.

---

[18] *See* Ex. 14, Mike Pare, "Chattanooga VW Will Source EV Batteries from New Georgia Factory," Chattanooga (Tenn.) Times / Free Press (Mar. 20, 2019) (reporting that a VW representative confirmed that "SK Innovation will supply lithium-ion battery cells for our planned electric vehicle production in 2022").

50.     Pursuant to 19 C.F.R. § 210.12(a)(12), the Accused Products are lithium-ion batteries, battery cells, battery modules, battery packs, components thereof, and production and testing systems and processes therefor.

## VI.     INTELLECTUAL PROPERTY AT ISSUE

### A.     The Misappropriated Trade Secrets

51.     The misappropriated Trade Secrets related to all aspects of electric vehicle battery development, manufacturing and sales and fell into the following general categories: (1) Research and Development; (2) Manufacturing Processes and Systems; (3) Assembly; (4) Quality Control and Testing; (5) Procurement; and (6) Sales/Business.

#### 1.     Research and Development Trade Secret Categories

52.      A representative research and development Trade Secret category, directed to the development of LGC batteries and misappropriated by Respondents, is described in the narrative attached in Confidential Exhibit 6.

#### 2.     Manufacturing Process Trade Secret Categories

53.     A representative manufacturing process Trade Secret category, directed to the development of LGC batteries and misappropriated by Respondents, is described in the narrative attached in Confidential Exhibit 6.

#### 3.     Manufacturing System Trade Secret Categories

54.     A representative manufacturing system Trade Secret category, directed to the development of LGC batteries and misappropriated by Respondents, is described in the narrative attached in Confidential Exhibit 6.

PUBLIC VERSION

### 4. Battery Assembly Trade Secrets Categories

55.     A representative battery assembly Trade Secret category, directed to the development of LGC batteries and misappropriated by Respondents, is described in the narrative attached in Confidential Exhibit 6.

### 5. Quality Control and Testing Trade Secret Categories

56.     A representative quality control and testing Trade Secret category, directed to the development of LGC batteries and misappropriated by Respondents, is described in the narrative attached in Confidential Exhibit 6.

### 6. Procurement Trade Secret Categories

57.     A representative procurement Trade Secret category, directed to the development of LGC batteries and misappropriated by Respondents, is described in the narrative attached in Confidential Exhibit 6.

### 7. Sales/Business Trade Secret Categories

58.     A representative sale Trade Secret category, directed to the development of LGC batteries and misappropriated by Respondents, is described in the narrative attached in Confidential Exhibit 6.

### B. LGC's Development of Trade Secrets

59.     As was discussed above, the four key components of a battery are the cathode, the anode, the separator, and the electrolyte. According to experts in the industry, "[t]o significantly improve the performance of the lithium battery, technology breakthroughs are required in all four components."[19] These battery components are important as they directly impact battery performance and cost. By improving the four key components, manufacturers can increase energy

---

[19] Ex. 15, Industry - EV Battery Makers, "Charging the car of tomorrow" (Deutsche Bank Markets Research June 2, 2016) at 40.

PUBLIC VERSION

storage (driving range), reduce charge time, manage heat production and conservation, and lower cost.[20] LGC has engaged and engages in extensive proprietary R&D regarding each of these key areas. That R&D is the technological foundation for the misappropriated Trade Secrets.

60.     Because different components comprise a larger system, changes concerning one component often require changes concerning another component to achieve the best overall result, considering factors such as specific energy, specific power, cost, performance, life span, and safety. LGC has many Trade Secrets, developed over the course of many years at substantial financial cost and with many labor-hours related to the optimum balancing for its products and components.

61.     The market for lithium-ion batteries is extremely competitive. "Intense price competition is leading manufacturers to develop new chemistries and improved processes to reduce production costs."[21]

62.     LGC is a pioneer in battery manufacturing, and invested substantial R&D and cost to progress from early manufacturing stages to more advanced manufacturing and product development.   Exhibit 16 shows LGC's achievements in developing and manufacturing automotive batteries.

63.     In 1999, LG Chem started commercial production of battery cells in South Korea. LG Chem and LGCMI coordinate in Korea and the United States to make and supply cells and batteries.

64.     LGC has developed many highly proprietary Trade Secrets to optimize and improve the manufacturing process for battery products, including cells, modules, and customized

---

[20] *Id.*
[21] Ex. 11, Claire Curry, "Lithium-ion Battery Costs and Market," Bloomberg New Energy Finance (June 20, 2017) at 7.

PUBLIC VERSION

equipment. This know-how constitutes the valuable Trade Secrets developed over many years of experience and capital investment in LGC's factories and R&D facilities.

65.     LGC required years to develop the misappropriated Trade Secrets, beginning with the development of the underlying proprietary LGC foundational battery technology and manufacturing.  The individual Trade Secrets themselves stem from the proprietary foundational technology, years of testing and analysis and a desire to advance the life, performance and function of battery products in EV market.

66.     Examples of LGC's underlying technology leadership in electric vehicle battery technology has been widely recognized.  As Deutsche Bank has explained:

(a)     ". . . LGC has shown the biggest improvement in energy density from transition of Gen 1 to Gen 2 batteries.  The improvement from Gen 1 to Gen 2 has been achieved through a series of R&D, leading to better mix in chemistry for batteries";

(b)     LGC was able to lower prices by 27% from Gen 1 to Gen 2;

(c)     With respect to the PHEV segment, LGC was identified as "the most advanced PHEV battery producer"; and

(d)     "Our comparative analysis of LGC's batteries indicates that the company is well positioned as one of the top tiered battery makers in terms of order book and technology."[22]

67.     Similarly, SNe Research identified LGC as one of only four or five "tier 1 battery makers," with a wide customer portfolio that includes many vehicle manufacturers as LGC

---

[22] Ex. 15, Industry - EV Battery Makers, "Charging the car of tomorrow" (Deutsche Bank Markets Research June 2, 2016) at 9-10, 31.

PUBLIC VERSION

customers.[23] SNe Research forecast that LGC would rank number 1 in 2018, and remain ranked number 1 in 2022, based on factors "technology," "global customers," "cost," and "financial support."[24]

68.     LGC's Trade Secrets apply to the entire spectrum of designing, manufacturing, distributing and selling battery products, including cells, modules, and packs, materials and components, manufacturing methods, systems and processes, production speed, production yield, performance issues (such as energy, power, battery life, safety, temperature), selling and marketing products, vendors, and obtaining contracts and business with customers. As an example, with respect to materials, LGC's Trade Secrets include know how used to obtain supply and reduce costs throughout the supply chain.[25] As an example, with respect to facilities, LGC's Trade Secrets include know how to construct, equip, and operate large-scale factories to manufacture and assemble products, including information specific to facilities in the U.S., Korea, China, and Europe. Based on its extensive R&D, product testing, trials, and other investments and experience, LGC has amassed Trade Secrets regarding what are and are not effective ways to manufacture EV batteries.

69.     The Trade Secrets have enabled LGC to be a recognized leader in the industry and in the market place. SKI's misappropriation of LGC's Trade Secrets has enabled SKI to avoid this investment in labor and capital needed to independently develop EV battery technology.

---

[23] Ex. 17, Presentation, "Opportunities and Issues of Enormously growing EV and battery Industry" (SNe Research) at 42 (identifying LGC customers as including VW/Audi, Daimler, Renault, GM, Ford, Hyundai, Volvo, and JLR).
[24] *Id.* at 57.
[25] An extensive supply chain exists with respect to EV battery manufacturing. *See, e.g.*, Ex. 15, Industry - EV Battery Makers, "Charging the car of tomorrow" (Deutsche Bank Markets Research June 2, 2016) at 57 (Table 85: supply chain of lithium industry).

PUBLIC VERSION

C.     **LGC Took Reasonable Measures to Maintain the Secrecy of Misappropriated Trade Secrets.**

70.     LGC has taken reasonable precautions to maintain the secrecy of its Trade Secrets. LGC has a strong internal culture to protect and secure the secrecy of its Trade Secrets. There are written and oral policies, continuing training programs, and secure data access and storage, among many protection schemes. The internal culture is pervasive as the Trade Secrets are actively being used, further developed and are evolving. Protection measures include:

1.     Restricting access to LGC's offices and plants through physical security measures, including where appropriate locked areas and areas requiring the use of company badges;

2.     Restricting access to LGC's computer network and IT systems by requiring the use of passwords and establishing appropriate firewalls and other IT security measures;

3.     Limiting access to Trade Secrets so that only employees with a need to know such information have access to that information, adopting appropriate company policies and procedures to protect trade secrets;

4.     Training employees on the importance of trade secret protection;

5.     Requiring confidentiality and non-disclosure agreements that protect Trade Secrets, including agreements with employees who have access to such information. Each employee, for example, signed a "Self-Declaration Regarding Prohibition on the Use of Trade Secrets" and "Self-Declaration Regarding In-House Inventions and Trade Secrets for an Individual Terminating Employment with LG Chem." *See* Conf. Exs. 18 & 19.

6.     Prohibiting unauthorized transfers or use of Trade Secrets (e.g., transfers to portable storage media); and

7.     Obtaining ISO27001 certification for information security management systems.

71.     Copies of the above-referenced documents, including the Declaration of R&D Information Security; OI Policy; JDA Policy; and ISO Certifications, are attached as Exhibits 20, 21, and 22.

72.     LGC's Trade Secrets were not readily ascertainable through proper means. The Trade Secrets were not discernible from inspection, reverse engineering, or tear down of the end products. They are unique, highly evolved, and not generally known. Independent development

23

PUBLIC VERSION

of the Trade Secrets, including the foundational technology, took LGC approximately 30 years of intense research and development, and would have taken SKI at least the same amount of time, if not more.

## VII.    SPECIFIC INSTANCES OF IMPORTATION AND SALE

73.    SKI has imported into the United States, sold for importation into the United States and/or have sold within the United States after importation Accused Products, that is, certain batteries, battery cells, battery modules, and battery packs, components thereof, produced in Korea using, *inter alia*, LGC's Trade Secret production processes and systems. In addition, on information and belief, the importation by SKI into the United States of unfairly traded production and testing systems and processes, designed using the Trade Secrets misappropriated by SKI from LGC, for use in SKI's Georgia plant, has occurred or is imminent.

74.    Upon information and belief, the 2019 Kia Niro EV, a crossover utility electric vehicle made in Korea and imported into the United States, contains accused lithium-ion battery cells produced by SKI in South Korea through the use and application of misappropriated LGC Trade Secrets.[26] Indeed, Kia Niro EV vehicles "use cells from [LGC's] Korean competitor SK Innovation."[27] The configuration and characteristics of the accused SKI battery cells in the Kia Niro EV Crossover Utility indicate they were produced and/or improved upon using LGC's Trade Secrets relating to battery cells, production and manufacturing systems and processes, testing

---

[26] *See* Ex. 23, "2019 Kia Niro EV: first drive of 239-mile electric Crossover" (Feb. 4, 2019), *available at* https://www.greencarreports.com/news/1121294_2019-kia-niro-ev-first-drive-of-239-mile-electric-crossover (last accessed April 11, 2019); Ex. 24, "All New 2019 Kia Niro EV Crossover Utility Makes North American Debut" at 4 (Nov. 28, 2018), available at https://www.kiamedia.com/us/en/print/14816 (disclosing LGC and SKI as suppliers of EV batteries for Kia).

[27] *Id.*

24

PUBLIC VERSION

equipment, testing protocols and processes, battery modules, battery packs, battery performance, sales and marketing, purchasing and vendors, and battery plants.

75.     The Kia Niro EV is now on sale and offered for sale in the United States after being imported from Korea.[28] A Kia dealership in Rockville, Maryland advertises at least six Kia Niro EV EX automobiles offered for sale or lease in the United States.[29] Window stickers for the vehicles indicate that they were assembled in Korea, imported into the United States through Philadelphia, and sold to the Kia dealership in Maryland.[30]

76.     In addition, upon information and belief, on or about November 30 to December 9, 2018, a 2019 Kia Niro EV containing SKI's Accused Products was imported into the United States and was demonstrated and displayed at the 2018 LA Auto Show, an annual automotive industry trade show held in Los Angeles, California.[31]

---

[28] *E.g.*, Ex. 25, Kia Order form from Herson's Auto Group (Rockville, Maryland), Odometer Discount Statement, Certificate of Title/Temporary Registration and Tag Application for Washington DC; Ex. 49, Photos and Documents of Purchased 2019 Kia Niro EV.

[29] Ex. 26, Herson's Kia, 2019 Kia Niro EV EX for Sale in Rockville, Maryland, *available at* https://www.hersonskia.com/search/new-niro-ev-rockville-md/?cy=20855&tp=new&md=8562.

[30] Ex. 27, 2019 Kia Niro EV EX Window Sticker (indicating "Sold To: MD047 Herson's Kia, 15531 Frederick Road, Rockville, MD 20855," "Final Assembly Point: Hwasung, Korea" and "Port of Entry: Philadelphia.").

[31] *See* Ex. 28, "2019 Kia Niro EV crossover utility makes North American debut at LA Auto Show" (Nov. 29, 2018), *available at* https://www.greencarcongress.com/2018/11/20181129-niro.html; Ex. 29, "2018 LA Auto Show: 10 Biggest Electric Car Debuts" (Nov. 29, 2018), *available at* https://cars.usnews.com/cars-trucks/la-auto-show-electric-cars (describing Kia Niro EV debut at 2018 LA Auto Show).

PUBLIC VERSION

77.     In addition, upon information and belief, on or about February 4, 2019, a 2019 Kia Niro EV containing SKI's Accused Products was imported into the United States and was test driven in Santa Cruz, California.[32]

78.     Upon information and belief, additional sales for importation, importations, and/or sales within the United States after importation of SKI MEB battery products containing LGC's Trade Secrets are also imminent.  SKI has signed long-term contracts at least with Volkswagen to supply SKI's Accused Products, specifically next-generation MEB battery products that SKI developed, improved upon, and/or is or will be producing by improper use of LGC's Trade Secrets. The existence of these long-term contracts is publicly known: on or about November 13, 2018, Volkswagen Group announced "that it has selected SK Innovation as a strategic supplier of battery cells for production of electric vehicles based on [Volkswagen's] modular electric drive (MED) platform."[33]

79.     Upon information and belief, importation of accused components and production and testing equipment for lithium ion batteries, battery cells, battery modules, and battery packs is also imminent. SKI and SKBA have announced plans to establish a production facility in Georgia, which will apply the misappropriated LGC Trade Secrets using imported battery cells, modules, packs, components thereof and imported production and testing systems and equipment to manufacture and assemble battery products.  Indeed, Volkswagen Group has confirmed that "SK Innovation will supply lithium-ion battery cells for our planned electric vehicle production in 2022

---

[32] *See* Ex. 23, "2019 Kia Niro EV: first drive of 239-mile electric crossover" (Feb. 4, 2019), *available at* https://www.greencarreports.com/news/1121294_2019-kia-niro-ev-first-drive-of-239-mile-electric-crossover.

[33] *See* Ex. 30, Jung Min-hee, "Volkswagen to Use SK Innovation Batteries for Next Generation Electric Cars," BusinessKorea (Nov. 15, 2018), *available at* http://www.businesskorea.co.kr/news/articleView.html?idxno=26587.

PUBLIC VERSION

. . ." from SK's Georgia factory, which broke ground on construction on March 19, 2019.[34]  The

violative processes and systems to be imported by SKI into the United States will largely duplicate

those already implemented by SKI in Korea to manufacture batteries that incorporate the Trade

Secrets misappropriated from LGC, and which are now being imported into the United States in

the Niro EV.

  80. LGC therefore expects information to be obtained in discovery to show that SKI

has taken concrete steps to import into the United States systems and processes—including the

customized equipment used in those systems and processes—that incorporate LGC's Trade

Secrets, for use in SKI's Georgia plant.  Those concrete steps, on information and belief, include

the placement by SKI of highly customized, long lead-time orders with Korean equipment

suppliers, for use in SKI's Georgia plant.  LGC reserves the right to seek leave to add to this

investigation the foreign suppliers of production and testing equipment used by SKI in the

production of infringing EV batteries and production processes and systems and imported (or that

imminently will be imported) into the United States, to the extent that those foreign suppliers sold

(or have entered into contracts to sell) for importation customized equipment ordered by SKI to its

specifications that misappropriates LGC's Trade Secrets and/or which will be used in an accused

SKI process or system.

  81. In short, while the details of importation information as it relates to SKI's infringing

production processes and systems are not publicly available, and by their nature can only be

obtained in confidential discovery, SKI's ongoing construction of its Georgia plant, viewed in light

---

[34] *See* Ex. 14, Mike Pare, "Chattanooga VW Will Source EV Batteries from New Georgia
Factory," <u>Chattanooga (Tenn.) Times Free Press</u> (Mar. 20, 2019), *available at*
https://www.ttnews.com/articles/chattanooga-vw-will-source-ev-batteries-new-georgia-factory.

PUBLIC VERSION

of the overwhelming evidence that SKI misappropriated LGC's EV Trade Secrets, is strong circumstantial evidence that the importation by SKI of infringing production processes and systems is imminent if it has not yet occurred.

82.     On information and belief, samples of SKI battery products manufactured using misappropriated LGC Trade Secrets have been imported into the U.S. The design-in and testing process for specific automotive manufacturers requires two or more years lead time prior to the commercial production.   On information and belief, Ford Motor Company is planning to incorporate imported SKI battery products into its next generation EV trucks.

## VIII.   UNLAWFUL AND UNFAIR ACTS COMMITTED BY THE RESPONDENTS

### A.     SKI's Specific Unfair Acts of Trade Secret Misappropriation

83.     SKI acknowledges that it "had a late start in the battery market compared to competitors . . . ."[35]

84.     Upon information and belief, in 2005, SKI "commenced its lithium-ion battery business, principally for hybrid electric vehicles."[36]

85.     Upon information and belief, in 2006, SKI "commenced production of lithium-ion batteries and in the second half of 2012, the Company commenced mass production of lithium-ion batteries at its production facilities located in Seosan, Korea with an annual production capacity of 800 megawatt hours . . . ."[37]

86.     Upon information and belief, in 2015, SKI "completed expansion of the Seosan battery plant, doubling its capacity," so that the plant "is now equipped with EV battery production

---

[35] Ex. 31, SK Innovation Sustainability Report at 19 (2015).

[36] Ex. 32, SK Innovation Co., Ltd. Offering Circular at 46 (Aug. 6, 2013).
[37] Id.

28

PUBLIC VERSION

facilities that can produce a total of 800 MWh, enough to supply 30 thousand units of EVs, twofold the original capacity."[38] In 2015, SKI reportedly produced 1.1GWh of EV batteries.[39]

87.    Upon information and belief, in March 2016, SKI expanded its Seosan factory. As of Q1 2017, the company listed as the tenth largest in capacity had a production capacity of 2.1GWh. SKI was not listed among the top ten battery companies in manufacturing capacity.[40]

88.    In 2018, SKI reportedly expanded its manufacturing from 1.1GWh electrode production capacity and 1.1GWh assembly capacity (three lines) in 2017 to 4.6GWh electrode production capacity and 3.9 GWh assembly capacity (six lines) in 2018.[41]

89.    Upon information and belief, "[i]n 2017 and the first quarter of 2018, [SKI] allocated approximately 0.6% and 0.4%, respectively, of its sales revenue toward research and development expenses."[42]

90.    As of 2017, SKI's manufacturing capacity and its R&D investment were not competitive with the manufacturing capacity or R&D investment of top tier battery companies, including LGC.

91.    As of 2017, SKI's market share was far below LGC's market share.

92.    Despite its low-tier position in market share, manufacturing capacity, and R&D, SKI set an objective to transform itself, leapfrog LGC, and become the largest EV battery company in the world, capturing 30% of the entire battery market.

---

[38] Ex. 31, SK Innovation Sustainability Report at 18 (2015).
[39] *See* Ex. 8, iTers News, "SK Innovation to invest 10 trillion on EV battery business through 2025" (May 31, 2017).
[40] *See* Ex. 11, Claire Curry, "Lithium-ion Battery Costs and Market," Bloomberg New Energy Finance (June 20, 2017) at 3. SK Innovation Sustainability Report at 35 (2015).
[41] Ex. 33, SKI Presentation, "SK Pursuit of Super Excellence 2017" at 25.
[42] Ex. 32, SK Innovation Co., Ltd. Offering Circular at 59 (July 9, 2018). This R&D presumably includes all of SKI's business segments, and therefore includes R&D that is unrelated to its battery business.

PUBLIC VERSION

93.    In May 2017, SKI's President reportedly stated that SKI had "set a target to seize 30% of [the] global EV battery market in 2025" and "become the world's biggest EV battery maker."[43]

94.    Upon information and belief, in August 2017, SKI "reorganized to put the battery unit and R&D lab under the direct supervision of CEO Kim Jun."[44]

95.    Shortly before announcing that it intended to propel itself ahead of LGC in the battery market, SKI began targeting and hiring multiple, highly experienced employees of LGC with knowledge of LGC's Trade Secrets that could be used by SKI to improve its production and products, build and operate plants, and obtain key contracts with vehicle manufacturers.

96.    SKI has unfairly and improperly obtained LGC's Trade Secrets through a strategic campaign to raid LGC for employees who could provide and apply LGC's Trade Secrets in SKI's manufacturing facilities in Korea, Hungary, and elsewhere in the world.

97.    Upon information and belief, SKI has hired scores of Former LGC Employees to work at SKI since in or about August 2016.

98.    The Former LGC Employees are highly experienced in core aspects of LGC's business and technology, and had access to, and knowledge of, LGC's Trade Secrets based on their employment with LGC.

99.    Upon information and belief, before hiring the Former LGC Employees, SKI intentionally solicited from them what they had learned about the Trade Secrets and could provide to SKI.

---

[43]Ex. 8, iTers News, "SK Innovation to invest 10 trillion on EV battery business through 2025" (May 31, 2017).
[44] Ex. 34, Green Car Congress, "SK Innovation to begin production of NCM-811 batteries" (Sept. 1, 2017).

PUBLIC VERSION

100.    Upon information and belief, each of the above Former LGC Employees is now working at SKI, or has worked at SKI since leaving LGC.  On information and belief, these employees are working at SKI in similar job positions to those they formerly occupied at LGC. Given the timing and nature of the departure of these employees, and the similarity of the positions they now occupy at SKI, it is also inevitable that, having disclosed to SKI the misappropriated Trade Secrets, they will continue to disclose the misappropriated Trade Secrets.

101.    Upon information and belief, by hiring highly experienced Former LGC Employees, with knowledge of LGC's Trade Secrets, SKI gained access to LGC's Trade Secrets.

102.    Each of the Former LGC Employees signed an agreement promising to protect the secrecy of LGC's Trade Secrets.  Representative examples of the agreements signed by these employees are attached as composite Conf. Ex. 35.

103.    Upon information and belief, it was understood by Former LGC Employees that they would be expected to use and/or disclose at SKI the proprietary know-how and Trade Secrets learned at LGC.  A Former LGC Employee solicited another LGC employee to "go to SK with me . . . We can go to the Advanced Development Team and introduce what has been applied here, take advantage of the situation for 2-3 years, then we will get promoted and let the juniors do the work and we can take it easy."[45]

104.    In an electronic message recovered by LGC, another LGC employee stated that the same Former LGC Employee informed him that SKI was copying LGC's Trade Secrets: "they're trying to follow everything that LG does."[46]

---

[45] Conf. Ex. 36.
[46] Conf. Ex. 37.

PUBLIC VERSION

105.    SKI employees have actively sought to obtain, and obtained, LGC's proprietary Trade Secrets to use and/or disclose at SKI from employees still employed at LGC.  For example, a now Former LGC Employee, shortly before leaving for SKI, gathered Trade Secrets from another LGC employee, on "████████████████" that was in the process of a design change, despite knowing that this information should not be disclosed.  Furthermore, that Former LGC Employee asked to "please send me one . . . even if it is being redone" and "I want to read it," and agreed not to "leak it outside."[47]  This information was exclusively highly proprietary LGC Trade Secret information.  In the same exchange, the Former LGC Employee sought additional proprietary information from the current LGC employee concerning LGC's Trade Secret technology:

> [Former LGC employee]:  How does the cooling work
>
> [LGC employee]:  ███████████████████████████
>
> [Former LGC employee]:  That's what I want to know the most.[48]

The Former LGC Employee in this conversation later left LGC for SKI.

106.    As another example of SKI improperly soliciting proprietary LGC information, one LGC employee asked another LGC employee for Trade Secret information concerning which electrolyte LGC was using.  On information and belief, the LGC Employee then took this information to SKI.[49]

107.    Through an extensive forensic investigation, LGC also has learned that Former LGC Employees, including at least seventy-seven employees who joined SKI after leaving LGC (from 2016 to 2018), improperly sent substantial amounts of proprietary Trade Secret information, to SKI.

---

[47] Conf. Ex. 38.

[48] *Id.*

[49] Conf. Ex. 39.

PUBLIC VERSION

108.    LGC has collected evidence of the bulk transfer of LGC's Trade Secret information to SKI by Former LGC Employees.

109.    Upon information and belief, including based on the above evidence, Former LGC Employees have used and/or disclosed LGC's Trade Secrets while working for SKI.

110.    The above evidence strongly supports LGC's reasonable belief that SKI and its employees deliberately misappropriated voluminous Trade Secret information from LGC.  LGC expects that discovery will show that the misappropriated LGC Trade Secrets, including Trade Secret production processes and systems, have already been incorporated into SKI's manufacturing facilities in Korea, Hungary, and elsewhere in the world, and are being designed into future SKI products destined for the United States.  Likewise, the misappropriated Trade Secrets are being designed into the domestic production facility that SKI is building in Georgia beginning in the spring of 2019 and scheduled for completion in the spring of 2020.[50]

## IX.   DOMESTIC INDUSTRY

111.    SKI's unfair acts in the importation of articles that embody the Trade Secrets misappropriated from LGC have the threat or effect of destroying or substantially injuring an industry in the United States, and preventing the establishment of such an industry.  *See* 19 U.S.C. § 1337(a)(1)(A) (requiring complainant to show a "threat or effect of . . . destroy[ing] or substantially injur[ing] an industry in the United States); *see also Certain Cast Steel Railway Wheels, Certain Processes for Manufacturing or Relating to Same and Certain Products Containing Same*, Inv. No. 337-655, Publ. No. 4265, Initial Determination at 80 (Nov. 20, 2009) (In an investigation under Section 337(a)(1)(A), a complainant must "show that a domestic

---

[50] Ex. 40, Clayco projects, SK Battery America, Inc., Commerce, GA, *available at* https://claycorp.com/project/sk-battery-america-inc/.

33

PUBLIC VERSION

industry exists that is subject to injury or destruction as a result of respondents' unfair acts. . . .
[S]ome have referred to this as a 'target' of the alleged unfair acts.").

112.     Here, where the only unfair acts fall under Section (a)(1)(A), there is no "technical
prong" of domestic industry to satisfy. *See id.* ("There is no authorization for singling out trade
secrets investigations to make them subject to such a requirement, when the statute does not
enumerate trade secrets in section (a)(l)(B), along with patents and other specified forms of
intellectual property.").

113.     LGC's affected domestic industry includes its U.S. facilities, equipment, labor, and
capital expenditures directed to manufacturing, research and development, engineering, and
technical support of its batteries, battery cells, battery modules, battery packs, components thereof,
articles incorporating batteries, and production and testing equipment for batteries and articles
incorporating batteries.

114.     LGC recently established the existence of a domestic industry based on the same
U.S. facilities and expenses and products that are affected by SKI's misappropriation of Trade
Secrets.[51] *See Certain Batteries & Electrochemical Devices Composite Separators, Components
Thereof, & Products Containing Same*, Inv. No. 337-TA-1087, Order No. 32, Initial Determination
Granting Complainants' Motion for Partial Summary Determination as to the Economic Prong of

---

[51] A complainant may rely on domestic industry investments relied on in prior investigations
involving different intellectual property. *See Certain Wireless Devices With 3G and/or 4G
Capabilities & Components Thereof*, Inv. No. 337-TA-868, Initial Determination (Pub. Version)
at 136 (Jun. 13, 2014) (finding that the economic prong had been satisfied where there were "no
significant changes from InterDigital's licensing program that would lead to a different conclusion
from those reached by the Commission in Inv. Nos. 337-TA-601, 337-TA-613 and 337-TA-800
and the Federal Circuit's finding that InterDigital has met the economic prong requirement for the
domestic industry requirement"); *see also Certain NOR & NAND Flash Memory Devices & Prods.
Containing Same*, Inv. No. 337-TA-560, Order No. 37, Initial Determination (Pub. Version) at 6-
7 (Nov. 17, 2006) (unreviewed).

PUBLIC VERSION

the Domestic Industry Requirement (Aug. 8, 2018) ("1087 DI Initial Determination").   Upon

review, the Commission determined to affirm this Initial Determination, with modification, noting

that the Commission's "long-standing principle that domestic industry… is not determined by a

rigid formula, but by an examination of the facts in each investigation, the article of commerce,

and the realities of the marketplace." Notice of Comm'n Decision to Review, And On Review, To

Affirm with Modification, an Initial Determination Granting Complainants' Motion for Partial

Summary Judgment as to the Economic Prong of the Domestic Industry Requirement, at 2 (Sept.

7, 2018).

115.    In the 1087 DI Initial Determination, the ALJ held that LGC's investments in plant

and equipment and labor and capital were based on expenditures associated with battery cells

manufactured in Holland, Michigan. *See* 1087 DI Initial Determination, at 5-7. This is the same

category of batteries targeted by SKI's misappropriation.

116.    The 1087 DI Initial Determination was based on expenditures through the end of

2017.  As set forth below, the LGC investments credited in the 1087 Investigation have continued

and will continue as the demand for EV batteries in the U.S. is experiencing exponential growth.

**A.      Substantial Manufacturing In The United States**

117.    LGC is one of the world's largest lithium-ion battery manufacturers, with

significant U.S. market share in both automotive and stationary applications.

118.    Since 2013, LGCMI has owned and operated a facility in Holland, Michigan

("Holland Facility") where it produces lithium-ion battery cells, modules, battery packs and

management systems.  LGCMI's Holland Facility is the result of LGCMI collaborating with

both the public and private sectors, including the U.S. Department of Energy, the state of

35

PUBLIC VERSION

Michigan, and the city of Holland.  LGCMI is an anchor company of Michigan's SmartCoast Advanced Energy Storage cluster of companies.[52]

119.   The   following   pictures [53]   illustrate   workers   performing   highly   technical manufacturing work in the Holland, Michigan facility:





---

[52] *See* Ex. 41, http://michigansmartcoast.com/we-make-it-here/.

[53] Exs. 42-44, Pictures available at: https://www.wardsauto.com/industry/lg-chem-details-cell-making-process-michigan-plant;   https://www.vanadiumcorp.com/news/sustainability-news/is-energy-storage-the-next-job-creator-part-2/; and https://www.prnewswire.com/news-releases/lg-chems-holland-plant-accelerates-battery-production-300163934.html.

PUBLIC VERSION



120.    Each of the battery cells ("LGC battery cells"), modules, battery packs and battery management systems (collectively, "LGC's Domestic Industry Products") that are made in the Holland Facility incorporates LGC's Trade Secrets.  The commercial utility of LGCMI's individual LGC battery cells is mainly with the automotive industry.  In this industry multiple LGC battery cells are combined into a module that has a case with terminals, and modules are combined into a battery pack, which is then incorporated into the power system of an electric vehicle. The battery pack has a battery management system due to the nature of lithium ion batteries. The management system monitors the battery cell state, controls its environment, and protects the battery pack from operating in an unsafe manner. The battery management systems are integral to and critical for the battery packs, their modules and cells.

121.    The Holland Facility is dedicated nearly exclusively to the manufacturing and production of the LGC Domestic Industry Products.[54]

122.    Every step of the process for manufacturing the LGC battery cells occurs at LGCMI's Holland Facility. Similarly, battery packs and battery modules made by LGCMI are also wholly-manufactured at its Holland Facility.  All of the LGC battery cells, modules and

---

[54] *See* Conf. Ex. 2, ¶ 10.

PUBLIC VERSION

battery packs with management systems made by LGCMI in Michigan are made with LGC's Trade Secrets.

123.    At its Holland, Michigan facility, LGCMI operates ██████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████. LGCMI has made significant investments in these production lines.[55] LGCMI manufactures a significant number of articles that incorporate LGC's Trade Secrets at its Holland Facility.[56]

## B.  Substantial Investment in Exploitation, Including Engineering and Research and Development, in the United States

124.    A focus of LGCMI's research, technical support, and product engineering concerns the design and creation of battery cells, modules, and packs in general, and in configurations customized to the technical specifications of their ultimate automotive applications.  These battery cells, modules, and/or packs are used by LGCMI's customers in one or more of the following electric vehicles: ████████████████████████████████████████████████████ ██████████████████████.

125.    LGCMI often combines the battery modules it manufactures with a battery management system into what is called a battery pack. Some LGCMI customers provide their own battery management system. The battery management system is often referred to as the "brain" of the battery pack, managing the rechargeable battery pack by monitoring its state, controlling its environment, and protecting the battery pack from operating in an unsafe manner.

126.    Battery management systems are integral with and critical for battery packs. LGCMI's research and development in its battery management systems has developed Trade

---

[55] *See id.*, ¶¶ 8-9.

[56] *Id.*, ¶ 10.

PUBLIC VERSION

Secrets in enhanced thermal safety, electrochemical safety, and performance characteristics of an LGC battery.

127.  LGCMI has operated its office in Troy, Michigan ("Troy Office") since 2005. The Troy Office occupies approximately ███████████, all of which is used for various activities designed to develop and improve LGC's Domestic Industry Products that incorporate LGC's proprietary technology, including LGC's Trade Secrets.[57]  Troy Office employees develop battery management systems as well as manufacture samples of batteries and battery packs for U.S. automobile manufacturers.  In addition, Troy Office employees have worked with, and are continuing to work with, U.S. automobile manufacturers to incorporate its battery packs in those manufacturers' products.

128.  The work of all of the employees in the Troy Office, regardless of the specific area in which they work, is directed to LGC battery cells that incorporate LGC's Trade Secrets. More than half of the LGCMI employees in the Troy Facility are directly involved in production, research, and/or development activities with respect to LGC's Domestic Industry Products.

129.  LGCMI currently leases the Troy Facility for a significant amount of money per month.[58]

C.  **Investment in Plant and Equipment in the United States**

130.  LGCMI's plant and equipment investments related to the Domestic Industry Products are qualitatively and quantitatively significant.[59]

---

[57] Conf. Ex. 2, ¶ 11.

[58] *See id.*

[59] *Id.*, ¶¶ 6-12

PUBLIC VERSION

131.    In total, LGCMI has invested ███████████████ into its Holland Facility. That investment is attributable to the articles incorporating LGC's Trade Secrets that are at issue in this Complaint and to LGCMI's relevant domestic industry.[60]

132.    Since 2010, LGCMI has invested ███████████ in its Troy Office for equipment used for its research, development, customer support, and product engineering activities.  That investment is attributable to the articles incorporating LGC's Trade Secrets that are at issue in this Complaint and to LGCMI's relevant domestic industry.[61]

133.    The Holland Facility is approximately ██████████, all of which is devoted to either production or production support activities.[62]

134.    The Troy Office is approximately █████████, all of which is devoted to production, research, and/or development activities with respect to LGC's Domestic Industry Products.[63]

**D.    Employment of Labor and Capital in the United States**

135.    LGCMI's labor and capital investments related to the LGC Domestic Industry products are qualitatively and quantitatively significant. LGCMI currently employs approximately ███ people in the United States, including approximately ███ people in business offices in the Troy Office. LGCMI is planning to expand the number of employees to ███ in Holland by the end of 2019.[64]

---

[60] *See* Conf. Ex. 2, ¶¶ 6-10.

[61] *Id.*

[62] *Id.*, ¶ 8.

[63] *Id.*, ¶ 11.

[64] *Id.*, ¶ 14.

PUBLIC VERSION

136.   The LGCMI employees in the Holland, Michigan facility have been and are dedicated to research and development, testing and engineering, manufacturing, sales and marketing of articles that incorporate LGC's Trade Secrets.

137.   The LGCMI employees in the Troy Office have been and are dedicated to research and development, customer support, product engineering, and other activities on lithium-ion battery products, including the articles that incorporate LGC's Trade Secrets that are manufactured at the Holland facility.

## X.   SUBSTANTIAL INJURY, THREAT OF SUBSTANTIAL INJURY AND TENDENCY TO SUBSTANTIALLY INJURE A DOMESTIC INDUSTRY

138.   Respondents' misappropriation of LGC's Trade Secrets already has caused substantial injury to LGC's domestic industry, and their continued misuse of the Trade Secrets threatens to compound that injury significantly if their misconduct continues unabated.

139.   LGC is recognized as a leading EV battery supplier to many global vehicle manufacturers.[65]   As of 2015, LGC had 12% market share for the global EV battery market, and it was the second leading supplier in the U.S. market (after Panasonic).[66]   By contrast, SKI was not identified as a top 10 producer and thus had less than 2% market share.[67]   According to one industry report, "LG Chem is capable of further expanding its U.S. plant without having to invest heavily in infrastructures, as the plant was originally designed to house further capacities."[68]

---

[65] *See* Ex. 15, Deutsche Bank Markets Research, "Charging the car of tomorrow," at 14 (Jun. 2, 2016) (Figure 24 -- LGC announced contracts), https://rocktechlithium.com/wp-content/uploads/2016/11/Deutsche-Bank-Lithium-Research.pdf.

[66] *Id.* at 12, 16.

[67] *Id.* at 12.

[68] *Id.* at 16.

41

PUBLIC VERSION

140.     SKI's misappropriation of LGC's Trade Secrets has disrupted LGC's customer relationships, diverted supply contracts from LGC to SKI, reduced LGC's market share, and threatens to result in further disruption, diversion, and reduction. SKI is able to compete in the lithium-ion battery market as a direct result of its misappropriation of LGC's Trade Secrets. Battery producers such as LGC and SKI compete to supply EV batteries to the same customers—namely automobile manufacturers. SKI's pursuit with LGC's actual or prospective customers, enabled by the misappropriation of LGC's Trade Secrets, is highly injurious to LGC.

141.     As one example of the substantial injury suffered by LGC, Volkswagen is an important customer in the EV battery market.[69] Volkswagen's battery supply contracts for electric vehicles have been estimated to amount to $40–$50 billion through 2025.[70] Volkswagen recently announced that it intends to invest heavily in the EV market and develop and sell many EV models.

142.     In or around 2016, Volkswagen considered proposals for battery orders for Volkswagen MEB vehicles in the European market.[71] In 2017, LGC competed for and won EV battery orders from Volkswagen for its MEB platform for Europe, and it has supplied batteries to Volkswagen vehicles in Europe.[72] Upon information and belief, SKI initially declined to compete

---

[69] *See* Ex. 50, Nora Manthey, "VW Sets up Battery Task Force with LG Chem" (Oct. 4, 2018), *available at* https://www.electrive.com/2018/10/04/vw-sets-up-battery-task-force-with-lg-chem/.

[70] *See* Ex. 45, Michael Herh, "Orders from Volkswagen Give a Breakthrough to Korean Battery Makers," BusinessKorea (Mar. 16, 2018) *available at* http://www.businesskorea.co.kr/news/articleView.html?idxno=21085.

[71] *See* Ex. 51, Christoph Rauwald, <u>Bloomberg</u>, "VW Increases Electric Vehicle Target by 50%" (Mar. 12, 2019) *available at* https://www.bloomberg.com/news/articles/2019-03-12/vw-s-audi-porsche-margins-sag-in-costly-shift-to-electric-era.

[72] Conf. Ex. 1 at ¶ 3.

PUBLIC VERSION

for Volkswagen's business in Europe, based on concerns regarding pricing.[73]  According to an

unidentified source, "SK Innovation did not participate in competing for the Volkswagen order by

taking its profitability into question."[74]

143.    Only months later, however, SKI changed its business strategy when Volkswagen

began accepting bids for the supply of EV batteries for its MEB platform for the United States

market.   After raiding LGC's employees, SKI chose to compete with LGC for orders from

Volkswagen for MEB vehicles for the U.S. market.[75]  This culminated in Volkswagen signing a

long-term contract with SKI as a "strategic supplier" of Volkswagen's next-generation MEB

battery cells for Volkswagen's electric vehicles for the U.S.  On or about November 13, 2018,

Volkswagen Group announced "that it has selected SK Innovation as a strategic supplier of battery

cells for production of electric vehicles based on [Volkswagen's] modular electric drive (MED)

platform."[76]  VW's selection of SKI as a "strategic supplier" represents a loss of future business

to LGC, and was only possible by reason of SKI's Trade Secret misappropriation.

144.    The misappropriated LGC Trade Secret manufacturing systems and processes

needed to produce the next-generation MEB batteries, on information and belief, are already in

use in Respondents' factories in Korea and Hungary.  On information and belief, Respondents

---

[73] Ex. 45, Michael Herh, "Orders from Volkswagen Give a Breakthrough to Korean Battery
Makers," BusinessKorea (Mar. 16, 2018) *available at*
http://www.businesskorea.co.kr/news/articleView.html?idxno=21085.

[74] *Id.*

[75] Conf. Ex. 1, ¶ 4.

[76] Ex. 30, Jung Min-hee, "Volkswagen to Use SK Innovation Batteries for Next Generation
Electric         Cars,"         BusinessKorea         (Nov.         15,         2018),
www.businesskorea.co.kr/news/articleView.html?idxno=26587; *see also* Ex. 46, Fred Lambert,
"Volkswagen announces 2 new factories to go electric, partners with SK Innovation for battery
cells" (Nov. 14, 2018), electrek.co/2018/11/14/volkswagen-electric-factories-sk-innovation-
battery-cells/.

PUBLIC VERSION

intend to supply Volkswagen with MEB batteries from Respondents' factory in Hungary.  In the future, Respondents also intend to import into the United States manufacturing and testing systems and processes for use in SKI's planned U.S. factory, scheduled to begin operations in Georgia in 2022.[77]

145.    Upon information and belief, SKI has obtained other contracts for the supply of EV battery products to be produced oversees and imported into the United States for use in electric vehicles produced domestically.  Upon information and belief, SKI plans to build and operate battery manufacturing plants in China, Hungary, and the United States.  Reportedly, SKI "began to expand its Seosan plant in Korea to raise its production capacity to 4.7 GWh, and is building battery cell plants in Changzhou (7.5GWh) of China and Komarom (7.5GWh) of Hungary."[78]

146.    Upon information and belief, SKI also is building a battery factory in Commerce, Georgia to develop and manufacture lithium-ion vehicle batteries and battery products for sale in the United States, so that SKI can "produce batteries for electric cars produced at Volkswagen's North America plant starting in 2022 . . . ."[79]  Upon information and belief, SKI intends to be the sole provider of batteries for Volkswagen's production facilities in North America, and specifically in the United States.[80]

---

[77] See Ex. 14, Mike Pare, "Chattanooga VW Will Source EV Batteries from New Georgia Factory," Chattanooga (Tenn.) Times Free Press (Mar. 20, 2019) (reporting that a VW representative confirmed that "SK Innovation will supply lithium-ion battery cells for our planned electric vehicle production in 2022").

[78] Ex. 30, Jung Min-hee, "Volkswagen to Use SK Innovation Batteries for Next Generation Electric Cars," BusinessKorea (Nov. 15, 2018).

[79] Id.

[80] Id.

PUBLIC VERSION

147.    Upon information and belief, SKI's Georgia factory will use Trade Secrets obtained from Former LGC Employees, and it will import equipment and systems for manufacturing lithium-ion EV batteries based on its misappropriation of the Trade Secrets.

148.    Due to SKI's misappropriation of the Trade Secrets, LGC has been and will continue to be forced to compete against SKI products made using the misappropriated Trade Secrets.  As SKI has targeted LGCMI's customers or users of LGCMI's EV lithium-ion battery packs with competing EV battery cells, modules, and/or packs made using the Trade Secrets, SKI's misappropriation has significantly impacted LGC's sales of Domestic Industry Products, and it is reasonably likely that LGC will suffer further reductions in the future.[81]

149.    SKI's misappropriation of the Trade Secrets already has substantially injured LGC based on its unfair competition with SKI for battery contracts, due to the long "design-in" times necessary for automotive manufacturers to incorporate battery designs into new vehicles.[82]  On information and belief, SKI has been able to obtain long-term contracts for future automotive products by offering for sale in the United States batteries that embody or will be made using the misappropriated Trade Secrets.  But for SKI's theft of LGC's Trade Secrets, SKI would not have been able to win contracts to supply battery products to Volkswagen, Kia, and other automobile manufacturers.  Moreover, SKI's misappropriation of the Trade Secrets has allowed and will continue to allow it to increase the volume of unfair imports into the United States, especially given the number of willing importers of such unfair products, including Volkswagen, and other auto manufacturers in the United States.

---

[81] *See* Conf. Ex. 1, ¶ 7, 10.

[82] *Id.*, ¶ 8.

45

PUBLIC VERSION

150.    In addition, SKI's unfair acts have caused substantial injury to the value of LGC's Trade Secrets.  By misappropriating the Trade Secrets, SKI has been able to free ride on LGC's significant production and development investments, eroding LGC's fairly and legitimately obtained first-mover advantage and availing itself of a substantial head start in developing competing EV lithium-ion batteries.  LGC developed the Trade Secrets over twenty-plus years through the significant efforts of many talented scientists and engineers and significant capital investment in equipment and testing.  SKI has taken the fruit of that effort and used it to launch a competitive business into the U.S. lithium-ion market, without payment, authorization, or right.

151.    SKI has relied on and used one or more of LGC's Trade Secrets in connection with actual or likely: (a) manufacturing; (b) seeking and obtaining approvals or certifications related to importing, selling, and/or offering for sale in the U.S.; (c) marketing in the U.S.; (d) offering for sale in the U.S.; (e) importing into the U.S.; (f) selling for importation into the U.S.; (g) selling in the U.S. after importation; (h) maintaining inventory in the U.S.; and/or (i) distributing in the U.S. products made using one or more of LGC's Trade Secrets.  In the process, SKI has unfairly and directly competed against LGC far earlier than it would have been able to compete but for its misappropriation of the Trade Secrets, if SKI ever would have been able to serve as a significant competitor.  LGC's actual and/or threatened injury to its domestic industry include, without limitation:

- Lost sales of Domestic Industry Products for the United States market due to SKI's rapid entry into the U.S. lithium-ion battery market as a result of its misappropriation of LGC's Trade Secrets, as well as the lost profits flowing from those lost sales;[83]

---

[83] *See* Conf. Ex. 1, ¶ 10.

PUBLIC VERSION

- LGC's price erosion resulting in lost profits as a result of SKI's likely underselling, which SKI can do because its misappropriation of LGC's Trade Secrets provided SKI an improper and unfair head start in developing competing lithium-ion battery technology and thus allowed SKI to avoid incurring the significant research and development expenditures that LGC made to develop the Trade Secrets;[84]

- LGC's loss of market share in the United States market for lithium-ion battery cells, modules, and packs attributable to SKI's ability to unfairly compete by offering lithium-ion batteries made using the Trade Secrets;[85]

- LGC's loss of potential royalties based on SKI's unauthorized use of the Trade Secrets;

- LGC's likely decline of its U.S. battery production and U.S. workforce related to battery design, development, and production;[86]

- LGC's loss of secrecy of its Trade Secrets; and

- LGC's loss of control over its Trade Secrets.

## XI.   HARMONIZED TARIFF SCHEDULE NUMBERS

152.   The lithium-ion battery products are believed to fall within at least the following classification of the Harmonized Tariff Schedules of the United States: 8507.60 and 8507.90.  This classification is intended for illustrative purposes only and is not intended to restrict the scope or type of subject products.

---

[84] *Id.*, ¶ 11.
[85] *Id.*, ¶ 10.
[86] Ex. 17, "Opportunities and Issues of Enormously growing EV and Battery Industry" SNE Research; *see also* Conf. Ex. 1, ¶ 8.

PUBLIC VERSION

## XII.   RELATED LITIGATION

153.   Litigation involving the LGC Trade Secrets against Respondents in the U.S. District Court for the District of Delaware is being filed concurrently herewith as *LG Chem, Ltd. and LG Chem Michigan Inc. v. SK Innovation Co., Ltd. and SK Battery America, Inc.*

154.   Other than as described above, the alleged unfair acts, or subject matter thereof, are not and have not been the subject of any court or agency litigation.

## XIII.   REMEDY

155.   The articles potentially subject to exclusion and/or cease and desist orders include certain lithium-ion battery products, including sample products, for use by vehicle manufacturers, and components used to manufacture those battery products, including battery cells, battery modules, battery packs, components thereof, and production and testing systems and processes therefor.

156.   The Respondents currently manufacture the accused products outside of the United States for importation and sale in the United States.  The accused batteries are already sold for importation and imported into the United States by Respondents, on information and belief, often as samples for testing.  The accused batteries are also sold for importation to the United States and incorporated into downstream automobile products, such as the Kia Niro EV.  On information and belief, Respondents likely have sold for importation or imported infringing batteries to be used as replacement parts in the Kia Niro EV.

157.   The Respondents' accused batteries are imported to the United States for testing purposes and to allow U.S. automotive manufacturers to "design in" accused batteries into future car and truck models.  Respondents are actively soliciting U.S. automotive customers for next-generation batteries that incorporate the accused Trade Secrets, made using infringing processes and systems.  Jun Kim, the Chief Executive Officer of SK Innovation has stated that

PUBLIC VERSION

in addition to signing contracts to supply Volkswagen's U.S. operations, "his company also is in talks with other carmakers, which he declined to name. Invited guests expected to attend SK Innovation's groundbreaking event Tuesday include executives from BMW AG, Ford Motor Co. and VW."[87]

158.    The requested remedy would extend to imported processes and systems that embody the misappropriated Trade Secrets. On information and belief, customized production equipment for the manufacture of EV batteries, incorporating the Trade Secrets, is manufactured overseas. This production equipment is highly customized for use in specially-designed production and testing systems. On information and belief, Respondents intend to import large quantities of manufacturing and testing equipment into the United States for use in systems and production processes that embody the Trade Secrets misappropriated by Respondents from LGC. LGC believes that discovery will show that Respondents have placed orders for customized equipment to be imported into the United States and assembled at SKBA's facilities into production and testing systems that embody the Trade Secrets. Relevant discovery will include Respondents' Korean and European manufacturing operations, which, on information and belief, are already producing infringing batteries made using LGC's misappropriated Trade Secrets. LGC reserves the right to seek to amend the Complaint to add manufacturers of EV battery equipment manufacturing suppliers to the extent discovery shows that this equipment embodies the misappropriated Trade Secrets and will be imminently imported into the United States pursuant to agreements with SKI.

---

[87] *See* Ex. 13, Chester Dawson, "Auto Supplier Sees Its EV Battery Business Breaking Even by 2021" (Mar. 18, 2019) (Bloomberg News) *available at* https://www.bloomberg.com/news/articles/2019-03-18/sk-innovation-ceo-sees-ev-battery-business-breaking-even-by-2021

PUBLIC VERSION

159.    In sum, the importation into the United States by Respondents of batteries and components thereof, along with production and testing processes and systems that embody the misappropriated Trade Secrets, would be covered by the proposed remedial orders.  LGC, in addition to exclusion orders, is also seeking cease and desist orders barring the domestic use of imported battery production processes and systems, including but not limited to quality control and testing systems, and imported components used in those systems and processes that incorporate the misappropriated Trade Secrets.

**XIV.   RELIEF REQUESTED**

160.    WHEREFORE, by reason of the foregoing, Complainants request that the United States International Trade Commission:

(a) Institute an immediate investigation, pursuant to Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, with respect to violations of Section 337 based on Respondents' unlawful importation into the United States, sale for importation into the United States, and/or sale within the United States after importation of certain lithium-ion batteries, battery cells, battery modules, battery packs, components thereof, and production and testing systems and processes therefor, that embody the misappropriated Trade Secrets;

(b) Schedule and conduct a hearing on the unlawful acts and, following the hearing, determine that there has been a violation of Section 337;

(c) Issue a limited exclusion order, pursuant to Section 337(d) of the Tariff Act of 1930, as amended, excluding from entry into the United States all of Respondents' lithium-ion batteries, battery cells, battery modules, battery packs, components thereof, production systems, testing systems, and products produced or tested utilizing processes related thereto, which have been imported in relation to Respondents' unfair acts in violation of Section 337, for at least twenty (20) years;

50

PUBLIC VERSION

(d) Issue cease and desist orders, pursuant to Section 337(f) of the Tariff Act of 1930, as amended, directing each Respondent to cease and desist from the importation, marketing, advertising, demonstrating, warehousing inventory for distribution, servicing, repairing, programming, updating, selling, and using of lithium-ion batteries, battery cells, battery modules, battery packs, components thereof, production systems, testing systems, and products produced or tested utilizing processes related thereto, which have been imported in relation to Respondents' unfair acts in violation of Section 337, for at least twenty (20) years;

(e) Impose a 100% bond upon each Respondent to the extent it continues to import offending articles during the 60-day Presidential review period per 19 U.S.C. § 1337(j); and

(f) Grant such other and further relief as the Commission deems just and proper based on the facts determined by the investigation and the authority of the Commission.

Date:  April 29, 2019                    Respectfully submitted,

Mark L. Hogge
R. Tyler Goodwyn
Nicholas H. Jackson
**DENTONS US LLP**
1900 K Street, NW
Washington, DC 20006
Telephone: (202) 496-7500
Facsimile: (202) 496-7756

Timothy Carroll
**DENTONS US LLP**
233 South Wacker Drive
Suite 5900
Chicago, Illinois 60606
Telephone: (312) 876-8000
Facsimile: (312)876-7934

Louis S. Mastriani
Jonathan J. Engler
Asha Allam

51

PUBLIC VERSION

Joshua Hartman
Lauren E. Peterson
**ADDUCI, MASTRIANI & SCHAUMBERG LLP**
1133 Connecticut Avenue, NW, 12th Floor
Washington, DC 20036
Telephone: (202) 467-6300
Facsimile: (202) 466-2006
E-Mail:  LGCHEM-001@adduci.com

*Counsel for Complainant LG Chem, Ltd. and LG Chem Michigan Inc.*

## VERIFICATION OF COMPLAINT

I, Nicholas Kassanos, declare under penalty of perjury and in accordance with 19 C.F.R. §§ 210.4(c) and 210.12(a) that the following statements are true:

1.     I am President of Complainant LG Chem Michigan, Inc. and am duly authorized to sign this complaint on behalf of Complainants;

2.     I have read the foregoing complaint;

3.     I certify, to the best of my knowledge, information, and belief, formed after reasonable inquiry that:

a.     the foregoing complaint is not being presented for an improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of the investigation or related proceeding;

b.     the claims and other legal contentions contained in the foregoing complaint are warranted by existing law;

c.     the allegations and other factual contentions contained within the foregoing complaint have evidentiary support or, if specifically identified, are likely to have evidentiary support after a reasonable opportunity to conduct further investigation or discovery.

Date: April 29, 2019

Nicholas Kassanos
President, LG Chem Michigan, Inc.